UNITED STATES COURT OF INTERNATIONAL TRADE
BEFORE: HON. MARK A. BARNETT, CHIEF JUDGE

——————————————————————
                                                          :
HONEYWELL INTERNATIONAL INC.,                             :
                                                          :
                              Plaintiff,                  :         Court No. 17-00256
                                                          :
                    v.                                    :
                                                          :
UNITED STATES,                                            :
                                                          :
                              Defendant.                  :
——————————————————————      :

## JUDGMENT ORDER

Upon reading plaintiff's motion for summary judgment, defendant's cross-motion for summary judgment, and the parties' responses thereto, and upon consideration of other papers and proceedings had herein, it is hereby

**ORDERED** that plaintiff's motion for summary judgment be, and hereby is, denied; and it is further

**ORDERED** that defendant's cross-motion for summary judgment be, and hereby is, granted, sustaining the classification of the imported merchandise, pursuant to Subheading 6307.90.98 Harmonized Tariff Schedule of the United States and it is further

**ORDERED** that this action be, and hereby is, dismissed.

_____
CHIEF JUDGE MARK A. BARNETT

Dated:  New York, New York
        This      day of            , 2024.

UNITED STATES COURT OF INTERNATIONAL TRADE
BEFORE: HON. MARK A. BARNETT, CHIEF JUDGE

—————————————————————————
                                          )
HONEYWELL INTERNATIONAL INC.,             )
                                          )
        Plaintiff                         )
                                          )
            v.                            )    Court No. 17-00256
                                          )
UNITED STATES,                            )
                                          )
        Defendant.                        )
—————————————————————————)

## **DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT**

Pursuant to Rule 56 of the Rules of the United States Court of International Trade, defendant, the United States, hereby moves for an order granting defendant's cross-motion for summary judgment sustaining U.S. Customs and Border Protection's classification of the merchandise in issue, and dismissing this action.

The bases for defendant's cross-motion for summary judgment are set forth in the attached memorandum, Defendant's Response to Plaintiff's Statement of Material Facts Not in Issue, and Defendant's Statement of Undisputed Material Facts with exhibits cited therein.

WHEREFORE, defendant respectfully moves this Court to enter an order granting defendant's cross motion for summary judgment in its entirety, and dismissing this action.

*Honeywell International Inc. v. United States*
Court No. 17-00256

Respectfully Submitted,

BRIAN M. BOYNTON
Principal Deputy Assistant
Attorney General

PATRICIA M. McCARTHY
Director

JUSTIN R. MILLER
Attorney In Charge
International Trade Field Office

By:    /s/ Aimee Lee
AIMEE LEE
Assistant Director

/s/ Edward F. Kenny
EDWARD F. KENNY
Senior Trial Counsel
Civil Division, Dept. of Justice
*Of Counsel*: Yelena Slepak, Esq.                Commercial Litigation Branch
Office of Assistant Chief Counsel                26 Federal Plaza – Suite 346
International Trade Litigation                New York, NY 10278
U.S. Customs and Border Protection                Attorneys for Defendant
Tel. (212) 264-0480

DATED:  New York, New York
June 11, 2024

UNITED STATES COURT OF INTERNATIONAL TRADE
BEFORE: HON. MARK A. BARNETT, CHIEF JUDGE

_____
                                                    :
HONEYWELL INTERNATIONAL INC.,        :
                                                    :
                            Plaintiff,           :          Court No. 17-00256
                                                    :
                                                    :
                                                    :
UNITED STATES,                               :
                                                    :
                            Defendant.         :
_____ :

### MEMORANDUM IN OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND IN SUPPORT OF DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

PATRICIA M. McCARTHY
Director

JUSTIN R. MILLER
Attorney In Charge
International Trade Field Office

AIMEE LEE
Assistant Director

EDWARD F. KENNY
Senior Trial Counsel
U.S. Department of Justice, Civil Division
Commercial Litigation Branch
International Trade Field Office
26 Federal Plaza, Room 346
New York, New York 10278
(212) 264-0480 or 9230
Attorneys for Defendant

Of Counsel:
Yelena Slepak, Esq.
Office of the Assistant Chief Counsel
International Trade Litigation
U.S. Customs and Border Protection

# TABLE OF CONTENTS

INTRODUCTION ............................................................................................................... 1

BACKGROUND ................................................................................................................. 2

    1.  The Imported Goods ............................................................................................... 2

    2.  The PAN Fabric Segments Are Used As Raw Material In The Manufacture
        Of Needled And Carbonized Preforms By BAM Inc. .................................... 4

     i.    The Manufacturer Of Needled Preforms From Fabric Segments at BAM ................... 5

     ii.   The Manufacturer Of Carbon Preforms From Needled Preforms at BAM.................. 6

    iii.   The Manufacturer of Densified Carbon-Carbon Brake Disks From
          Carbonized Preforms At Honeywell's South Bend Plant ........................................ 7

QUESTION PRESENTED....................................................................................................9

 I.    SUMMARY OF ARGUMENT .................................................................................... 9

ARGUMENT .................................................................................................................... 11

STANDARD OF REVIEW ............................................................................................... 11

 II.    THE IMPORTED FABRIC SEGMENTS ARE PROEPRLY CLASSIFIED IN
       SUBHEADING 6307.90.98, HTSUS BECAUSE THEY ARE
       MADE UP TEXTITLE ARTICLES.................................................................... 12

 III.   THE IMPORTED MADE UP TEXTILE SEGMENTS ARE NOT
       CLASSIFIABLE AS PARTS OF GOODS OF HEADING 8803 .................................. 15

    A.  The Textile Fabric Segments Are Not "Parts" Or "Parts Of Parts" Because
        They Are Not Ready To Be Used As a Part of An Aircraft
        Breaking System Upon Importation .......................................................... 15

    B.  The PAN Fabric Segments In Their Imported Form Are Not Fixed In Identity and
        Must Undergo a Molecular Transformation Through An Extensive Manufacturing
        Process Before Becoming A Finished Part .................................................... 17

    C.  The Imported Non-Woven PAN Fabric Segments Also Cannot Be Considered
        Incomplete Or Unfinished Parts Of Aircraft Of Heading 8803 As They Do
        Not Have The Essential Character Of Aircraft Brake Discs.............................. 19

i

D.  Plaintiff's Analysis Grounded In Case Law Interpreting The Tariff Schedules of the United States Is Not Applicable Because The Relevant Statutory Language Has Changed Under The Harmonized Tariff Schedule Of The United States ...................... 24

IV.  EVEN IF THE COURT DETERMINES THAT THE IMPORTED NONWOEN PAN FABRIC SEGMENTS MEET THE DEFINITION OF PARTS, HEADING 6307 IS STILL THE CORRECT CLASSIFICATION ........................................... 28

CONCLUSION ..................................................................................................... 31

## TABLE OF AUTHORITIES

**Cases**

*Adickes v. S.H. Kress & Co.*,
398 U.S. 144 (1970).......................................................................................... 11

*Bauerhin Technologies Ltd. v. U.S.*,
110 F.3d 774 (Fed. Cir. 1997).......................................................................... 16

*Bausch & Lomb, Inc. v. United States*,
148 F.3d 1363 (Fed. Cir. 1998).................................................................. 11, 12

*Bausch & Lomb, Inc. v. United States*,
957 F. Supp. 281 (Ct. Intl Trade 1997)
*aff'd,* 148 F.3d 1363 (Fed. Cir,. 1998) ............................................................ 13

*Baxter Healthcare Corp. of Puerto Rico v. United States*,
182 F.3d 1333 (Fed. Cir. 1999)..................................................................26, 27

*Baxter Healthcare Corp. of Puerto Rico v. United States*,
998 F. Supp. 1133, (Ct. Int'l Trade, 1998) ..................................................24, 25

*Celotex Corp. v. Catrett*,
477 U.S. 317 (1986)........................................................................................ 11

*Clarendon Marketing, Inc. v. United States*,
144 F.3d 1464 (Fed. Cir. 1998)........................................................................ 12

*Ero Indus., Inc. v. United States*,
24 CIT 1175, 118 F. Supp. 2d 1356 (2000) ...................................................... 11

*Ludvig Svensson, Inc. v.United States*, 62 F.Supp.2d 1171 (1999) ............................................. 25

*Lynteq, Inc. v. United States*,
976 F.2d 693 (Fed. Cir.1992) ..................................................................................... 13

*Marubeni Am. Corp. v. United States*,
35 F.3d 530 (Fed. Cir. 1994) ...................................................................................... 13

*Matsushita Elecs. Indus. Co. v. Zenith Radio Corp.*,
475 U.S. 574 (1986) ..................................................................................................... 11

*Mita Copystar Am. v. United States*,
21 F.3d 1079 (Fed. Cir. 1994) .................................................................................... 13

*Orlando Food Corp. v. United States*,
140 F.3d 1437 (Fed. Cir. 1998) .................................................................................. 12

*Pillowtex Corp. v. United States*,
171 F.3d 1370 (Fed. Cir.1999) ................................................................................... 12

*Pomeroy Collection, Ltd. v. United States.*,
893 F.Supp.2d 1269 (Ct. Int'l Trade 2013) ......................................................... 20, 21

*Pomeroy Collection, Ltd. v. United States*,
246 F. Supp. 2d 1286 (CIT 2002)
*aff'd,* 336 F.3d 1370 (Fed. Cir. 2003) ....................................................................... 11

*Pomeroy Collection, Ltd. v. United States*,
559 F. Supp. 2d 1374 (Ct. Int'l Trade 2008) ........................................... 12, 20, 21, 22

*RKW Klerks v. United States*,
592 F.Supp.3d 1349, (Ct. Int'l Trade 2022) ............................................................. 16

*Solvay Fluorides, Inc. v. United States*,
86 F. Supp. 2d 1353 (CIT 2000) ................................................................................ 13

*Trumpf Med. Sys., Inc. v. United States*,
753 F. Supp. 2d 1297 (Ct. Intl Trade 2010) ........................................................ 11, 12

*United States v. Pompeo*,
43 C.C.P.A. 9 (1955) ............................................................................................. 16, 20

*United States v. Willoughby Camera Stores,
Inc.*, 21 C.C.P.A. 322 (1933) .................................................................................... 16

## Harmonized Tariff Schedule of The United States

General Rules of Interpretation 1 ................................................................ 12

General rules of Interpretation 2(a) .................................................... *passim*

General Rules of Interpretation 3(b) ................................................ 21, 27, 28

Additional U.S Rule of Interpretation 1(c) ............................................... 28

Chapter 54

    Heading 5404

        Subheading 5404.10.80 ................................................................ 27

Chapter 56

    Heading 5603

        Subheading 5603.94.90 ................................................................ 15

Chapter 63

    Heading 6307 ................................................................... *passim*

        Subheading 6307.90.98 ..................................................... *passim*

Chapter 88

    Heading 8801 ................................................................... 28, 29

    Heading 8802 ........................................................................ 28

    Heading 8803 ................................................................... 29, 30

        Subheading 8803.20.00 ...................................................... 9, 10, 15

Chapter 84

    Heading 8436

        Subheading 8436.99.00 ................................................................ 25

Chapter 94

    Heading 9405 ........................................................................................................ 21, 22

Section XI

    Note 7(a) ...................................................................................................... 14, 15, 17, 29

    Note 8 ...................................................................................................................... 14, 15

**Tariff Schedules of The United States (Former Tariff)**

Rule 10(h) ....................................................................................................................... 24


**United States Court of International Trade Rules**

USCIT Rule 30(b)(6) ........................................................................................... 2, 4, 9, 23

USCIT Rule 56 ................................................................................................................. 10

USCIT Rule 56(c) ............................................................................................................ 11

**Other Authorities**

PREFORM, *Merriam-Webster Dictionary*
available at https://www.merriam-webster.com/dictionary/preform) ........................................... 3

SEMI-MANUFACTURES, Merriam-Webster Dictionary
available at https://www.merriam-webster.com/dictionary/semimanufactures ......................... 17

HQ H243798 .................................................................................................................... 15

HQ 954822 ....................................................................................................................... 24

UNITED STATES COURT OF INTERNATIONAL TRADE
BEFORE:  HON. MARK A. BARNETT, CHIEF JUDGE

_____

HONEYWELL INTERNATIONAL INC.,              :
                                           :
                                           :
                          Plaintiff,       :            Court No.  17-00256
                                           :
              v.                           :
                                           :
UNITED STATES,                             :
                                           :
                          Defendant.       :
_____  :


**DEFENDANT'S MEMORANDUM OF LAW IN OPPOSITION TO
PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND IN SUPPORT
OF DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT**

Defendant, the United States (the Government), submits this memorandum in

opposition to plaintiff's, Honeywell International Inc.'s (Honeywell), motion for

summary judgment and in support of our cross-motion for summary judgment.

## INTRODUCTION

This case involves the classification of nonwoven radial, chordal and web

polyacrylonitrile (PAN) fabric segments that are subject to a series of extensive post-

importation manufacturing steps comprising a months-long process that results in the

creation of a solid carbon-carbon brake disc.  Honeywell imported the fabric segments

between mid-October 2015 through mid-June 2016.  U.S. Customs and Border Protection

(CBP) classified the fabric segments as entered under subheading 6307.90.98 of the

Harmonized Tariff Schedule of the United States (HTSUS), which provides for "Other

made up articles, including dress patterns: ... Other: ... Other: ... Other: ... Other."

Following liquidation of the entries between September 2016 and April 2017, Honeywell

filed protests, which were denied, positing that its nonwoven PAN fabric segments are properly classified under subheading 8803.20.00, HTSUS, which provides for "[p]arts of goods of heading 8801 or 8802: . . . Undercarriages and parts thereof . . . For use in civil aircraft."  For the reasons discussed below, at importation, the fabric segments are properly classified as made up textile fabric articles.  They are not a complete or finished part, do not have the essential character of a finished part, and, therefore, are not discernable as a part of an aircraft and cannot be classified as such.

## BACKGROUND

### 1.  The Imported Goods

As noted, the merchandise at issue is radial, chordal, and web nonwoven polyacrylonitrile (PAN) fabric segments that are cut to a specific shape and size.  Pl. Ex. A: Brown Dep. at 20.[1]  The PAN synthetic fibers are composed of a synthetic polymer of acrylonitrile.  *See* Pl. Ex. A Brown Dep at 20, 21 and 81; Gov. Ex. 1: EMS-181 at Bates No. HONEYWELL00197.  The identification of the fabric segments as either "radial," "chordal" or "web," refers to the unidirectional arrangement of the bundles of untwisted continuous fibers called "tows" which are visible in the top layer of each type of fabric segment.  A "[T]ow is a term used to describe a type of textile fiber that is characterized by its long, continuous strands." Gov. Ex. 7: TextileGlossary.com definition of : Tow, Gov. Ex. 1: EMS-181 at Bates No. HONEYWELL00197.

The tows comprising the visible top layer of fabric of the chordal segments are laid out perpendicularly in relation to the center radius of the segment's arc.  *See* Gov.

---

[1] Mark D. Brown is a lead production engineer for Honeywell's wheel and brake development engineering department and testified in this case as a US CIT Rule 30(b)(6) representative of Honeywell.  *See* Pl. Ex. A: Brown Dep at 8, 9 and 11.

Ex. 2: Phys. Sample of Chordal Segment, Pl. Ex. A: Brown Dep. at 18.  The tows comprising the visible top layer of fabric of the radial segments are laid out parallel to the center radius of the segment's arc.  *See* Gov. Ex. 3: Phys Sample of Radial Segment, Pl. Ex. A: Brown Dep. at 15, 16.  Lastly, the tows comprising the web segments are arranged in a randomized web design.  *See* Gov. Exhs. 4: Phys. Sample of Web Segment, Pl. Ex. A: Brown Dep. at 18.

Each type of imported PAN fabric segment is arc shaped, approximately 10 1/2 inches across at its widest portion, approximately 5 inches along its radius and approximately 2/16 of an inch thick.  *See* Gov. Exhs. 2-4 (radial, chordal and web segment samples).  The segments are created on needle punching machines, or needle looms, which produce nonwovens by mechanically bonding the tows through needling. *See* Pl. Ex. A: Brown Dep. at 14-18, Gov. Ex. 5: PCD 215 at Bates No. HONEYWELL00381.  Needling is the process by which the needles punch vertically into and out of the material, interlocking the tows together to form a PAN tow fabric.  *See* Gov. Ex. 5: PCD 215 at Bates No. HONEYWELL00381.  The segments, as imported, look and feel like fabric material, able to be hand manipulated by folding or crumpling. *See* Gov. Exhs. 2-4 (radial, chordal and web segment samples).

The fabric segments, as imported, are not in a form or condition to be installed on an aircraft brake system and are not finished aircraft parts.  *See* Pl. Ex. A: Brown Dep. at 88 lines 5, 6.  Instead post-importation, as described in more detail below, the segments first must be manufactured into a needled preform[2], then transformed into a carbonized

---

[2] Gov. Ex. 15: *Merriam-Webster Online Dictionary* accessed on May 24, 2024 (https://www.merriam-webster.com/dictionary/preform) a "preform" used as a noun is defined as:

preform and then transformed again through a densification process into a carbon-carbon preform.  The densified carbon-carbon preform is then finished by machining the outer dimension and lugs, as well as painting with antioxidant, thereby becoming an aircraft brake disc which is part of an aircraft brake system.  *See* Pl. Ex. A: Brown Dep. at 69-72.

### 2.  The PAN Fabric Segments Are Used As Raw Material In The Manufacture Of Needled And Carbonized Preforms By BAM Inc.

Upon importation, the PAN fabric segments are delivered directly to Honeywell's contractor, BAM, Inc., in Knoxville, Tennessee.  *See* Gov. Ex. 6: Jones Dep. at 10-13.[3] BAM, Inc. is an advanced materials company that specializes in the processing and manufacturing of carbonized products through its use of high-temperature furnace systems.  *See* Gov. Ex. 14: BAM, Inc. website (https://www.bamknoxville.com/).  BAM, Inc. uses the imported PAN fabric segments as material to manufacture a "needled preform" and subsequently molecularly transform the needled preform through a high heat and pressurization process into a "carbonized preform." *See* Pl. Ex. A: Brown Dep. at 64.  In fact, the Honeywell/BAM, Inc. contract has characterized the PAN fabric segments as raw material for use by BAM, Inc. in the creation of carbonized preforms for Honeywell.  *See* Third Addendum to Amended and Restated Toll Manufacturing Agreement for Carbonization Services at ¶4A(7) and 4B(6) See BAM000046, BAM000050, BAM000076 and BAM000080. Gov. Ex. 13.

---

any of various objects of manufacture or handicraft after preliminary shaping: such as
a : a rough gemstone that has been cut to approximately its finished size and shape
b: a tube produced for the purpose of being molded into a particular form (such as a bottle)

[3] Ester Jones is a Vice President of Quality at BAM, Inc and testified in this case as a US CIT Rule 30(b)(6) representative of BAM, Inc.  Gov. Ex. 6: Jones Dep at 5,10, and 11.

### i.    The Manufacture of Needled Preforms From Fabric Segments at BAM

BAM, Inc. utilizes a processing specification which sets forth its manufacturing steps in creating a needled preform.  *See* Gov. Ex. 8: PS-1526 Bates No. BAM000280. The specification lists segments as one of the necessary materials for the fabrication of the needled preform.  *See* Gov. Ex. 8: PS-1526 at ¶3.1.2 Bates No. BAM000283. Specifically, the BAM, Inc. process begins with BAM's personnel reviewing the relevant Honeywell purchase order to understand what specific "preform" Honeywell wants manufactured, so BAM's personnel can gather and prepare the appropriate segments and machines.  Gov. Ex. 6: Jones Dep. at 10-13.  Part of the preparation of the segments is to gather the correct number of radial, chordal and web segments required for processing and acclimating those segments over a 24-hour period.  The acclimating process brings the segments to a temperature between 60 and 80 degrees Fahrenheit and a relative humidity of between 40 and 70 percent, enabling the segments to be further worked by the needling machinery.  *Id.* at 10-13, 23.  BAM, Inc. personnel then prepare the needling machine in accordance with the requirements of the relevant purchase order.

Honeywell supplied BAM, Inc. with the specifications and drawings necessary to program its needling machines to correlate with needled preform models requested by Honeywell's purchase orders.  *Id.* at 13-14.  The BAM, Inc. machine operator loads the needling machine's magazines (chambers for holding the segment supply) with the appropriate number of radial, chordal and web segments.  The operation of the BAM, Inc. needling machine commences the needling process with the machine automatically picking and laying down a group of six segments of the same type, *e.g.*, all chordal, to create a layer inside the machine's doughnut shaped form.  *Id.* at 15-17.  Thereafter the

needling machine automatically creates an additional layer of six segments of a different

type than the first and possibly another layer of six segments of a third type depending on

the requirements correlating with the preform requested by the purchase order. *Id.* at 15-

17. While the machine is picking and laying the segments in the doughnut shaped form,

the machine's needling apparatus is jabbing the needles into and out of the segments to

physically insert portions of one segment into another segment, interconnecting the layers

of segments with each other. *Id.* at 18-20.

Once the needled preform is completed by the needling machine, it is removed

from the form and given a serial number. The operator records the relevant data

including the number of segments utilized in creating the needled preform, its weight,

and thickness. *Id.* at 18. The needled preforms are then gathered in lots as specified by

the relevant purchase orders. These lots are placed in a furnace staging area until a

furnace load of between four and seven lots is accumulated. *Id.* at 22.

### ii.  The Manufacture of Carbon Preforms From Needled Preforms at BAM

Once a furnace lot of needled preforms are gathered, the preforms are stacked into

the furnace with spacers between each needled preform and a weighted load positioned

on the top of the stack to apply the predetermined pressure. Gov. Ex. 6: Jones Dep. at 22-

25. A Honeywell supplied engineering specification utilized by BAM, Inc. sets forth the

furnace cycles necessary to create a carbonized preform. *See* Gov. Ex. 9: ESM-184-R

Bates No. BAM000237. The furnace is set for the required temperature cycle required

for carbonization of the needled preforms. Gov. Ex. 6: Jones Dep. at 22-25. The stacks

of needled preforms are heated for three and a half to four days in the furnace as part of

the carbonization cycle. *Id.* at 26, 27. During the days-long carbonization process, gases

are given off from the preforms and upon completion what remains is a carbonized

preform.  *Id.* at 27, 28.  The carbonized preform is no longer considered a

polyacrylonitrile material but has undergone a molecular change and is considered a

carbon material.  Pl. Ex. A: Brown Dep. at 64.  Upon completion of the carbonization

cycle, the carbonized preform has lost 50 percent of its needled preform weight, and its

size has also shrunk.  *Id.* at 64.  Once the BAM, Inc. carbonization process is completed,

the preforms no longer exhibit the pliable fabric quality of the imported segments but

instead are much more rigid, solid, and inflexible.  *Id.*

The carbonized preforms are inspected by BAM, Inc. and shipped to Honeywell

in South Bend, Indiana for further processing.  Jones Dep. at 33, 34.  The operations

undertaken by BAM, Inc. to produce carbonized preforms from the fabric segments cost

Honeywell $246.87 per carbonized preform.  *See* Pl. Ex. B: Pltf.'s Supp. Rog. Resp. 6.

### iii.    The Manufacture of Densified Carbon-Carbon Brake Discs From Carbonized Preforms at Honeywell's South Bend Plant

The carbonized preforms shipped from BAM, Inc. are further processed at

Honeywell's South Bend Indiana facility to create a densified carbon-carbon preform

which is then finished to produce either disc brakes for aviation or automotive programs.

Specifically, Honeywell's South Bend facility further processes the carbonized

preform through a densification process involving chemical vapor infiltration (CVI) and

chemical vapor deposition (CVD) process which deposits additional carbon on and

around the carbonized preform.  Pl. Ex. A: Brown Dep. at 21, 92, 93, 104-109.  The

CVI/CVD includes heat treating the carbonized preforms in Honeywell's furnaces which

are under vacuum pressure; this is called the densification process.  *Id*.  While being

heated and pressurized, a mixture of gases is added to the furnace which promotes a

carbon matrix surrounding the heated substrate material.  *Id.* at 66.   The carbonized

preforms remain in the furnace under heat for three to four furnace cycles which amounts

to months of furnace heating totaling hundreds of hours.  *Id.* at 67.  The CVI/CVD

densification process also adds back weight to the doughnut shaped densified carbon-

carbon preform to essentially regain the weight it lost during the first carbonization

process at BAM, Inc.  *Id.* at 107, 108.  Overall, the manufacturing process for a densified

carbon-carbon preform can take up to six months, with the CVD/CVI densification

process being the longest portion of the manufacturing process.  *Id.* at 68.

Once the carbon preforms have gone through the densification steps, the preforms

undergo a final machining operation in which the friction surfaces are ground to specific

dimensions, the inner and outer dimensions are machined and the other parts, such as

lugs, grooves and holes, are machined creating an aircraft brake disc.  *Id.* at 69.

Thereafter, antioxidant is applied.  *Id.* at 69, 70.   The additional cost incurred in

transforming the carbon preform received from BAM, Inc. into a densified carbon-carbon

brake disc manufacturing at Honeywell's South Bend facility totals $1,539.47 per disc.

*See* Pl. Ex. B: Pltf's Supp. Rog. Resp. 6.

The result of the process wherein the preform is densified and carbonized is that it

takes on the desired characteristics of brake discs including high strength, added thermal

characteristics, ability to absorb and transfer heat, and generate friction.  Pl. Ex. A:

Brown Dep. at 27, 90, 91, 106.   As Mr. Brown, Honeywell's engineer, stated, "[o]nce

it's fully densified, it has all the characteristics we're looking for [in] a brake assembly."

*Id.* at 27, 90-91.  Carbon-carbon rotors and stators (brake discs) are desirable in the

market because they weigh considerably less than steel brake discs, and the carbon-

carbon products have a longer service life, as well as offer superior strength, energy absorption capability, and thermal properties over similar steel products.  *Id*. at 27.

The total cost of the post-importation manufacturing which transformed the imported fabric segments[4] first into needled preforms, second into carbonized preforms, and finally into carbon-carbon brake discs is $1,786.34.  *See* Pl. Ex. B: Pltf's Supp. Rog. Resp. 6.  Comparatively, the cost of manufacturing the number of fabric segments used to make the preforms, which preforms are used to make the brake disc, is a mere 8.447% of the total cost involved in manufacturing the brake disc itself.  *Id.*

The resultant brake discs are used in aircrafts and have been used in automotive applications.  *See* Pl. Ex. A: Brown Dep. at 54-56 and Gov. Ex. 16: Matheis Dep. at 10-13.[5]

## QUESTION PRESENTED

Whether the imported goods, certain radial, chordal and web nonwoven polyacrylonitrile fabric segments, are correctly classified in subheading 6307.90.98, HTSUS, as other made-up textile articles, or whether they are parts of aircraft undercarriages of subheading 8803.20.00, HTSUS.

## SUMMARY OF ARGUMENT

Summary judgment is appropriate here because there is no dispute as to the merchandise.  Plaintiff does not dispute that the imported goods are nonwoven textile

---

[4] The cost of manufacturing the average number of imported fabric segments which are used to make the preforms that eventually are transformed into a brake disc is $164.82. *See* Pl. Ex. B: Pltf's Supp. Rog. Resp. 6.
[5] Chris Matheis is Honeywell's Director of Offering Management and is one of Honeywell's Rule 30(b)(6) representatives in this case.  *See* Gov. Ex. 16: Matheis Dep. at 2, 6, 7.

fabric cut to a specific size and shape that is not square or rectangular.  *See* Pl. Ex. A:

Brown Dep. at 20 and Gov. Exhs. 2-4 (radial, chordal and web segment samples).

Accordingly, the goods *prima facie* meet the terms of heading 6307 HTSUS as "[o]ther

made up [textile] articles."

The imported PAN fabric segments are not classifiable as parts of an aircraft

under subheading 8803.20.00, HTSUS.  In their condition as imported, the fabric

segments are not finished products ready for use in an aircraft brake system.  Neither are

the imported fabric segments incomplete or unfinished parts.  GRI 2(a) provides that a

reference in a heading to an article includes a reference to that article incomplete or

unfinished, so long as the incomplete or unfinished article has the essential character of

the complete or finished article.

As imported, the fabric segments are pieces of textile material cut to a specific

size and shape, which are not useable on any aircraft brake systems.  Instead, the fabric

segments must be combined with other segments and undergo months of cyclical heating

in a furnace to transform molecularly from a malleable fabric into a hard, dense, and

strong carbon-carbon disc.  In other words, the fabric segments are a material used in the

manufacture of an intermediate product called a carbon preform which is further

manufactured into a carbon-carbon preform and further advanced into a carbon-carbon

brake disc.  Based on the samples, the process involved in creating carbon-carbon brake

discs, and judicial precedent, the subject fabric segments do not have the essential

character of a finished carbon-carbon aircraft brake disc and cannot be classified as

incomplete or unfinished parts of aircraft braking systems.

# ARGUMENT

## I.    STANDARD OF REVIEW

Under Rule 56 of the United States Court of International Trade, summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  USCIT Rule 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  A fact is material only if it might affect the outcome of an action.  *See Trumpf Med. Sys., Inc. v. United States*, 753 F. Supp. 2d 1297, 1305 (Ct. Intl Trade 2010).  In determining whether a genuine issue of fact exists, a court reviews the evidence submitted drawing all inferences against the moving party.  *See Matsushita Elecs. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).  The movant bears the burden of demonstrating that there exists no genuine issue of material fact that would warrant a trial.  *See, e.g., Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970).  The movant may satisfy this burden by noting that the party who will bear the ultimate burden of proof at trial cannot support an essential element of its claim.  *See, e.g., Celotex*, 477 U.S. at 322-23.

Classification issues may be resolved through summary judgment.  *See Bausch & Lomb, Inc. v. United States*, 148 F.3d 1363, 1365 (Fed. Cir. 1998); *The Pomeroy Collection, Ltd. v. United States*, 246 F. Supp. 2d 1286, 1289 (CIT 2002) *aff'd* 336 F.3d 1370 (Fed. Cir. 2003).  Summary judgment is appropriate when "there is no genuine dispute as to . . .what the merchandise is."  *Ero Indus., Inc. v. United States*, 24 CIT 1175, 1179, 118 F. Supp. 2d 1356, 1359 (2000).  In the absence of genuine factual issues, whether to grant summary judgment turns on the proper construction of the HTSUS,

which is a question of law. *Clarendon Marketing, Inc. v. United States*, 144 F.3d 1464, 1466 (Fed. Cir. 1998). "Resolution of that issue entails a two-step process: (1) ascertaining the proper meaning of specific terms in the tariff provision; and (2) determining whether the merchandise at issue comes within the description of such terms as properly construed." *Pillowtex Corp. v. United States*, 171 F.3d 1370, 1373 (Fed. Cir.1999); *Bausch & Lomb*, 148 F.3d at 1365; *Orlando Food Corp. v. United States*, 140 F.3d 1437, 1439 (Fed. Cir. 1998). Courts look to the General Rules of Interpretation (GRI) and the Additional United States Rules of Interpretation (ARI) to construe and apply the HTSUS. *Trumpf*, 753 F. Supp. 2d at 1305.

## II. THE IMPORTED FABRIC SEGMENTS ARE PROPERLY CLASSIFIED IN SUBHEADING 6307.90.98, HTSUS, BECAUSE THEY ARE MADE UP TEXTILE ARTICLES

The imported merchandise is correctly classified under heading 6307 pursuant to GRI 1, as a made up textile fabric article. GRI 1 calls for classification "according to the terms of the headings and any relative section or chapter notes and, provided such headings or notes do not otherwise require, according to the following [GRIs 2 through 6]." *The Pomeroy Collection, Ltd. v. United States*, 559 F. Supp. 2d 1374, 1385 (Ct. Int'l Trade 2008) (emphasis omitted).

Specifically, GRI 1 states that classification shall be governed by the following principles:

1. The table of contents, alphabetical index, and titles of sections, chapters and sub-chapters are provided for ease of reference only; for legal purposes, classification shall be determined according to the terms of the headings and any relative section or chapter notes and, provided such headings or notes do not otherwise require, according to the following provisions:

The courts may also rely on the Explanatory Notes (ENs) published by the World Customs Organization which, while not controlling, may help to clarify the scope of the HTSUS. *See Trumpf*, 753 F. Supp. 2d at 1306 n.20 (citing *Mita Copystar Am. v. United States*, 21 F.3d 1079, 1082 (Fed. Cir. 1994).[6]

Specifically, Honeywell's "nonwoven PAN fabric segments" were liquidated as entered pursuant to subheading 6307.90.98, HTSUS, which under the title "I. OTHER MADE-UP TEXTILE ARTICLES," provides as follows:

> 6307    Other made up articles, including dress patterns:
> 6307.90: Other:
>                     Other:
> 6307.90.98            Other, …………………….. 7% *ad valorem*

The World Customs Organization's ENs for Chapter 63.07 state:

> 63.07 - Other made up articles, including dress patterns.
> 6307.10 - Floor-cloths, dish-cloths, dusters and similar cleaning cloths
> 6307.20 - Life-jackets and life-belts
> 6307.90 – Other
>
>    This heading covers made up articles of any textile material which are not included more specifically in other headings of Section XI or elsewhere in the Nomenclature.

---

[6] The Explanatory Notes to the Harmonized Commodity Description and Coding System, while not legally binding, are "generally indicative of the proper interpretation of the [Harmonized Tariff System] . . ." *Lynteq, Inc. v. United States*, 976 F.2d 693, 699 (Fed. Cir.1992) (quoting H.R. Conf. Rep. No. 576, 100th Cong., 2d Sess. 549 (1988)), *reprinted in* 1988 U.S.C.C.A.N. 1547, 1582; *see also Solvay Fluorides, Inc. v. United States*, 86 F. Supp. 2d 1353, 1357 (CIT 2000) (the Explanatory Notes for a particular HTSUS heading are not binding on the court, but provide guidance in interpreting tariff provisions); *Marubeni Am. Corp. v. United States*, 35 F.3d 530, 535 n.3 (Fed. Cir. 1994) (stating Explanatory Notes, while not dispositive or binding, are instructive). Additionally, in determining whether an item is properly classified under a particular heading in the HTSUS, the Explanatory Notes may be persuasive authority when they specifically include or exclude an item from a tariff heading. *See, e.g., Bausch & Lomb, Inc. v. United States*, 957 F. Supp. 281, 288 (Ct. Intl Trade 1997), *aff'd*, 148 F.3d 1363 (Fed. Cir. 1998).

Heading 6307 provides for other "made up" textile articles.  Note 7(a) to Section XI

defines "made up" and states:

> 7.    For the purposes of this section, the expression "made up" means:
> (a)    Cut otherwise than into squares or rectangles;

*See* HTSUS Section XI note 7(a).

The imported radial, chordal and web brake segments meet the requisites for

classification as "other made up textile articles" of subheading 6307.90.98, HTSUS.

Specifically, the segments have the following in common: 1) The segments are fabric

material, *i.e.* textiles (Pl. Ex. A: Brown Dep. at 19); 2) The fabric segments are more

specifically a nonwoven type (*Id*. at 15); and 3) The segments are cut in an arc shape.

*See* Pl. Ex. B: Response to Interrogatories at Response 5; Gov. Exhs. 2-4 (radial, chordal

and web segment samples).  Accordingly, the arc shaped textile segments *prima facie*

meet the terms of subheading 6307.90.98, HTSUS.

Moreover, the provisions in the HTSUS for textiles and textile articles are found

in Section XI which includes Chapters 50 through 63.  As noted above, since the fabric

segments are cut to an arc shape, under the HTSUS, they are "made up" textile articles

within the meaning of the tariff statute.  *See* Section XI Note 7(a) (made up means, "[c]ut

otherwise than into squares or rectangles").  Because the imported goods are considered

to be "made up" textile articles, Note 8 to Section XI[7] states that such articles are

excluded from the textile provisions comprising Chapters 50-55 and 60 and also from

---

[7] HTSUS Section XI Note 8 states in relevant part as follows:

> 8.    For the purposes of Chapters 50 to 60:
> (a)    Chapters 50 to 55 and 60 and, except where the context otherwise
> requires, chapters 56 to 59, do not apply to goods made up within
> the meaning of note 7 above;

Chapters 56-59, unless the language of any specific provision shows otherwise.  Chapters 61 and 62 cover apparel and are inapplicable.  Lastly the PAN fabric segments "are not included more specifically in other headings of Section XI or elsewhere in the Nomenclature."[8]  Therefore, even though subheading 6307.90.98, HTSUS, is a basket provision, it describes exactly what the imported goods are, *i.e.,* made up textile articles, and no other textile provision is applicable.  *See* Pl. Ex. A: Brown Dep. at 15-20, Gov. Exhs. 2-4 (radial, chordal and web segment samples); HTSUS Section XI note 7(a) and 8.

Accordingly, the fabric segments are properly classifiable under subheading 6307.90.98, HTSUS.

### III.    THE IMPORTED MADE UP TEXTILE SEGMENTS ARE NOT CLASSIFIABLE AS PARTS OF GOODS OF HEADING 8803.

#### A.  The Textile Fabric Segments Are Not "Parts" Or "Parts Of Parts" Because They Are Not Ready To Be Used As a Part of An Aircraft Breaking System Upon Importation.

While Honeywell does not dispute that the PAN fabric segments meet the terms of subheading 6307.90.98, HTSUS, it asserts that the imported fabric segments are "parts" (or parts of parts) of an aircraft brake system properly classifiable under heading

---

[8] Honeywell and CBP had considered subheading 5603.94.90, HTSUS, but ultimately rejected it.  Honeywell in prior shipments of radial and chordal segments occurring in 2012 entered its segments under HTSUS subheading 5603.94.90, which provided for: "Nonwovens, whether or not impregnated, coated, covered or laminated: Other: Weighing more than 150 g/m²: Other: Other."  *See* Gov. Ex. 10: HQ H243798 at page 2. In HQ H243798, however, CBP showed that while the segments were in fact nonwoven and met the weight requirement of subheading 5603.94.90, that subheading was inapplicable because the segments were considered "made up" according to Note 7(a) to Section XI, and no exception to Section XI Note 8's general prohibition for "made up" goods within Chapter 56 applied.  Honeywell in the present case is not seeking classification of the PAN fabric segments under subheading 5603.94.90, HTSUS, as it has pivoted its classification argument to that of "parts of aircraft" under subheading 8803.20.00, HTSUS.

8803.  However, the PAN fabric segments are not parts of an aircraft brake system, because in their imported condition they are not ready to be used and cannot be taken to an aircraft on the flight line and put on an aircraft brake system.  Pl. Ex. A: Brown Dep. at 88, lines 5, 6.  Physical samples of the textile PAN fabric segments as compared to the physical samples of densified carbon-carbon brake discs which can be used directly in an aircraft brake system further demonstrate this point.  *See* Gov. Exhs. 2-4 (radial, chordal and web segment samples) and Gov. Exhs. 19 -20 (aircraft brake discs).  Instead of being a "part," the PAN fabric segments are a precursor to the finished part that must undergo significant processing.

Judicial precedent on the classification of "parts" supports the conclusion that the PAN fabric segment is not a part.  Plaintiff cites to, among other cases, *RKW Klerks v. United States,* 592 F.Supp.3d 1349, (Ct. Int'l Trade 2022), *aff'd,* 94 F.4th 1374 (Fed. Cir. 2024) (involving the classification of two particular types of synthetic fabric net wrap, used to wrap round bales of harvested crops), *Bauerhin Technologies Ltd. v. U.S*., 110 F.3d 774, 779 (Fed. Cir. 1997) (involving the classification of cushioned inserts and canopies for child seats), *United States v. Willoughby Camera Stores, Inc*., 21 C.C.P.A. 322, 324 (1933) (involving the classification of certain tripods, composed of wood), and *United States v. Pompeo*, 43 C.C.P.A. 9, 14 (1955) (involving the classification of certain superchargers, designed for use on automobiles).  Pl. Br. at 23-27.  These cases discuss the test for a "part," noting that the item under consideration must be "integral" and "dedicated" to the good of which it is alleged to be part.  Significantly, the goods at issue in *RKW Klerks, Bauerhin Technologies Ltd., Pompeo* and *Willoughby*, were all finished, in the sense they were ready for direct use and fixed in form and composition, even when

joined to the good of which they were claimed to be a part.  However, the PAN fabric

segments in their condition as imported are unlike the goods in these cases.  The fabric

segments are not finished goods ready for direct use as "parts."  Accordingly, these cases

provide limited precedential value when considering classification of the unfinished

semi-manufactured[9] goods involved here.

### B. The PAN Fabric Segments In Their Imported Form Are Not Fixed In Identity And Must Undergo a Molecular Transformation Through An Extensive Manufacturing Process Before Becoming a Finished Part

The PAN fabric segments as imported are not finished parts but, at best, semi-

manufactured pieces of textile material cut to a specific size and arc shape, *i.e.*, "made

up" pursuant to the terms of Section IV, Note 7(a), HTSUS.  As imported, the segments

cannot be directly used on any aircraft braking system in their fabric form, and no piece

or part of a densified carbon-carbon aircraft brake disc can be discerned from the

segments themselves.  Pl. Ex. A: Brown Dep. at 88, Gov. Exhs. 2-4 (radial, chordal and

web segment samples).  The PAN fabric segments require extensive post-importation

processing before they can be considered parts of an aircraft brake system.  *See* Pl. Ex. B:

Pltf's Supp. Rog. Resp. 6., Gov. Ex. 8: PS-1526 (Bates No. BAM000280) and Gov. Ex.

9: ESM-184-R (Bates No. BAM000237).

Significantly, Honeywell in its contract with its carbon preform manufacturer

BAM, Inc. identifies the fabric segments as raw material used in the manufacture of

carbon preforms.  *See* Gov. Ex. 13: BAM/Honeywell contract at ¶4A(7) and 4B(6)

---

[9] Gov. Ex. 17: *Merriam-Webster Online Dictionary* accessed on June 10, 2024 (https://www.merriam-webster.com/dictionary/semimanufactures): Semi-manufactures are  "products (as steel, rubber, newsprint) made from raw materials and used to manufacture finished goods."

(BAM000046, BAM000050, BAM000076 and BAM000080).  While technically the PAN fabric segments are  semi-manufactures, "Raw material" is an apt description of the status of the segments because they must undergo an extensive series of transformative steps post-importation to become a finished part.

Specifically, the first step in the post-importation manufacturing process involving the PAN fabric segments is to combine and layer the fabric segments with other segments in a form where a needling process is undertaken to create a circular shaped and interlocked needled preform.  Gov. Ex. 6: Jones Dep. at 16-20, Gov. Ex. 18: Physical Sample of Needled Preform.  Second, the PAN fabric material, as a needled preform, is molecularly transformed into carbon through an extensive pressurized furnace heating program at BAM, Inc. to become a carbonized preform.  Gov. Ex. 6: Jones Dep. at 26-28, Pl. Ex. A: Brown Dep. at 63. 64.  Next, the carbon preforms are transferred from BAM, Inc. to Honeywell's South Bend facility where the preforms undergo a second transformative change where a months-long vacuum furnace process is undertaken in a proprietary gaseous environment which allows a carbon matrix to be deposited (added) onto the carbon fibers of the carbonized preform.  Pl. Ex. A: Brown Dep. at 21, 92, 93, 104-109.  During this process, the preforms accumulate more carbon in the heated gaseous environment, becoming densified carbon-carbon preforms (*Id*.) which are finished into aircraft brake discs.  *Id.* at 69-72.  Lastly, the carbon-carbon preforms are die cut (finish cutting to create disc brakes with appropriate grooves and holes) and painted with an anti-oxidant coating (*Id.*) and inspected before being declared acceptable carbon-carbon aircraft brake discs.  *Id.* at 113-114.

Only after this six-month manufacturing process which takes place at two

different facilities (*Id.* at 67, 68), do the flexible, foldable, bendable imported fabric segments, transform into dense, hard, strong unbending, discs capable of withstanding both great thermodynamic changes and enormous friction forces. *Id.* at 90-91. The process by which the fabric segments are transformed into carbon-carbon brake discs can be metaphorically described as that of a caterpillar metamorphosizing into a butterfly.

The total cost of the months-long post-importation manufacturing process which transformed the fabric segments first into needled preforms, second into carbonized preforms, and finally into densified carbon-carbon brake discs is $1,786.34. *See* Pl. Ex. B: Pltf's Supp. Rog. Resp. 6. Comparatively, the cost of manufacturing the number of fabric segments used to make a brake disc is $164.82, a mere 8.447% of the total cost involved in manufacturing the brake disc itself. The minor cost of the fabric segments, *i.e.* the "raw material," in comparison to the post-importation brake disc manufacturing cost is indicative of the fact that the segments are far from the advance state of manufacture needed to be recognized as a part of an aircraft brake system, *i.e.,* an aircraft disc brake.

As discussed, the fabric segments in their imported condition as a semi-manufacture are not capable of being directly used on an aircraft braking system and cannot be considered a part of such system. Instead, the imported PAN fabric segments are a semi manufacture that is transformed after a complex, time-consuming and multi-step process into a finished part.

### C. The Imported Non-Woven PAN Fabric Segments Also Cannot Be Considered Incomplete Or Unfinished Parts Of Aircraft Of Heading 8803 As They Do Not Have The Essential Character Of Aircraft Brake Discs

Not only are the imported PAN fabric segments not finished parts under GRI 1,

they are also not incomplete or unfinished parts of an aircraft brake system under GRI 2(a). GRI 2(a) provides that a reference in a heading to an article includes a reference to that article incomplete or unfinished, so long as the incomplete or unfinished article has the essential character of the complete or finished article. *See* GRI 2(a) HTSUS. The PAN fabric segments as imported are pieces of textile material cut to a specific size and arc shape, *i.e.*, "made up." No piece or part of a finished carbon-carbon aircraft brake disc can be discerned from the imported segments themselves.

As we have noted, Honeywell identifies the fabric segments as raw material in its contract with BAM, Inc. covering BAM, Inc.'s services involving the processing of the segments, *i.e.*, laying the segments out and layering them into a doughnut shaped needled preforms and then transforming the needled preforms into carbon preforms before delivering them to Honeywell for further manufacturing into brake discs. However, the semi-manufactured segments would need to meet the criteria of GRI 2(a) to be classified as parts of aircraft brake systems albeit in an unfinished form.[10] In other words, to meet the criteria of GRI 2(a), the unfinished aircraft brake parts would need to possess the essential character of the aircraft brake system of which they claim to be a part, *i.e.* the densified carbon-carbon aircraft disc brake. *See Pomeroy Collection, Ltd. v. United States,* 559 F.Supp.2d 1374 (Ct. Int'l Trade 2008); *Pomeroy Collection, Ltd. v. United States,* 893 F.Supp.2d 1269 (Ct. Int'l Trade 2013).

---

[10] It its moving brief, Plaintiff mentions GRI 2(a) once on page 18 as being "irrelevant" and instead declares the textile fabric segments to be fully finished parts of an aircraft. *See* Pl. Br. at 34. Plaintiff ignores its own factual write-up of the extensive post-importation manufacturing process which transforms the fabric segments into densified carbon-carbon aircraft brake discs, when it asserts that the segments do not require "additional parts, assembly or processing to be used as a part of a brake disc." *Id.*

Rather, the imported segments are fabric material that, as explained, must undergo extensive post-importation processing before they take on the essential characteristics of the densified carbon-carbon aircraft brake disc. Pl. Ex. A: Brown Dep. at 90-91. As discussed, that processing involves two significant molecular transformations. First, after combining the fabric segments into a needled fabric preform, that preform is then molecularly transformed through extensive heating transforming the fabric preform to a carbon preform. Next, the carbon preform is then molecularly transformed a second time by further heating in a gaseous environment to infuse additional carbon molecules onto the carbonized preform (CVI and CVD), resulting in a densified carbon-carbon preform which is finished into a densified carbon-carbon aircraft brake disc. These molecular changes are integral to imparting the qualities and essential character of a finished part of an aircraft brake system which are not present in the imported fabric preforms.

*Pomeroy Collection, Ltd. v. United States*, 893 F.Supp.2d 1269 (Ct. Int'l Trade 2013) is instructive regarding the application of GRI 2(a). The *Pomeroy* court considered whether a product described as a candle holder imported without the candle could be considered a lamp and lighting fitting of heading 9405. The court in *Pomeroy* noted that while the plaintiff did not discuss the imported good as being an incomplete article of heading 9405 pursuant to GRI 2(a), it addressed the possible classification position in footnote 21 of its Opinion. The trial court in *Pomeroy* stated the following:

> Although both GRI 2(a) and GRI 3(b) employ the term "essential character," they do so in very different contexts; and there is little authority as to the term's meaning in the context of GRI 2(a). *See Pomeroy II*, 32 CIT at 539 n. 14, 559 F.Supp.2d at 1387 n. 14. But that lack of guidance is of little moment here. By any measure, the merchandise at issue here lacks the "essential character" of "complete" merchandise that falls within the terms of heading 9405.

The Government considers whether—absent candles—the articles in question here can be classified under heading 9405 as incomplete articles possessing the essential character of a completed article (*i.e.,* a candle holder) under GRI 2(a). *See* Def.'s Brief at 15. The Government concludes that the imported articles do not possess—under GRI 2(a)—the essential character of a candle holder classifiable under heading 9405, which is to provide illumination by securely holding a candle. *See* Def.'s Brief at 15. The Government emphasizes that none of the articles incorporates any special design features to securely hold a candle, as do candelabras, candle sticks, and candle brackets. *See id.* Because the articles at issue do not incorporate any design characteristics that would permit them to function like the candelabras, candle sticks, and candle brackets specified in the Explanatory Notes to heading 9405, the Government concludes that the articles could not be classified under heading 9405 as incomplete lamps or lighting fixtures pursuant to GRI 2(a). *Id.*

As noted, the PAN fabric segments as imported are molecularly different from the densified carbon-carbon aircraft brake discs into which they are processed.  Pl. Ex. A: Brown Dep. at 64.  In terms of physical characteristics, the stark contrast of the texture and feel of the imported fabric segments as compared with the hard, solid, dense feel of the densified carbon-carbon aircraft brake disc is indicative of the difference in the characteristics.  See Gov. Exhs. 2-4: segments and Gov. Exhs. 19-20: Physical Samples of densified carbon-carbon aircraft brake discs (stator and rotor).  The PAN fabric segments in their condition as imported cannot be substituted for the finished densified carbon-carbon aircraft brake discs.  The fabric segments do not have the strength to withstand hundreds of thousands of pounds of pressure involved in braking a jet aircraft.  Nor do the fabric segments have the extensive friction capabilities and thermal absorption characteristics allowing them to repeatedly stop the force of large jets landing.  Nor is the fabric as imported capable of being drilled and shaped into a form capable of being assembled into the finished aircraft brake system.  In other words, the essential character of the final product, *i.e.*, the densified carbon-carbon aircraft brake disc, its strength, and

its ability to absorb the heat created by the friction inherent in stopping jet aircraft, is nothing like the character of the pliable, soft, delicate, feltlike fabric segments that in their imported form are incapable of being used in a braking system to stop any aircraft. *See* Gov. Exhs. 2-4 (Segment Samples) and Gov. Ex. 19-20 Densified Carbon-Carbon Aircraft Brake Disc Samples (stator and rotor); Pl. Ex. A: Brown Dep. at 90, 91.

While the imported PAN fabric segment might, at best, be considered an unfinished part, that unfinished part, as noted above, does not have the stopping strength and friction characteristics, which provide the essential character of the finished densified carbon-carbon aircraft brake disc that is a part of an aircraft brake system.  Mr. Brown, one of Honeywell's Rule 30(b)(6) witnesses and lead production engineer for wheel and brake development, when asked about the desirability or prevalence of the carbon-carbon rotors and stators (carbon-carbon brake discs) stated as follows:

> The carbon-carbon material offers a significant advantage over most steel or historical steel offerings. Specifically, they generally weigh a lot less than steel, and in the aircraft industry, weight is usually king in terms of a design feature. They also offer generally longer brake life, meaning you can get more landings out of a carbon heat sync generally than an equivalent steel heat sync.  Additionally, they provide excellent friction capability for -- specific for[] aircraft braking  parameters and needs. They also have many of the other desirable characteristics that are necessary for that application such as strength and energy absorption capability, the thermal properties.

Pl. Ex. A: Brown Dep. at 27.

As noted above, it is the strength, excellent friction capability, energy absorption capability and thermal properties of the carbon-carbon brake discs that make these brake discs so prevalent and desirable in the aircraft brake industry.  These qualities are not found in the PAN fabric segments as imported, which are foldable arc shaped pieces of material incapable of aiding in the stopping of a jet aircraft.  As Mr. Brown noted, it is

23

not until the imported segments advance in manufacture beyond the needled preform stage, beyond the carbonized preform stage, and complete the densification stage wherein a carbon matrix affixes to the carbon preform to become a densified carbon-carbon preform – do the aforementioned characteristics of an aircraft brake disc inure to the material.  *See* Pl. Ex. A: Brown Dep. at 90-91.

Accordingly, GRI 2(a) dictates that because the PAN fabric segments do not possess the essential character of an aircraft brake disc at importation, they cannot be classified as an unfinished part of an aircraft brake disc.

### D.  Plaintiff's Analysis Grounded In Case Law Interpreting The Tariff Schedules of the United States Is Not Applicable Because The Relevant Statutory Language Has Changed Under The Harmonized Tariff Schedule Of The United States

Plaintiff discusses various aspects of jurisprudence involving the "parts" analysis and issues involving unfinished goods.  Pl. Br. at 31-40.  However, many of these cases plaintiff relies upon are grounded in the prior statutory tariff scheme, *i.e.*, the Tariff Schedules of the United States (TSUS).  When the Harmonized Tariff Schedule of the United States was enacted on January 1, 1989, entries of goods became subject to the wording of the HTSUS, and the TSUS was no longer in effect.  Specifically, plaintiff relies on case law that applies General Headnote 10(h) of the TSUS, which is similar to GRI 2(a) under the HTSUS, for unfinished or incomplete goods.  However, the difference in the two rules is explained in *Baxter Healthcare Corp. of Puerto Rico v. United States*, 998 F. Supp. 1133, 1145, (Ct. Int'l Trade, 1998) which, citing to CBP's Ruling HQ 954822, stated the following:

> [t]he law governing unfinished articles under the TSUS[ ] is not the same as that under the HTSUS[ ]. General Headnote 10(h), TSUS, merely states that a tariff provision covers an article whether finished or not finished.

The TSUS [ ] left up to the court and Customs to set the rules for deciding if an article had been sufficiently processed to be classified as a finished article. On the other hand, GRI 2(a), HTSUS[ ], though somewhat similar, contains the proviso that *for an incomplete or unfinished article, the unfinished or incomplete article must have the "essential character" of the complete or finished article.* (emphasis in the original)

Because TSUS General Headnote 10(h) involving unfinished goods does not include the requirement of HTSUS GRI 2(a) that the unfinished good have the essential character of the finished good, the TSUS cases do not provide the correct or any relevant analysis for the fabric segments at issue here.  Pl. Br. at 26-40.

One case that plaintiff relies on involving the HTSUS is distinguishable and does not support its position.  Plaintiff cites to *Ludvig Svensson, Inc.  v. United States*, 23 CIT 573, 62 F.Supp. 2d 1171, 1179 (1999), where the trial court found that certain heat/shade screens and insect screens used with greenhouses were classified as parts of agricultural equipment under subheading 8436.99.00, HTSUS.  Pl. Br. at 31.  In *Ludvig Svensson*, the trial court determined that the imported screens were in such an advanced state of manufacture and that the post-importation processing was merely "incidental" to have no effect on the classification of the screens.  *Ludvig Svensson*, 62 F.Supp. 2d at 1180.  The trial court found that:

Any post-importation processing conducted by Svensson is minor processing attributable to the installation of the screens and does not alter the function or composition of the screen; in fact, Customs admits that the "post-importation addition of reinforcing tape and plastic hooks [does] not alter the shade factor or energy savings factor."

*Id.* at 1180.  While the *Ludvig Svensson* case involved the interpretation of certain sections of the HTSUS, the trial court did not explicitly analyze the issues under GRI 2(a).  The above quote from *Ludvig Svensson* shows that the screens in their imported state, had the essential character of the final finished product and the outcome under a

GRI 2(a) would have been the same.

Factually, the *Ludvig Svensson* case involving minor post-importation processing is 180 degrees opposite from the extensive, transformative post-importation work which occurred with Honeywell's PAN fabric segments. Moreover, unlike the screens in *Ludvig Svensson,* the PAN fabric segments at issue here do not have the essential character of an aircraft brake disc and classification as an aircraft brake part is inapplicable. *See* Brown Dep. at 90-91.

Plaintiff also cites *Baxter Healthcare Corp. of Puerto Rico v. United States*, 182 F.3d 1333 (Fed. Cir. 1999). Pl. Br. at 29. The *Baxter* trial court and Federal Circuit decisions confirm that GRI 2(a) must be analyzed when considering the classification of a good which is not in a finished condition at importation. In *Baxter Healthcare*, the Federal Circuit classified Oxyphan®, a polypropylene filament, as a textile article, and not as a "part" or "unfinished part" of a membrane oxygenator. *Id*. at 1339. Oxyphan® was imported in ten-kilometer spool units and was cut to length after importation to be used in the manufacture of oxygenators. *Id*. at 1335-36. Oxyphan® was designed to be gas-permeable for use as the gas-exchanging membrane of an oxygenator. *Id*. at 1335. It had no other known use. *Id.* The appeals court found that while Oxyphan® was "dedicated for use" with an oxygenator, the court nonetheless agreed with the Government's argument that Oxyphan® had not been modified (*e.g.,* by being cut to specific lengths or by being attached to something else) at the time of importation, and thus did not possess the "essential character" of a part of an oxygenator at the time of importation. *Id*. at 1338. The appeals court concluded that Oxyphan® was not a "part" because "the individual parts are not identifiable or fixed at the time of import," in that

they were not cut to a predefined length for use in the oxygenator. *Id*. at 1339. In sum, because the Oxyphan® membrane in *Baxter* was not cut to size, and because sizing was part of the essential character of Oxyphan®, it was not considered an unfinished part pursuant to GRI 2(a) classifiable as a part of an oxygenator. The Federal Circuit therefore found that Oxyphan® was not fixed and identifiable at the time of import and affirmed its classification as material under subheading 5404.10.80, HTSUS.

Here, the PAN fabric segments as imported require extensive post-importation processing including transforming the fabric to a densified carbon-carbon aircraft brake disc. Unsurprisingly, the imported fabric segments do not exhibit the essential characteristics of the extensively processed densified carbon-carbon discs, that being the discs' mechanical strength and ability to withstand thermal changes. Brown Dep. at 90, 91. The PAN segments' identity, therefore, cannot be considered fixed with certainty upon importation, as it does not have the essential character of the final carbon-carbon brake discs – because, among other things, its material composition must be molecularly transformed from a PAN fiber to a carbon-carbon material through extensive processing. Pl. Ex. A: Brown Dep. at 64, 90, 91. Furthermore, the textile fabric segments' identity is not fixed at importation because while Honeywell may have an idea as to the number of segments needed to create a specific preform, that number is just an average and the actual number is determined based on the weight of the needled preform at the time of its creation. *Id.* 99-103. Thus, whether a segment is destined for a specific disc, is a function of the weight of the needled preform.

Judicial precedent supports the conclusion that the subject brake segments constitute material rather than unfinished parts, *i.e.* an unfinished brake disc. As a result,

pursuant to GRI 2(a), the segments cannot be considered unfinished aircraft brake components, and therefore CBP properly classified them under subheading 6307.90.98, HTSUS.

## IV.    EVEN IF THE COURT DETERMINES THAT THE IMPORTED NONWOVEN PAN FABRIC SEGMENTS MEET THE DEFINITION OF PARTS, HEADING 6307 IS STILL THE CORRECT CLASSIFICATION

Notwithstanding our classification position as noted above, Honeywell posits that Additional United States Rule of Interpretation (AUSRI) 1(c), HTSUS, as well as common law supports their idea that heading 6307, a basket provision, cannot prevail over a provision for parts such as heading 8803. *See* Pl. Br. at 38-41. AUSRI 1(c), HTSUS, states as follows:

> In the absence of special language or context which otherwise requires . . . a provision for parts of an article covers products solely or principally used as a part of such articles but a provision for "parts" or "parts and accessories" shall not prevail over a specific provision for such part or accessory.

Honeywell further notes at page 41 of its moving brief that "[t]he prohibition against classification in a basket provision when there is a more specific tariff heading is also consistent with GRI 3(a), generally known as the 'rule of relative specificity'. . .".

We take issue with plaintiff's broad sweeping conclusion it attributes to both AUSRI 1(c), HTSUS and GRI 3(a), as we submit that there are instances where a tariff provision for the part itself may have basket elements in its terms; however, that provision provides a more specific description of a good than certain parts provisions which also have basket elements present in its terms. Such is the situation in this case. Here, the imported nonwoven PAN fabric segments are more specifically described by heading 6307, despite being a type of basket provision, than heading 8803, HTSUS

which also contains basket elements in its wording. At the core of both HTSUS AUSRI 1(c) and GRI 3(a), is the concept that ultimately classification is appropriate under the more specific tariff provision.

In this case heading 6307, HTSUS, is the more "specific provision" describing the imported PAN fabric segments, in comparison with heading 8803, HTSUS. Heading 8803 is an extremely broad provision generally covering "Parts of goods of heading 8801" (Heading 8801 – "Ballons and dirigibles; gliders, hang gliders and other non-powered aircraft") "or 8802" (Heading 8802 – "Other Aircraft (for example, helicopters, airplanes); spacecraft (including satellites) and suborbital and spacecraft launch vehicles), and "products solely or principally used as a part of such articles." Consequently, even if the Court were to determine that the imported fabric segments are parts of an aircraft, the fabric segments should still be classified under heading 6307 as they are, as imported, more specifically described as made up (cut in a shape other than in a square or rectangle) textile articles.

Honeywell disputes that our classification could be more specific than their preferred classification. *See* Pl. Ex. A Brown Dep. at 15-20, Response to Interrogatories at Response 5, and Complaint at ¶¶ 28 and 29. Plaintiff argues that heading 8803, HTSUS, should prevail over heading 6307, HTSUS, because of AUSRI 1(c), HTSUS. Specifically, plaintiff argues that a provision for a part does not prevail over a specific provision for such parts and that "there is no general rule that a part of a subpart cannot be classified as part of the whole." Pl. Br. at 38. As stated above, heading 6307 is a specific provision covering the made up fabric segments. Here, plaintiff's preferred heading 8803, which covers parts of goods of headings 8801 and 8802, is not a more

specific heading as both headings 8801 and 8802 also include a basket element in addition to named articles.

Specifically, heading 8801 includes "Ballons and dirigibles; gliders, hang gliders and **other non-powered aircraft"** and heading 8802 includes "**Other Aircraft** (for example, helicopters, airplanes); spacecraft (including satellites) and suborbital and spacecraft launch vehicles)." Logic dictates that a parts provision encompassing a basket provision cannot be considered any more specific than a provision covering the part itself even if that provision contains basket elements. As noted above, given that both heading 8803 and heading 6307 involve certain "catch all" elements, neither can be ruled out on this factor alone.

Of note, heading 6307 covers "made up textile fabric," which clearly identifies the imported good as both a fabric and as "made up," meaning cut other than square or rectangular. *See* Note 7(a) to Section XI, HTSUS (the note delineates the specific conditions required to be considered "made up.") Further, heading 6307 is "residual" in the sense that headings 6301 through 6306 are to be considered before heading 6307. By comparison, heading 8803 involves a vast assortment of parts of balloons, dirigibles, aircraft, spacecraft, sub-orbital machines, and "other" powered or non-powered aircraft and is not specifically descriptive of the imported nonwoven fabric segment. Heading 8803 does not describe the imported article by its material or its shape. Since comparatively, heading 6307 is more specifically descriptive of the imported good than heading 8803, heading 6307 is the proper heading in which to classify the good at issue.

# **CONCLUSION**

For the above reasons, we respectfully request that this Court enter an Order (1) denying plaintiff's motion for summary judgment; (2) granting our cross-motion for summary judgment finding that the merchandise at issue is classifiable in subheading 6307.90.98, HTSUS; and (3) dismissing this action in its entirety.

Respectfully submitted,

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney
General

PATRICIA M. McCARTHY
Director

JUSTIN R. MILLER
Attorney-In-Charge
International Trade Field Office

By:    /s/ Aimee Lee
       AIMEE LEE
       Assistant Director

       /s/ Edward F. Kenny
       EDWARD F. KENNY
       Senior Trial Counsel
       Civil Division, Dept. of Justice
       Commercial Litigation Branch
*Of Counsel*                              26 Federal Plaza, Room 346
Yelena Slepak, Esq.                       New York, New York 10278
Office of the Assistant Chief Counsel     Tel. No. (212) 264-9230 or 0480
International Trade Litigation             Attorneys for Defendant
U.S. Customs and Border Protection

Dated: June 11, 2024

## <u>CERTIFICATE OF COMPLIANCE</u>

I, Edward F. Kenny, a senior trial counsel in the Office of the Assistant Attorney General, Civil Division, Commercial Litigation Brach, International Trade Field Office, who is responsible for the Government's memorandum in opposition to plaintiff's motion for summary judgment and in support of defendant's cross-motion for summary judgment, dated June 11, 2024, relying upon the word count feature of the word processing program used to prepare the memorandum, certify that this memorandum complies with the word count limitation under the Court's chambers procedures, and contains 9,232 words.

<u>/s/ Edward F. Kenny</u>

UNITED STATES COURT OF INTERNATIONAL TRADE
BEFORE:  HON. MARK A. BARNETT, CHIEF JUDGE

_____

HONEYWELL INTERNATIONAL INC.,　　　　:
　　　　　　　　　　　　　　　　　　　　:
　　　　　　　　　　　　　　　　　　　　:
　　　　　　　　　　　　Plaintiff,　　　　:　　　　Court No.  17-00256
　　　　　　　　　　　　　　　　　　　　:
　　　　　　　　　v.　　　　　　　　　　:
　　　　　　　　　　　　　　　　　　　　:
UNITED STATES,　　　　　　　　　　　　:
　　　　　　　　　　　　　　　　　　　　:
　　　　　　　　　　　　Defendant.　　　:
_____　:

## DEFENDANT'S RESPONSE TO PLAINTIFF'S STATEMENT
## OF MATERIAL FACTS NOT IN ISSUE

Pursuant to Rule 56 of the Rules of the United States Court of International Trade,

defendant United States (Government) responds to plaintiff's, Honeywell International Inc.,

(Honeywell), Statement of Undisputed Material Facts (SUMF), dated March 5, 2024, as

follows:[1]

**SOF 1.**  Honeywell was the importer of record of the entries at issue in this action (the "Subject

Entries") and has standing to bring this action. (Second Amended Complaint ("Compl.") &

Answer to Second Amended Complaint. ("Answer") ¶ 2, ECF Nos. 34 & 39.)

**Response 1.**    Admits that plaintiff is the importer of record for the entries that are the subject of

this action.  The remainder of this allegation consist of legal argument and/or conclusions of law

to which no response is required.  (Compl. & Answer ¶ 2, ECF Nos. 34 & 39.)

**SOF 2.**  The Subject Entries cover importations made at the ports of Minneapolis, Charlotte, and

Atlanta during the period of 2015 through 2016. (Summons, ECF No. 1.)

---

[1] For the convenience of the Court, each of plaintiff's statements is included, followed by our
response.  For example, SOF 1 reflects plaintiff's first statement, and Response 1 reflects our
response.  For clarity, when citing to exhibits we will refer to both parties' exhibit numbers.

**Response 2.**    Admits.

**SOF 3.**  The products imported under the Subject Entries are chordal, radial, and web brake segments ("Brake Segments") used in aircraft wheel and brake assemblies. Deposition of Mark Brown, attached hereto as Exhibit A (hereinafter, "Brown Dep.") at pg. 6:17; Compl. ¶ 7; Pl.'s Answers and Supplemental Answers to Def.'s First Interrs., Answer to Interr. No. 3, attached hereto as Exhibit B.

**Response 3.**    Objection to referencing the imported products as "Brake Segments."  The imported products at issue are more appropriately called "nonwoven fabrics segments" or "web, chordal and radial segments" or "web, chordal and radial stator or rotor segments." *See* Pl. Ex. E, Segment Drawings, Gov. Ex. 1: Engineering Material Specification (EMS) 181, Pl. Ex. C, EMS 182, and Gov. Ex. 11: EMS 270.  Further objection to the cited documents drafted in anticipation of litigation and/or documents created during this litigation that reference the imported articles as radial, web and chordal *brake* segments.  A party's own interrogatory responses are self-serving hearsay, for which no exception to the hearsay rule applies.  *Marine Industrial Construction, LLC v. United States*, 151 Fed.Cl. 349, 365 (Ct. Fed. Claims 2020).  Notwithstanding and without waiving these objections, denies that the chordal, radial, and web segments are used in their condition as imported in aircraft wheel and brake assemblies; but admits that the chordal, radial, and web segments are used as material that is manufactured by BAM Inc. into a "needled preform" which is then further processed and transformed by BAM, Inc. into a "carbonized preform."    Gov. Ex. 6, Jones Dep. at 12-37, 65, 69.

**SOF 4.**  At the time of entry, Honeywell declared the Brake Segments under subheading 6307.90.9889 of the Harmonized Tariff Schedule of the United States ("HTSUS"), 19 U.S.C § 1202.  *See* ECF Nos. 5-6 (Protests and Entries Received).

**Response 4.**    Objection to referencing the imported products as "Brake Segments."  The imported products at issue are more appropriately called "nonwoven fabrics segments" or "web, chordal and radial segments" or "web, chordal and radial stator or rotor segments." *See* Pl. Ex. E, Segment Drawings, Gov. Ex. 1: EMS 181, Pl. Ex. C, EMS 182, and Gov. Ex. 11: EMS 270. Notwithstanding and without waiving this objection, denies.  *See* USCIT Rule 73.1 entries. Avers that Honeywell entered all of the nonwoven radial and chordal fabric segments covered by Protest No. 1704-17-101113 and some of the nonwoven radial and chordal brake segments covered by Protest No. 1704-17-101346 under subheading 8803.20.00 of the Harmonized Tariff Schedule of the United States ("HTSUS"), which provides for "Parts of goods of heading 8801 or 8802: Undercarriages and parts thereof," duty-free.  The remaining nonwoven radial and chordal fabric segments covered by Protest No. 1704-17-101346 were entered under subheading 6307.90.98, HTSUS, which provides for: "Other made up articles, including dress patterns: Other: Other: Other," dutiable at 7% ad valorem.  *See* USCIT Rule 73.1 entries.

**SOF 5.**  U.S. Customs and Border Protection ("Customs") liquidated the Brake Segments under HTSUS subheading 6307.90.9889. (Compl. & Answer ¶ 13.)

**Response 5.** Objection to referencing the imported products as "Brake Segments."  The imported products at issue are more appropriately called "nonwoven fabrics segments" or "web, chordal and radial segments" or "web, chordal and radial stator or rotor segments." *See* Pl. Ex. E, Segment Drawings, Gov. Ex. 1: EMS 181, Pl. Ex. C, EMS 182, and Gov. Ex. 11: EMS 270. Notwithstanding and without waiving this objection, admits that the imported nonwoven PAN fabric segments were classified by CBP at liquidation under subheading 6307.90.98, HTSUS. Denies that the last two digits of subheading 6307.90.98**89**, HTSUS, set forth in bold herein, are relevant because they are not part of 19 U.S.C. § 1202, the statute which sets forth the HTSUS.

**SOF 6.**  On May 19, 2017, Customs issued Headquarters Ruling Letter ("HRL") H243798, holding certain radial and chordal brake segments imported by Honeywell are classified under HTSUS subheading 6307.90.98.

**Response 6.**  Admits that on May 9, 2017, Customs issued Headquarters Ruling Letter ("HRL") H243798, holding certain radial and chordal brake segments imported by Honeywell are classified under subheading 6307.90.98, HTSUS.  Avers that "radial and chordal brake segments" is the description provided to Customs by Honeywell in its ruling request.  Except as specifically admitted, denies the remainder of the SOF.  *See* HRL H243798 (This Ruling is available online on Customs Rulings Online Search System (CROSS)).

**SOF 7.**  Honeywell timely filed administrative protests in relation to the Subject Entries, asserting that the Subject Entries were classifiable under HTSUS Heading 8803, which proves for "[p]arts of goods of heading 8801 or 8802";[1] and Customs subsequently denied the protests. (Compl. & Answer ¶ 4.)  (FN 1: On January 27, 2022, Heading 8806 was added to the HTSUS and Heading 8803 was transferred to Heading 8807.  *See* Chapter 88, HTSUS (2024). Unless otherwise noted, reference to the HTSUS throughout this brief is to the version enacted at the time of entry of the Subject Entries.)

**Response 7.**    Objection: the asserted Statement of Fact is unintelligible and vague. Notwithstanding and without waiving the stated objection, admits that Honeywell timely filed administrative protests Protest No. 1704-17-101113, Protest No. 1704-17-101346 and Protest No. 3501-17-100099, and that Customs denied the protests.  Further avers that Footnote 1 is not material as any such amendments to Chapter 88 HTSUS occurring in 2022 do not effect the version of the HTSUS as it existed at the time of entry of the subject entries.

**SOF 8.**  Plaintiff has paid all liquidated duties and fees for the Subject Entries and timely filed this action. (Id. at ¶ 6.)

**Response 8**.  Admits (*See* Answer at ¶¶ 5 and 6).

**SOF 9.**  This Court has jurisdiction over this action under 28 U.S.C. § 1581(a). (Id. at ¶ 2.)

**Response 9.**  Objection.  Plaintiff's statement is not a statement of fact but rather is a conclusion of law to which no response is required.

**SOF 10.**  The Brake Segments at issue in this litigation are listed in the table below:

| Part Number | Part Name | Brake Segment Type | Aircraft Program Use |
|---|---|---|---|
| 2703272 | Segment Rotor, Web | Web | Boeing 777 |
| 2703273 | Segment Stator, Web | Web | Boeing 777 |
| 2703275 | Segment, Rotor Chordal Duplex | Chordal Duplex | Boeing 777 |
| 2703276 | Segment, Rotor Radial Duplex | Radial Duplex | Boeing 777 |
| 2703277 | Segment, Stator, Chordal Duplex | Chordal Duplex | Boeing 777 |
| 2703278 | Segment, Stator, Radial Duplex | Radial Duplex | Boeing 777 |
| 2703329 | Segment, Web | Web | McDonnell Douglas F/A-18E/F Super Hornet |
| 2703331 | Segment, Chordal Duplex | Chordal Duplex | McDonnell Douglas F/A-18E/F Super Hornet |
| 2703332 | Segment, Radial Duplex | Radial Duplex | McDonnell Douglas F/A-18E/F Super Hornet |
| 2703337 | Segment, Rotor, Web | Web | Lockheed Martin F-22 Raptor |

| 2703338 | Segment, Rotor Chordal Duplex | Chordal Duplex | Lockheed Martin F-22 Raptor |
| 2703339 | Segment, Rotor, Radial Duplex | Radial Duplex | Lockheed Martin F-22 Raptor |
| 2703340 | Segment, Stator Web | Web | Lockheed Martin F-22 Raptor |
| 2703341 | Segment, Stator, Chordal Duplex | Chordal Duplex | Lockheed Martin F-22 Raptor |
| 2703342 | Segment, Stator, Radial Duplex | Radial Duplex | Lockheed Martin F-22 Raptor |
| 2703355 | Segment, Stator, Radial Duplex | Radial Duplex | Airbus A380-800 |
| 2703356 | Segment, Stator, Chordal Duplex | Chordal Duplex | Airbus A380-800 |
| 2703358 | Segment, Rotor, Radial Duplex | Radial Duplex | Airbus A380-800 |
| 2703359 | Segment, Rotor, Chordal Duplex | Chordal Duplex | Airbus A380-800 |
| 59000865-001 | Segment, Chordal Duplex | Chordal Duplex | Airbus A380-800 |
| 59000866-001 | Segment, Radial Duplex | Radial Duplex | Airbus A380-800 |
| 59000867-001 | Segment, Chordal Duplex | Chordal Duplex | Airbus A380-800 |
| 59000868-001 | Segment, Radial Duplex | Radial Duplex | Airbus A380-800 |

Ex. B, Pl.'s Answer to Def.'s First Interr. No. 3; Pl.'s Answer to Def.'s First Interr. No. 10 (describing the aircraft designations included in the chart above).

**RESPONSE 10.**  Objection to referencing the imported products as "Brake Segments."  The imported products at issue are more appropriately called "nonwoven fabrics segments" or "web, chordal and radial segments" or "web, chordal and radial stator or rotor segments."  *See* Pl. Ex. E, Segment Drawings, Gov. Ex. 1: EMS 181, Pl. Ex. C, EMS 182, and Gov. Ex. 11: EMS 270. Objection, the interrogatories cited in support of the table are not admissible evidence.  *See* USCIT Rules 56(c) and 56.3(c).  A party's own interrogatory responses are self-serving hearsay,

6

for which no exception to the hearsay rule applies. *Marine Industrial Construction, LLC v. United States*, 151 Fed.Cl. 349, 365 (Ct. Fed. Claims 2020). Notwithstanding and without waiving these objections, admits that the Rule 73.1 filings in this case include the information as to "part number", "part name", and "segment type." referenced within the table above.

**SOF 11.** The Brake Segments are made from nonwoven polyacrylonitrile (PAN) fiber fabric material that is cut to a specific shape and size. *See* Answer at ¶¶ 5 and 6.

**RESPONSE 11.** Objection to referencing the imported products as "Brake Segments." The imported products at issue are more appropriately called "nonwoven fabrics segments" or "web, chordal and radial segments" or "web, chordal and radial stator or rotor segments." *See* Pl. Ex. E, Segment Drawings, Gov. Ex. 1: EMS 181, Pl. Ex. C, EMS 182, and Gov. Ex. 11: EMS 270. Notwithstanding and without waiving this objection, admits that radial, chordal and web segments are made from nonwoven polyacrylonitrile (PAN) fiber fabric material that is cut to a specific shape and size. *See* Compl. ¶ 8.

**SOF 12.** The PAN fiber fabric materials used to make the Brake Segments are described in one of three (3) Engineering Material Specifications (EMS-182, EMS-183, or EMS-270). See Exhibit C.

**RESPONSE 12.** Objection to referencing the imported products as "Brake Segments." The imported products at issue are more appropriately called "nonwoven fabrics segments" or "web, chordal and radial segments" or "web, chordal and radial stator or rotor segments." *See* Pl. Ex. E, Segment Drawings, Gov. Ex. 1: EMS 181, Pl. Ex. C, EMS 182, and Gov. Ex. 11: EMS 270 Notwithstanding and without waiving this objection, admits that radial, chordal and web segments consist of nonwoven polyacrylonitrile (PAN) fiber fabric material which is cut to shape as described in Engineering Material Specifications (EMS 181(Gov. Ex. 1), EMS-182 (Pl. Ex.

C), and EMS-270 (Pl. Es. C)) which specifications incorporate PCD-215 (nonwoven fabrics/segment manufacturing procedure) (Exhibit 5) and XCI-276 (process specifications for nonwoven fabrics and segments) (Exhibit 12).

**SOF 13.**  The Radial and Chordal Brake Segments are "Duplex Segments" manufactured by needling web and unidirectional tow fabrics together to form a duplex fabric of a specific areal weight and width specified for the Brake Segment. Ex. B, Pl.'s Answer to Def.'s First Interr. No. 5; Brake Segment patents, attached hereto as Exhibit D.

**RESPONSE 13.**  Objection to referencing the imported products as "Brake Segments."  The imported products at issue are more appropriately called "nonwoven fabrics segments" or "web, chordal and radial segments" or "web, chordal and radial stator or rotor segments."  *See* Pl. Ex. E, Segment Drawings, Gov. Ex. 1: EMS 181, Pl. Ex. C, EMS 182, and Gov. Ex. 11: EMS 270. Objection the interrogatories cited to support the statement cannot be presented in a form that would be admissible in evidence.  *See* USCIT Rules 56(c) and 56.3(c).  A party's own interrogatory responses are self-serving hearsay, for which no exception to the hearsay rule applies.  *Marine Industrial Construction, LLC v. United States*, 151 Fed.Cl. 349, 365 (Ct. Fed. Claims 2020).  Notwithstanding and without waiving these objections, admits that the radial and chordal segments at issue are "Duplex Segments."  Subject to our objections, further admits that the tow fabric of the duplex segments can, within a certain tolerance, be made to a desired areal weight and width.  *See* Exhibit 12 XCI-276 Honeywell 00477-490.  Except as specifically admitted, the statement is denied.  *Id*.

**SOF 14.** Web Brake Segments are made of a single layer of PAN fabric material. Ex. B, Pl.'s Answer to Def.'s First Interr. No. 5.

**RESPONSE 14.**  Objection to referencing the imported products as "Brake Segments."  The imported products at issue are more appropriately called "nonwoven fabrics segments" or "web, chordal and radial segments" or "web, chordal and radial stator or rotor segments."  *See* Pl. Ex. E, Segment Drawings, Gov. Ex. 1: EMS 181, Pl. Ex. C, EMS 182, and Gov. Ex. 11: EMS 270. Objection the interrogatories cited to support the statement cannot be presented in a form that would be admissible in evidence.  *See* USCIT Rules 56(c) and 56.3(c).  A party's own interrogatory responses are self-serving hearsay, for which no exception to the hearsay rule applies.  *Marine Industrial Construction, LLC v. United States*, 151 Fed.Cl. 349, 365 (Ct. Fed. Claims 2020).  Notwithstanding and without waiving these objections, admits that web segments are made of PAN fabric material.  Avers that during the manufacturing of web fabric segments, nonwoven web material is layered.  *See* Gov. Ex. 12 XCI-276 process specifications for nonwoven fabrics and segments at bates no. HONEYWELL00495.

**SOF 15.**  The Radial and Chordal Brake Segments (Duplex Segments) are manufactured through the following steps:

    • A unidirectional fiber layer is formed by needling a specific number of parallel, non-twisted, continuous tows of oxidized polyacrylonitrile (PAN) fiber in a manner that stabilizes the fibers in their parallel orientation for further handling. The number of tows and the width of the needled fibers are designed to achieve the required areal weight and width needed for the segment.

    • A web fiber layer is formed by needling tows of a different size of oxidized PAN fiber in a manner that results in a web of fibers. The number of tows and the width of the web are designed to achieve the required areal weight and width needed for the segment.

    • Next, the unidirectional fiber layer and the web layer are needled together to form a duplex assembly of a specific areal weight and width to meet segment needs and to be stable enough for further handling.

    • Segments are then cut in arc shapes from the duplex assembly in a manner that results in either a radial or chordal orientation of the unidirectional fibers as required for the segment, all of which are designed for the final needled preform with the correct fiber orientation and density.

**Ex. B**, Pl.'s Answer to Def.'s First Interr. No. 5.

**RESPONSE 15.**  Objection to referencing the imported products as "Brake Segments."  The imported products at issue are more appropriately called "nonwoven fabrics segments" or "web, chordal and radial segments" or "web, chordal and radial stator or rotor segments."  *See* Pl. Ex. E, Segment Drawings, Gov. Ex. 1: EMS 181, Pl. Ex. C, EMS 182, and Gov. Ex. 11: EMS 270. Objection the interrogatories cited to support the statement cannot be presented in a form that would be admissible in evidence.  *See* USCIT Rules 56(c) and 56.3(c).  A party's own interrogatory responses are self-serving hearsay, for which no exception to the hearsay rule applies.  *Marine Industrial Construction, LLC v. United States*, 151 Fed.Cl. 349, 365 (Ct. Fed. Claims 2020).  Notwithstanding and without waiving these objections, admits the facts contained in first bullet point.  With regard to the second bullet point, admits that a web fiber layer is formed by creating a light aggregation of fiber or web which is built up in layers and needled together.  With regard to the third bullet point, admits that the unidirectional fiber layer and the web layer are needled together to form a duplex assembly which seeks to meet one of three specific areal weights and adds stability for further handling of the segment.  With regard to the fourth bullet point, admits that segments are then cut in arc shapes from the duplex assembly in a manner that results in either a radial or chordal orientation of the unidirectional fibers.  Except as specifically admitted, these statements are denied.  *See* Engineering Material Specifications (EMS-182 (Pl. Ex. C), EMS-183 (Pl. Ex. C), or EMS-270 (Pl. Ex. C)), which specifications incorporate PCD-215 (nonwoven fabrics/segment manufacturing procedure) (Gov. Ex. 5) and XCI-276 (process specifications for nonwoven fabrics and segments) (Gov. Ex. 12).

**SOF 16.** The width and final cut of the duplex fabric is defined such that a finished Radial Brake Segment has a radial orientation of the unidirectional fibers. Brown Dep. at pgs. 15:23-16:12,

17:2-8; *see* **Ex. B**, Pl.'s Answer to Def.'s First Interr. No. 11 (describing chordal and radial brake segments).

**RESPONSE 16.** Objection to referencing the imported products as "Brake Segments."  The imported products at issue are more appropriately called "nonwoven fabrics segments" or "web, chordal and radial segments" or "web, chordal and radial stator or rotor segments." *See* Pl. Ex. E, Segment Drawings, Gov. Ex. 1: EMS 181, Pl. Ex. C, EMS 182, and Gov. Ex. 11: EMS 270. Notwithstanding and without waiving these objections, admits that the finished Radial Brake Segment is cut in a manner that the radial orientation of the unidirectional fibers of the tow fabric of the duplex material exhibits a radial orientation.  Except as specifically admitted, the statement is denied. *See e.g.*, Pl. Ex. E, Diagram Radial Segment HONEYWELL0044.

**SOF 17**. The width and final cut of the duplex fabric is defined such that a finished Chordal Brake Segment has a chordal orientation of the unidirectional fibers for a chordal segment. *Id.*

**RESPONSE 17.**  Objection to referencing the imported products as "Brake Segments."  The imported products at issue are more appropriately called "nonwoven fabrics segments" or "web, chordal and radial segments" or "web, chordal and radial stator or rotor segments."  *See* Pl. Ex. E, Segment Drawings, Gov. Ex. 1: EMS 181, Pl. Ex. C, EMS 182, and Gov. Ex. 11: EMS 270Notwithstanding and without waiving this objection, admits that the finished Chordal Brake Segment is cut in a manner that the chordal orientation of the unidirectional fibers of the tow fabric of the duplex material exhibits a chordal orientation.  Except as specifically admitted, the statement is denied.  *See e.g.*, Pl. Ex. E, Diagram Chordal Segment HONEYWELL0043.

**SOF 18.** Web Brake Segments are manufactured through the following steps:

• A web fiber layer is formed by needling tows of oxidized PAN fiber in a manner that results in a web of fibers.

• The number of tows and the width of the web are designed to achieve the required areal weight and width needed for the Brake Segment.

• The Brake Segments are cut into arc shapes with a specific outer radius, a specific inner radius and an arc angle, all of which are designed for the final needled preform with the correct fiber orientation and density.

*Id.*

**RESPONSE 18.**  Objection to referencing the imported products as "Brake Segments."  The imported products at issue are more appropriately called "nonwoven fabrics segments" or "web, chordal and radial segments" or "web, chordal and radial stator or rotor segments."  *See* Pl. Ex. E, Segment Drawings, Gov. Ex. 1: EMS 181, Pl. Ex. C, EMS 182, and Gov. Ex. 11: EMS 270. Further objection it is vague what support plaintiff is citing for this statement as the reference is "Id" and the prior SOF is "Id" also.   Assuming plaintiff is referencing the support for SOF 16 (the last cite not utilizing "Id"), above, then denies the cited material supports the facts here and the interrogatories cited in support of SOF 16 cannot be presented in a form that would be admissible in evidence.  *See* USCIT Rules 56(c) and 56.3(c).  A party's own interrogatory responses are self-serving hearsay, for which no exception to the hearsay rule applies.  *Marine Industrial Construction, LLC v. United States*, 151 Fed.Cl. 349, 365 (Ct. Fed. Claims 2020). Notwithstanding and without waiving these objections, admits that a web segment is created through a process which includes a web fiber layer being formed by needling tows of oxidized PAN fiber in a manner that results in a web of fibers; the number of tows and the width of the web being designed to achieve the specific areal weight and width and the web Segments being cut into arc shapes with a specific outer radius, a specific inner radius and an arc angle.  Denies that the tows in a web segment have any orientation other than web.  *See* Gov. Exhibit 4 - Physical Sample of Web PAN Fabric Segment.

**SOF 19**. Each Brake Segment is specifically designed and manufactured for exclusive use in aircraft braking systems. Compl. ¶ 10; **Ex. B**, Pl.'s Answer to Def.'s First Interr. No. 3.

**RESPONSE 19.**  Objection to referencing the imported products as "Brake Segments."  The imported products at issue are more appropriately called "nonwoven fabrics segments" or "web, chordal and radial segments" or "web, chordal and radial stator or rotor segments."  *See* Pl. Ex. E, Segment Drawings, Gov. Ex. 1: EMS 181, Pl. Ex. C, EMS 182, and Gov. Ex. 11: EMS 270.  Objection the interrogatories cited to support the statement cannot be presented in a form that would be admissible in evidence.  *See* USCIT Rules 56(c) and 56.3(c).  A party's own interrogatory responses are self-serving hearsay, for which no exception to the hearsay rule applies.  *Marine Industrial Construction, LLC v. United States*, 151 Fed.Cl. 349, 365 (Ct. Fed. Claims 2020).  Notwithstanding and without waiving these objections, denies.  *See* Brown Dep. at 54-56 and Matheis Dep. at 11, 12.  Avers that Honeywell in its answers to interrogatories at Response 3 (Pl. Ex. B) included a chart which has a column entitled "Program Use" which shows that at least 6 different segments are designated for both aircraft and automotive use (*i.e.,* Brembo).  Further avers that the chordal, radial, and web segments are not used in their condition as imported in aircraft brake systems but rather that the chordal, radial, and web segments are used as material that is manufactured by BAM Inc. into a "needled preform" which is then further processed and transformed by BAM Inc. into a "carbonized preform."    Gov. Ex. 6, Jones Dep. at 12-37, 65, 69.

**SOF 20**. The Brake Segments are cut to a specific shape and size that is dedicated for use within aircraft braking systems. **Ex. B**, Pl.'s Answer to Def.'s First Interr. No. 6; Engineer Drawings for each of the twenty-three (23) Brake Segments at issue, attached hereto as **Exhibit E**.

**RESPONSE 20**.  Objection to referencing the imported products as "Brake Segments."  The imported products at issue are more appropriately called "nonwoven fabrics segments" or "web, chordal and radial segments" or "web, chordal and radial stator or rotor segments." *See* Pl. Ex. E,

Segment Drawings, Gov. Ex. 1: EMS 181, Pl. Ex. C, EMS 182, and Gov. Ex. 11: EMS 270.

Objection the interrogatories cited to support the statement cannot be presented in a form that

would be admissible in evidence.  *See* USCIT Rules 56(c) and 56.3(c).  A party's own

interrogatory responses are self-serving hearsay, for which no exception to the hearsay rule

applies.  *Marine Industrial Construction, LLC v. United States*, 151 Fed.Cl. 349, 365 (Ct. Fed.

Claims 2020).  Notwithstanding and without waiving these objections, admits that the segments

are cut to a specific shape and size.  Except as specifically admitted, denies the remainder.  Avers

that Honeywell in its answers to interrogatories at Response 3 (Pl. Ex. B) included a chart which

has a column entitled "Program Use" which shows that at least 6 different segments are

designated for both aircraft and automotive use (*i.e.,* Brembo). Further avers that the chordal,

radial, and web segments are not used in their condition as imported in aircraft brake systems but

rather that the chordal, radial, and web segments are used as material that is manufactured by

BAM Inc. into a "needled preform" which is then further processed and transformed by BAM,

Inc. into a "carbonized preform."    Gov. Ex. 6, Jones Dep. at 12-37, 65, 69.

**SOF 21.**  Each Brake Segment has a unique inner radius and outer radius that is specific to the

final brake disc configuration for a specific aircraft braking system to be used in a specific

airplane. Ex. B, Pl.'s Answer to Def.'s First Interr. No. 3; Ex. A, Brown Dep. at pg. 34:10-19;

Ex. E (Engineering Drawings).

**RESPONSE 21.**  Objection to referencing the imported products as "Brake Segments."  The

imported products at issue are more appropriately called "nonwoven fabrics segments" or "web,

chordal and radial segments" or "web, chordal and radial stator or rotor segments."  *See* Pl. Ex.

E, Segment Drawings, Gov. Ex. 1: EMS 181, Pl. Ex. C, EMS 182, and Gov. Ex. 11: EMS 270.

Objection the interrogatories cited to support the statement cannot be presented in a form that

would be admissible in evidence.  *See* USCIT Rules 56(c) and 56.3(c).  A party's own

interrogatory responses are self-serving hearsay, for which no exception to the hearsay rule

applies.  *Marine Industrial Construction, LLC v. United States*, 151 Fed.Cl. 349, 365 (Ct. Fed.

Claims 2020).  Notwithstanding and without waiving these objections, denies that the cited

material supports the statement which is a requirement for citations under USCIT Rules 56(c)

and 56.3(c).  Admits, however, that the segments are cut to a specific inner radius and outer

radius which segments are then combined with other segments and manufactured by BAM Inc.

into an interim product called a "needled preform", which is then further processed and

transformed by BAM, Inc. into a "carbonized preform."  Gov. Ex. 6, Jones Dep. at 12-37, 65, 69.

Avers that the "carbonized preform" is then further manufactured and densified by Honeywell's

South Bend facility to become a carbon-carbon preform which is then cut (the carbon-carbon

preform's  inner and outer radius cut) to create a brake disc. Pl. Ex. A Brown Dep. at 69, 70, 103.

104.

**SOF 22.** The Brake Segments are generally not interchangeable between aircraft braking

systems that require different disc sizes as each part numbered Brake Segment is designed and

uniquely manufactured for use within a specific braking system. Id.

**RESPONSE 22.**  Objection to referencing the imported products as "Brake Segments."  The

imported products at issue are more appropriately called "nonwoven fabrics segments" or "web,

chordal and radial segments" or "web, chordal and radial stator or rotor segments." *See* Pl. Ex. E,

Segment Drawings, Gov. Ex. 1: EMS 181, Pl. Ex. C, EMS 182, and Gov. Ex. 11: EMS 270.

Notwithstanding and without waiving this objection, admits as a general proposition that web,

chordal and radial segments are not interchangeable when BAM Inc. is creating a specific

needled preform.  *See* Response No. 21**.**  Avers that final cutting and machining of a disc for a

specific braking system is performed by Honeywell's South Bend facility on the densified

carbon-carbon preforms and not on the segments.  Pl. Ex. A Brown Dep. at 69, 70, 103, 104.

**SOF 23.** The specific radius, angle, fiber composition, and layering for each imported Brake

Segment is specifically engineered to provide the strength, friction, heat absorption, and heat

transfer capabilities to meet the braking needs and tolerances for specific disc sizes and

respective aircraft brake assemblies. Brown Dep. at pgs. 29:16-30:15; 30:16-32:4; *see* also Ex. E

(Engineer Drawings).

**RESPONSE 23.**  Objection to referencing the imported products as "Brake Segments."  The

imported products at issue are more appropriately called "nonwoven fabrics segments" or "web,

chordal and radial segments" or "web, chordal and radial stator or rotor segments." *See* Pl. Ex. E,

Segment Drawings, Gov. Ex. 1: EMS 181, Pl. Ex. C, EMS 182, and Gov. Ex. 11: EMS 270.

Notwithstanding and without waiving this objection, denies.  Avers that the segments as

imported are material and cannot provide any capabilities or tolerances for any aircraft brake

discs or aircraft brake assemblies. *See* Gov. Exhs. 2-4 (PAN Fabric Segments).  Avers further

that it is only when the segments are combined with other segments to become a needled

preform, and then are transformed by heating to become a carbonized preform, and then are

densified by adding a carbon matrix to become a carbon-carbon preform and are finally

machined and cut to become a brake disc do they have the qualities necessary for the aircraft

brake assemblies.  *See* Pl. Ex. A, Brown Dep. at 27, 90, 91, 103, 104, 106, 107.   Avers further

that Mr. Brown, Honeywell's engineer, stated, "[o]nce it's fully densified, it has all the

characteristics we're looking for [in] a brake assembly."  *See* Pl. Ex. A, Brown Dep. at 27, 90-91,

106, 107.   Avers further that the result of the process wherein the preform is densified and

carbonized is that it takes on the desired characteristics of brake discs including high strength,

added thermal characteristics, ability to absorb and transfer heat, and generate friction.  *See* Pl.

Ex. A, Brown Dep. at 27, 90, 91, 106, 107, Gov. Exhs. 19-20 physical samples of aircraft brake

discs.

**SOF 24.**  The Brake Segments are used solely for the manufacture and production of carbon

brake discs for commercial and military aircraft braking systems. Ex. B, Pl.'s Answer to Def.'s

First Interr. No. 6; Deposition of Chris Matheis (hereinafter "Matheis Dep.") at pg. 11:1-12;

Brown Dep. at pgs. 21:3-7.

**RESPONSE 24.**  Objection to referencing the imported products as "Brake Segments."  The

imported products at issue are more appropriately called "nonwoven fabrics segments" or "web,

chordal and radial segments" or "web, chordal and radial stator or rotor segments."  *See* Pl. Ex.

E, Segment Drawings, Gov. Ex. 1: EMS 181, Pl. Ex. C, EMS 182, and Gov. Ex. 11: EMS 270.

Objection the interrogatories cited to support the statement cannot be presented in a form that

would be admissible in evidence.  *See* USCIT Rules 56(c) and 56.3(c).  A party's own

interrogatory responses are self-serving hearsay, for which no exception to the hearsay rule

applies.  *Marine Industrial Construction, LLC v. United States*, 151 Fed.Cl. 349, 365 (Ct. Fed.

Claims 2020).  Notwithstanding and without waiving these objections, denies.  *See* Pl. Ex. B at

response 3.  Avers that Honeywell in its answers to interrogatories at Response 3 (Pl. Ex. B)

included a chart which has a column entitled "Program Use" which shows that at least 6 different

segments are designated for the manufacture of brake discs for both aircraft and automotive use

(*i.e.,* Brembo).

**SOF 25.**  Aircraft braking systems are parts of aircraft. Compl. and Answer ¶ 23, HRL H243798

at pg. 5; Ex. A, Brown Dep. at pg. 14:6-17.

**RESPONSE 25.**  Admits.

**SOF 26.**  The brake discs made from the Brake Segments are parts of aircraft braking systems used in aircraft landing gear. Compl. and Answer ¶ 24; HRL H243798 at pg. 5.; Ex. A, Brown Dep. at pgs. 29:13-32:4; Ex. B, Pl.'s Answer to Def.'s First Interr. No. 3.

**RESPONSE 26.**  Objection to referencing the imported products as "Brake Segments."  The imported products at issue are more appropriately called "nonwoven fabrics segments" or "web, chordal and radial segments" or "web, chordal and radial stator or rotor segments."  *See* Pl. Ex. E, Segment Drawings, Gov. Ex. 1: EMS 181, Pl. Ex. C, EMS 182, and Gov. Ex. 11: EMS 270. Objection the interrogatories cited to support the statement cannot be presented in a form that would be admissible in evidence.  *See* USCIT Rules 56(c) and 56.3(c).  A party's own interrogatory responses are self-serving hearsay, for which no exception to the hearsay rule applies.  *Marine Industrial Construction, LLC v. United States*, 151 Fed.Cl. 349, 365 (Ct. Fed. Claims 2020).   Notwithstanding and without waiving these objections, admits that aircraft brake discs used in aircraft landing gear are parts of aircraft braking systems.  Except as specifically admitted, denies the remainder.  *See* Pl. Ex. B, Plaintiff's Supplemental/Amended Answers to Def. First Interrogatories at Resp. 6.  Gov. Exhibit 13, *See* BAM/Honeywell contract at ¶4A(7) and 4B(6) (BAM000046, BAM000050, BAM000076 and BAM000080).  Avers that nonwoven segments are material used by BAM Inc. to manufacture needled preforms.  *See* Pl. Ex. B, Plaintiff's Supplemental/Amended Answers to Def. First Interrogatories at Resp. 6.  Gov. Exhibit 13, *See* BAM/Honeywell contract at ¶4A(7) and 4B(6) (BAM000046, BAM000050, BAM000076 and BAM000080).

**SOF 27.** Brake Segments are parts of brake discs. Ex. B, Pl.'s Answer to Def.'s First Interr. No. 3; HRL H243798.

**RESPONSE 27.**  Objection to referencing the imported products as "Brake Segments."  The imported products at issue are more appropriately called "nonwoven fabrics segments" or "web, chordal and radial segments" or "web, chordal and radial stator or rotor segments." *See* Pl. Ex. E, Segment Drawings, Gov. Ex. 1: EMS 181, Pl. Ex. C, EMS 182, and Gov. Ex. 11: EMS 270.  Objection the interrogatories cited to support the statement cannot be presented in a form that would be admissible in evidence.  *See* USCIT Rules 56(c) and 56.3(c).  A party's own interrogatory responses are self-serving hearsay, for which no exception to the hearsay rule applies.  *Marine Industrial Construction, LLC v. United States*, 151 Fed.Cl. 349, 365 (Ct. Fed. Claims 2020).  Further objects as plaintiff's alleged statement of material fact is the ultimate question of law in this case.  Notwithstanding and without waiving these objections, denies.  Gov. Exhibit 13, BAM/Honeywell contract at ¶4A(7) and 4B(6) (BAM000046, BAM000050, BAM000076 and BAM000080).  Avers that nonwoven segments are material used to manufacture needled preforms.  *See* Plaintiff's Supplemental/Amended Answers to Def. First Interrogatories at Resp. 6., Gov. Exhibit 13, BAM/Honeywell contract at ¶4A(7) and 4B(6) (BAM000046, BAM000050, BAM000076 and BAM000080), Gov. Ex. 18, physical sample of needled preform.

**SOF 28.**  At the time of importation, the Brake Segments are ready for use in the manufacture of brake discs and do not require any further processing to be ready for use as part of a brake disc.  **Ex. B**, Pl.'s Answer to Def.'s First Interr. No. 6.

**RESPONSE 28.**  Objection to referencing the imported products as "Brake Segments."  The imported products at issue are more appropriately called "nonwoven fabrics segments" or "web, chordal and radial segments" or "web, chordal and radial stator or rotor segments."  *See* Pl. Ex. E, Segment Drawings, Gov. Ex. 1: EMS 181, Pl. Ex. C, EMS 182, and Gov. Ex. 11: EMS 270.

Objection the interrogatories cited to support the statement cannot be presented in a form that would be admissible in evidence. *See* USCIT Rules 56(c) and 56.3(c). A party's own interrogatory responses are self-serving hearsay, for which no exception to the hearsay rule applies. *Marine Industrial Construction, LLC v. United States*, 151 Fed.Cl. 349, 365 (Ct. Fed. Claims 2020). Further objects as plaintiff's alleged statement of material fact is the ultimate question of law in this case. Notwithstanding and without waiving these objections, denies. See Gov. Exhibit 13, BAM/Honeywell contract at ¶4A(7) and 4B(6) (BAM000046, BAM000050, BAM000076 and BAM000080). Avers that at the time of importation the segments are material used in the manufacture of needled preforms by Honeywell's subcontractor BAM Inc. *See* Gov. Exhibit 13, BAM/Honeywell contract at ¶4A(7) and 4B(6) (BAM000046, BAM000050, BAM000076 and BAM000080), Gov. Exhs, 2-4 physical samples of segments. Avers further that a great amount of post-importation processing and expense is required in order to first manufacture a needled preform from dozens of segments, then manufacture a carbonized preform and ultimately produce a carbon-carbon aircraft brake disc. *See* Pl. Ex. B, Plaintiff's Supplemental/Amended Answers to Def. First Interrogatories at Resp. 6.

**SOF 29.** Each Brake Segment is specifically designed to serve as an integral and constituent part of carbon composite rotor and stator brake discs. Compl. ¶ 9, **Ex. A**, Brown Dep. at pgs. 20:20-23; 86:25-87:5; 88:5-11.

**RESPONSE 29.** Objection to referencing the imported products as "Brake Segments." The imported products at issue are more appropriately called "nonwoven fabrics segments" or "web, chordal and radial segments" or "web, chordal and radial stator or rotor segments." *See* Pl. Ex. E, Segment Drawings, Gov. Ex. 1: EMS 181, Pl. Ex. C, EMS 182, and Gov. Ex. 11: EMS 270. Objection plaintiff's alleged statement of material fact is the ultimate question of law in this case.

Notwithstanding and without waiving these objections, denies.  *See* Gov. Exhibit 13, BAM/Honeywell contract at ¶4A(7) and 4B(6) (BAM000046,  BAM000076).  Avers that nonwoven segments are material used by BAM Inc. to manufacture needled preforms.  *See* Pl. Ex. B, Plaintiff's Supplemental/Amended Answers to Def. First Interrogatories at Resp. 6., Gov. Ex. 13, BAM/Honeywell contract at ¶4A(7) and 4B(6) (BAM000046,  BAM000076).  Avers further that a great amount of post-importation processing and expense is required in order to first manufacture a needled preform from hundreds of segments, then manufacture a carbonized preform and ultimately produce a carbon-carbon aircraft brake disc.  *See* Pl. Ex. B, Plaintiff's Supplemental/Amended Answers to Def. First Interrogatories at Resp. 6.

**SOF 30.**  A rotor is a rotating disc used in an aircraft brake assembly that is keyed to the wheel assembly and provides friction and heat absorption during braking. **Ex. B**, Pl.'s Answer to Def.'s First Interr. No. 11; *see also* **Ex. A**, Brown Dep. at pgs. 23:24-24:18 (further describing the function of rotors and stators within an aircraft braking system).

**RESPONSE 30.**  Objection the interrogatories cited to support the statement cannot be presented in a form that would be admissible in evidence.  See USCIT Rules 56(c) and 56.3(c).  A party's own interrogatory responses are self-serving hearsay, for which no exception to the hearsay rule applies.  *Marine Industrial Construction, LLC v. United States*, 151 Fed.Cl. 349, 365 (Ct. Fed. Claims 2020).  Notwithstanding and without waiving this objection, admits.

**SOF 31.**  A stator, including auxiliary stators that are more commonly referred to as the pressure plate and the backing plate, is a stationary disc used in an aircraft brake assembly that is keyed to the torque tube and provides friction and heat absorption during braking. **Ex. A**, Brown Dep. at pgs. 23:24-24:18.

**RESPONSE 31.**  Admits.

**SOF 32.** Brake discs are made of a specific number of Brake Segments that are layered together in a specific orientation and configuration and then subjected to further processing to create carbon brake discs. **Ex. B**, Pl.'s Answer to Def.'s First Interr. No. 6.; **Ex. D**, Brake Segment Patents.

**RESPONSE 32.**  Objection to referencing the imported products as "Brake Segments."  The imported products at issue are more appropriately called "nonwoven fabrics segments" or "web, chordal and radial segments" or "web, chordal and radial stator or rotor segments." *See* Pl. Ex. E, Segment Drawings, Gov. Ex. 1: EMS 181, Pl. Ex. C, EMS 182, and Gov. Ex. 11: EMS 270. Objection the interrogatories cited to support the statement cannot be presented in a form that would be admissible in evidence.  *See* USCIT Rules 56(c) and 56.3(c).  A party's own interrogatory responses are self-serving hearsay, for which no exception to the hearsay rule applies.  *Marine Industrial Construction, LLC v. United States*, 151 Fed.Cl. 349, 365 (Ct. Fed. Claims 2020).   Notwithstanding and without waiving these objections, denies.  Pl. Ex. A, Brown Dep. 99-103.  Avers that brake discs are made from carbon preforms. *See* Pl. Ex. B, Plaintiff's Supplemental/Amended Answers to Def. First Interrogatories at Resp. 6.  Further avers that Honeywell may have an idea as to the number of segments needed to create a specific preform, but that number is just an average and the actual number is determined based on the weight of the needled preform at the time of its creation.  Pl. Ex. A, Brown Dep. 99-103.

**SOF 33.** The number and type of Brake Segments used to create a brake disc varies depending on each aircraft's unique specifications. Brown Dep. at pg. 34:2-9 ("For example, one disc might have 100 radial segments and 110 chordal segments.").

**RESPONSE 33.**  Objection to referencing the imported products as "Brake Segments."  The imported products at issue are more appropriately called "nonwoven fabrics segments" or "web,

chordal and radial segments" or "web, chordal and radial stator or rotor segments." *See* Pl. Ex. E, Segment Drawings, Gov. Ex. 1: EMS 181, Pl. Ex. C, EMS 182, and Gov. Ex. 11: EMS 270. Notwithstanding and without waiving this objection, denies. *See* Pl. Ex. B, Plaintiff's Supplemental/Amended Answers to Def. First Interrogatories at Resp. 6. Avers that brake discs are made from carbon preforms and not nonwoven fabric segments. *See* Pl. Ex. B, Plaintiff's Supplemental/Amended Answers to Def. First Interrogatories at Resp. 6. Avers further that a carbon preform is made from a needled preform. Id. Avers further that a needled preform is made from a nonwoven PAN fabric segment. Id.

<div style="margin-left:40%">

Respectfully submitted,

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney
General

PATRICIA M. McCARTHY
Director

JUSTIN R. MILLER
Attorney-In-Charge
International Trade Field Office

/s/ Aimee Lee
AIMEE LEE
Assistant Director

/s/ Edward F. Kenny
EDWARD F. KENNY
Senior Trial Counsel
Civil Division, Dept. of Justice
Commercial Litigation Branch
26 Federal Plaza, Room 346
New York, New York 10278
Tel. No. (212) 264-9230 or 0480
Attorneys for Defendant

</div>

*Of Counsel*
Yelena Slepak, Esq.
Office of the Assistant Chief Counsel
International Trade Litigation
U.S. Customs and Border Protection

UNITED STATES COURT OF INTERNATIONAL TRADE
BEFORE: HON. MARK A. BARNETT, CHIEF JUDGE

| | | |
|---|---|---|
| _____ | ) | |
| HONEYWELL INTERNATIONAL INC., | ) | |
| | ) | |
| Plaintiff | ) | |
| | ) | |
| v. | ) | Court No. 17-00256 |
| | ) | |
| UNITED STATES, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

## DEFENDANT'S STATEMENT OF UNDISPUTED MATERIAL FACTS

Pursuant to Rule 56.3 of the Rules of the United States Court of International Trade, motions for summary judgment must include a separate statement of the material facts as to which the moving party contends there is no genuine issue to be tried.  In this case, with respect to Defendant's Cross-Motion for Summary Judgment only, there are no material facts as to which there exists a genuine issue to be tried and the issues are amenable to resolution through dispositive motions.  The pertinent undisputed facts of this case are as follows:

1. The merchandise at issue is radial, chordal, and web nonwoven polyacrylonitrile (PAN) fabric segments that are cut to a specific shape and size.  Pl. Ex. A, Brown Dep. at 20.[1]

2. The PAN synthetic fibers are composed of a synthetic polymer of acrylonitrile.  Pl. Ex. A Brown Dep at 20, 21 and 81.

_____

[1] Mark D. Brown is a lead production engineer for Honeywell's wheel and brake development engineering department and testified in this case as a US CIT Rule 30(b)(6) representative of Honeywell.  Pl. Ex. A, Brown Dep at 8, 9 and 11.

3.  Each type of imported PAN fabric segment is arc shaped, approximately 10 ½ inches across at its widest portion, approximately 5 inches along its radius and approximately 2/16 of an inch thick.  Gov. Exs. 2-4 (radial, chordal and web segment physical samples).

4.  The segments as imported look and feel like fabric material, able to be hand manipulated by folding or crumpling.  Gov. Exs. 2-4 (radial, chordal and web segment physical samples).

5.  The fabric segments as imported, are not finished aircraft parts as they are not in a form or condition to be installed on an aircraft brake system.  Pl. Ex. A, Brown Dep. p 88 lines 5, 6; Gov. Exs. 2-4 (radial, chordal and web segment physical samples).

6.  The PAN fabric segments upon importation are delivered directly to Honeywell's contractor, BAM, Inc. in Knoxville, Tennessee.  Pl. Ex. A, Jones Dep. 10-13.[2]

7.  BAM, Inc. is an advanced materials company that specializes in the processing and manufacturing of carbonized products through its use of high-temperature furnace systems. Gov. Ex. 14, BAM, Inc. Website (https://www.bamknoxville.com/).

8.  The Honeywell/BAM, Inc. contract has characterized the PAN fabric segments as raw material for use by BAM, Inc. in the creation of needled preforms for Honeywell. Gov. Ex. 13, Third Addendum to Amended and Restated Toll Manufacturing Agreement for Carbonization Services at ¶4A(7) and 4B(6). See BAM000046, BAM000050, BAM000076 and BAM000080.

9.  BAM, Inc. utilizes a processing specification which sets forth its manufacturing steps

---

[2] Ester Jones is a Vice President of Quality at BAM, Inc and testified in this case as a US CIT Rule 30(b)(6) representative of BAM, Inc.  Gov. Ex. 6, Jones Dep at 5,10, and 11.

in creating a needled preform.  Gov. Ex. 8, PS-1526 Bates No. BAM000280.

10. The segments are one of the "materials" necessary for the fabrication of the needled preform.  Pl. Ex. B: Pltf.'s Supp. Rog. Resp. 6, Gov. Ex. 8, PS-1526 at ¶3.1.2, Bates No. BAM000283.

11. Specifically, the BAM, Inc. process begins with BAM's personnel reviewing the relevant Honeywell purchase order to understand what specific "preform" Honeywell wants manufactured, so BAM's personnel can gather and prepare the appropriate segments and machines.  Gov. Ex. 6, Jones Dep. 10-13, 23.

12. BAM, Inc. personnel then prepare the needling machine in accordance with the requirements of the relevant purchase order.  Gov. Ex. 6, Jones Dep. 13-14.

13. As part of the preparation, the BAM, Inc. machine operator loads the needling machine's magazines (chambers for holding the segment supply) with the appropriate number of radial, chordal and web segments.  Gov. Ex. 6, Jones Dep. 13-15.

14. The operation of the BAM, Inc. needling machine commences the needling process with the machine automatically picking and laying down a group of six segments of the same type, *e.g.*, all chordal, to create a layer inside the machine's doughnut shaped form.  Gov. Ex. 6, Jones Dep. 15-17.

15. Thereafter, the needling machine automatically creates an additional layer of six segments of a different type than the first, and possibly another layer of six segments of a third type, depending on the requirements correlating with the preform requested by the purchase order.  Gov. Ex. 6, Jones Dep. 15-17.

16. While the machine is picking and laying the segments in the doughnut shaped form, the machine's needling apparatus is jabbing the needles into and out of the segments

to physically insert portions of one segment into another segment, interconnecting the layers of segments with each other.  Gov. Ex. 6, Jones Dep. 18-20.

17. Once the needled preform is completed by the needling machine, it is removed from the form and given a serial number.  The operator records the relevant data including the number of segments utilized in creating the needled preform, its weight, and thickness.  Gov. Ex. 6, Jones Dep. 18; Gov. Ex. 18, physical sample of needled preform.

18. The needled preforms are then gathered in lots as specified by the relevant purchase orders.  These lots are placed in a furnace staging area until a furnace load of between four and seven lots is accumulated.  Gov. Ex. 6, Jones Dep. 22.

19. Once a furnace lot of needled preforms are gathered, the preforms are stacked into the furnace with spacers between each needled preform and a weighted load positioned on the top of the stack to apply the predetermined pressure.  Gov. Ex. 6, Jones Dep. 22-25.

20. BAM Inc. follows engineering specifications which delineate the details of the furnace cycles necessary to create a carbonized preform.  Gov. Ex. 9, EMS-184-R Bates No. BAM000237.

21. The stacks of needled preforms are heated for three and a half to four days in the furnace as part of the carbonization cycle.  Gov. Ex. 6, Jones Dep. 26, 27.

22. During the days-long carbonization process, gases are given off from the preforms and upon completion what is remaining is a carbonized preform.  Gov. Ex. 6, Jones Dep. 27, 28.

23. The carbonized preform is no longer considered a polyacrylonitrile material but has

undergone a molecular change and is considered a carbon material.  Pl. Ex. A, Brown Dep. at 64.

24. Upon completion of the carbonization cycle at BAM, Inc. the carbonized preform has lost 50 percent of its needled preform weight, and its size has also shrunk.  Pl. Ex. A, Brown Dep. at 64.

25. Once the BAM, Inc. carbonization process is completed, the preforms no longer exhibit the fabric quality of the imported segments but instead are much more rigid, solid, and inflexible.  Pl. Ex. A, Brown Dep. 64,

26. The carbonized preforms are inspected by BAM, Inc. and shipped to Honeywell in South Bend, Indiana for further processing.  Gov. Ex. 6, Jones Dep. 33, 34.

27. Specifically, Honeywell's South Bend facility further processes the carbonized preform through a densification process involving chemical vapor infiltration (CVI) and chemical vapor deposition (CVD) process which deposits additional carbon on and around the carbonized preform.  Pl. Ex. A, Brown Dep. at 21, 64-67, 92, 93, 104-109,  Pl. Ex. B, Pltf's Supp. Rog. Resp. 6.

28. The CVI/CVD densification process described above occurs while the carbonized preforms undergo cycles of heat treatment in Honeywell's furnaces which are under vacuum pressure.  Pl. Ex. A, Brown Dep. at 21, 64-67, 92, 93, 104-109,  Pl. Ex. B, Pltf's Supp. Rog. Resp. 6.

29. More specifically, while under heat and pressurization, a mixture of gases is added to the furnace which promotes a carbon matrix surrounding and building on the heated carbon substrate material of the carbonized preform.  Pl. Ex. A, Brown Dep at 66, Pl. Ex. B, Pltf's Supp. Rog. Resp. 6.

30. The densification process is a time-consuming evolution involving months of cyclical heating in the furnace totaling hundreds of hours.  Pl. Ex. A, Brown Dep. at 67, 68, Pl. Ex. B, Pltf's Supp. Rog. Resp. 6.

31. The CVI/CVD densification process, wherein the carbon matrix surrounds and builds more carbon onto the carbon substrate of the preform, results in the preforms increased weight.  Pl. Ex. A, Brown Dep. at 107, 108, Pl. Ex. B, Pltf's Supp. Rog. Resp. 6.

32. Overall, the manufacturing process for a densified carbon-carbon preform can take up to six months, with the CVD/CVI densification process being the longest portion of the manufacturing process.  Pl. Ex. A, Brown Dep. at 67, 68,  Pl. Ex. B, Pltf's Supp. Rog. Resp. 6.

33. Once the carbon preforms have gone through the densification steps, the preforms undergo a final machining operation in which the friction surfaces are ground to specific dimensions, the inner and outer dimensions are machined and the other parts such as lugs, grooves and holes are machined and antioxidant applied, creating an aircraft brake disc.  Pl. Ex. A, Brown Dep. at 69, 70, Pl. Ex. B, Pltf's Supp. Rog. Resp. 6; Gov. Exhs. 19-20 physical samples of densified carbon-carbon aircraft brake discs.

34. The result of the process wherein the preform is densified and carbonized is that it takes on the desired characteristics of brake discs including high strength, added thermal characteristics, ability to absorb and transfer heat, and generate friction.  Pl, Ex. A, Brown Dep. at 27, 90, 91, 106.

35. Carbon-carbon rotors and stators (brake discs) are desirable in the market because

they weigh considerably less than steel brake discs, and the carbon-carbon products have a longer service life, as well as offer superior strength, energy absorption capability, and advantageous thermal properties. Pl. Ex. A, Brown Dep. at 27.

36. The total cost of the post-importation manufacturing ($1,786.34) which transformed the quantity of imported fabric segments, first, into needled preforms, second, into carbonized preforms, third, into a densified carbon-carbon preform and finally, machined into an aircraft brake disc is approximately eleven times of the cost of the number of segments themselves ($164.82).  Pl. Ex. B, Pltf's Supp. Rog. Resp. 6.

Respectfully submitted,

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney
General

PATRICIA M. McCARTHY
Director

JUSTIN R. MILLER
Attorney-In-Charge
International Trade Field Office

By:    /s/ Aimee Lee
       AIMEE LEE
       Assistant Director

       /s/ Edward F. Kenny
       EDWARD F. KENNY
       Senior Trial Counsel
       Civil Division, Dept. of Justice
Of Counsel                          Commercial Litigation Branch
Yelena Slepak, Esq.                 26 Federal Plaza, Room 346
Office of the Assistant Chief Counsel   New York, New York 10278
International Trade Litigation       Tel. No. (212) 264-9230 or 0480
U.S. Customs and Border Protection  Attorneys for Defendant

Dated: June 11, 2024

UNITED STATES COURT OF INTERNATIONAL TRADE
BEFORE: HON. MARK A. BARNETT, CHIEF JUDGE

_____
                                                    :
HONEYWELL INTERNATIONAL INC.,      :
                                                    :
                        Plaintiff,             :          Court No. 17-00256
                                                    :
            v.                                     :
                                                    :
UNITED STATES,                            :
                                                    :
                        Defendant.           :
_____ :

**LIST OF EXHIBITS CITED IN DEFENDANT'S OPPOSITION TO PLAINTIFF'S SUMMARY
JUDGMENT MOTION AND IN ITS CROSS-MOTION FOR SUMMARY JUDGMENT**

Gov. Exhibit 1: Confidential EMS-181 at Bates No. HONEYWELL00197.

Gov. Exhibit 2*: Physical Sample of Chordal PAN Fabric Segment (former Brown Dep. Ex. 4).

Gov. Exhibit 3*: Physical Sample of Radial PAN Fabric Segment (former Brown Dep. Ex. 3).

Gov. Exhibit 4*: Physical Sample of Web PAN Fabric Segment.

Gov. Exhibit 5: Confidential PCD 215 Segment Manufacturing Procedure.

Gov. Exhibit 6: Deposition of Esther Jones, Rule 30(b)(6) representative of BAM, Inc.

Gov. Exhibit 7: TextileGlossary.com definition of Tow accessed on June 10, 2024.

Gov. Exhibit 8: Confidential PS-1526 (Processing Specification).

Gov. Exhibit 9: Confidential EMS-184-R.

Gov. Exhibit 10: HQ H243798.

Gov. Exhibit 11: Confidential EMS-270 (Engineering Material Specification).

Gov. Exhibit 12: Confidential XCI-276 (Engineering Instructions).

Gov. Exhibit 13: Confidential Third Addendum to Amended and Restated Toll Manufacturing
      Agreement for Carbonization Services between BAM, Inc. and Honeywell.

Gov. Exhibit 14: BAM Inc. Website (https://www.bamknoxville.com/).

Gov. Exhibit 15: Merriam-Webster Online Dictionary accessed on May 24, 2024.
      (https://www.merriam-webster.com/dictionary/preform) a "preform."

Gov. Exhibit 16: Deposition of Chris Matheis, Rule 30(b)(6) representative of Honeywell Int.
      Inc.

Honeywell International Inc. v. United States, Court No. 17-00256
Exhibit List (Continued)

Gov. Exhibit 17: Merriam-Webster Online Dictionary accessed on June 10, 2024
(https://www.merriam-webster.com/dictionary/ semimanufactures). "semi-manufactures
(n.)."

Gov. Exhibit 18*: Physical Sample of Needled Preform.

Gov. Exhibit 19*: Physical Sample of densified carbon-carbon aircraft brake disc (stator) (former
Brown Dep. Ex. 6).

Gov. Exhibit 20*: Physical Sample of densified carbon-carbon aircraft brake disc (rotor) (former
Brown Dep. Ex. 5).

Respectfully Submitted,


BRIAN M. BOYNTON
Principal Deputy Assistant Attorney
General

PATRICIA M. McCARTHY
Director

JUSTIN R. MILLER
Attorney In Charge
International Trade Field Office

By:    /s/ Aimee Lee
AIMEE LEE
Assistant Director

/s/ Edward F. Kenny

*Of Counsel*: Yelena Slepak, Esq.                EDWARD F. KENNY
Office of Assistant Chief Counsel                Senior Trial Counsel
International Trade Litigation                    Civil Division, Dept. of Justice
U.S. Customs and Border Protection               Commercial Litigation Branch
                                                 26 Federal Plaza – Suite 346
DATED:  New York, New York                       New York, NY 10278
         June 11, 2024                            Attorneys for Defendant
                                                 Tel. (212) 264-0480


\* Asterisked exhibits are physical samples of merchandise at issue.  The physical exhibits were
transferred to the Court, as noted on the Government's Form 23 "Certification of Filing and
Service of Physical Exhibit[s]."