Slip Op. 25-13

## UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| HONEYWELL INTERNATIONAL, INC., | |
| Plaintiff, | |
| v. | Before: Mark A. Barnett, Chief Judge |
| UNITED STATES, | Court No. 17-00256 |
| Defendant. | |

## <u>OPINION</u>

[Court grants Plaintiff's motion for summary judgment and denies Defendant's cross-motion for summary judgment because subject imports are correctly classified under subheading 8803.20.00 of the Harmonized Tariff Schedule of the United States.]

Dated: January 30, 2025

<u>Wm. Randolph Rucker</u>, Faegre Drinker Biddle & Reath, LLP, of Chicago, IL, argued for Plaintiff Honeywell International, Inc.

<u>Edward F. Kenny</u>, Senior Trial Counsel, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of New York, NY, argued for Defendant United States.  On the brief were <u>Brian M. Boynton</u>, Principal Deputy Assistant Attorney General, <u>Patricia M. McCarthy</u>, Director, <u>Justin R. Miller</u>, Attorney in Charge, International Trade Field Office, and <u>Aimee Lee</u>, Assistant Director.  Of counsel on the brief was <u>Yelena Slapek</u>, Office of the Assistant Chief Counsel, International Trade Litigation, U.S. Customs and Border Protection.

Barnett, Chief Judge:  Plaintiff Honeywell International, Inc. ("Honeywell")

commenced this case to contest the denial of three protests challenging U.S. Customs

and Border Protection's ("Customs" or "CBP") liquidation of Honeywell's radial, web,

and chordal segments (the "imported segments" or "segments") under subheading

6307.90.98 of the Harmonized Tariff Schedule of the United States ("HTSUS"), as

"[o]ther made up articles, including dress patterns," dutiable at seven percent *ad*

*valorem*.  Summons, ECF No. 1; Second Am. Compl., ECF No. 34.[1]  Plaintiff alleges

that the segments are properly classified pursuant to HTSUS subheading 8803.20.00 as

"[p]arts of goods of heading 8801 or 8802: . . . [u]ndercarriages and parts thereof," a

duty-free provision applicable to parts of aircraft.  Second Am. Compl. ¶ 30.  Honeywell

seeks summary judgment accordingly.  Pl.'s Mot. for Summ. J., and accompanying

Mem. of Law in Supp. of Pl.'s Mot. for Summ. J. ("Pl.'s Mem."), ECF No. 43.[2]

Defendant United States ("the Government") has cross-moved for summary judgment,

seeking classification of the segments pursuant to HTSUS subheading 6307.90.98.[3]

Def.'s Cross-Mot. for Summ. J., and accompanying Mem. in Opp'n to Pl.'s Mot. for

Summ. J and in Supp. of Def.'s Cross-Mot. for Summ. J. ("Def.'s Cross-Mem."), ECF

No. 54.  For the reasons discussed herein, the court will enter judgment for Plaintiff.

---

[1] All citations to the HTSUS are to the 2015 version, as determined by the date of importation of the merchandise.  *See LeMans Corp. v. United States*, 660 F.3d 1311, 1314 n.2 (Fed. Cir. 2011).

[2] Plaintiff initially filed Exhibits A, B, and D appended to its motion for summary judgment under seal.  *See* ECF Nos. 42-1, 42-2, 42-4.  Plaintiff later sought, and obtained, leave to unseal those exhibits.  *See* Order (June 10, 2024), ECF No. 52; ECF Nos. 53, 53-1, 53-2 (Pl.'s Exhibits A, B, and D, respectively).  In the filings accompanying Plaintiff's motion to unseal, Plaintiff labeled Exhibits A, B, and D as Exhibits 1, 2, and 3.  For consistency with the parties' references to the exhibits in their briefs, the court refers to the exhibits as Exhibits A, B, and D.

[3] Defendant is not seeking deference for Customs' basis for rejecting heading 8803 as a potential classification and advances different arguments in that regard.  Oral Arg. at 1:23:05–1:23:20 (time stamp from the recording), https://www.cit.uscourts.gov/audio-recordings-select-public-court-proceedings; *see also United States v. Mead Corp.*, 533 U.S. 218, 235 (2001) (the court affords deference to CBP's classification rulings relative to their "power to persuade") (quoting *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944)).

**BACKGROUND**

## I.   Material Facts Not In Dispute

A party moving for summary judgment must show "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  U.S. Court of International Trade ("USCIT") Rule 56(a).  Parties submitted separate statements of undisputed material facts with their respective motions and responses to the opposing party's statements.  Confid. Pl.'s Statement of Material Facts Not In Dispute ("Pl.'s SOF"), ECF No. 42; Def.'s Resp. to Pl.'s Statement of Material Facts Not In Issue ("Def.'s Resp. Pl.'s SOF"), ECF No. 54; Def.'s Statement of Undisputed Material Facts ("Def.'s SOF"), ECF No. 54; Pl.'s Resp. to Def.'s Statement of Undisputed Material Facts ("Pl.'s Resp. Def.'s SOF"), ECF No. 60.  Upon review of the Parties' facts (and supporting exhibits),[4] the court finds the following undisputed and material facts.

Honeywell is the importer of record for the segments and made the subject entries through the ports of Minneapolis, Charlotte, and Atlanta in 2015 and 2016.  Pl.'s

---

[4] The Government submitted physical samples of the segments, a needled preform, and aircraft brake discs for the court's review.  *See* Def.'s Form 23, ECF No. 56.  The physical samples are designated as Defendant's Physical Exhibits 2 (chordal segment), 3 (radial segment), 4 (web segment), 18 (needled preform), 19 (densified carbon-carbon aircraft brake disc (stator)), and 20 (densified carbon-carbon aircraft brake disc (rotor)).  "A rotor is a rotating disc used in an aircraft brake assembly that is keyed to the wheel assembly and provides friction and heat absorption during braking."  Pl.'s SOF ¶ 30; *see also* Def.'s Resp. Pl.'s SOF ¶ 30 (admitting without waiving objection as to cited authority).  A stator, including auxiliary stators referred to as the pressure plate and the backing plate, "is a stationary disc used in an aircraft brake assembly that is keyed to the torque tube and provides friction and heat absorption during braking."  Pl.'s SOF ¶ 31; Def.'s Resp. Pl.'s SOF ¶ 31.

SOF ¶¶ 1–3; Def.'s Resp. Pl.'s SOF ¶¶ 1–3.  At the time of entry, Honeywell classified the segments under either subheading 6307.90.98 or 8803.20.00.  Def.'s Resp. Pl.'s SOF ¶ 4 (citing Customs documentation filed pursuant to USCIT Rule 73.1); *see also* Pl.'s SOF ¶ 4 (averring entry classification under subheading 6307.90.98).  Customs liquidated the segments under subheading 6307.90.98.  Pl.'s SOF ¶ 5; Def.'s Resp. Pl.'s SOF ¶ 5.

The segments are made from nonwoven polyacrylonitrile ("PAN") fiber fabric material that is cut to a specific shape and size as described in one of three Engineering Material Specifications: EMS-182, EMS-183, or EMS-270.  Pl.'s SOF ¶¶ 11–12; Def.'s Resp. Pl.'s SOF ¶¶ 11–12; *see also* Pl.'s SOF ¶ 21; Def.'s Resp. Pl.'s SOF ¶ 21 (admitting that "the segments are cut to a specific inner radius and outer radius").

The below diagram, taken from patents for the segments, depicts the shape of the segments in relation to the PAN fiber fabric material from which the segments are cut:



Fig.4.

Pl.'s Ex. D at 4, ECF No. 53-2.

As shown above, the segments are arc shaped.  *Id.*; Pl.'s SOF ¶¶ 15, 18; Def.'s Resp. Pl.'s SOF ¶¶ 15, 18.  The court's inspection of the segments indicates that each segment is approximately ten and a half inches across at its widest portion, approximately five inches along its radius, and approximately one eighth of an inch thick.  Def.'s Physical Exs. 2–4; *see also* Def.'s SOF ¶ 3; Pl. Resp. Def.'s SOF ¶ 3 (averring that the segments are manufactured to specific dimensions but that any dispute regarding numerical specifications is immaterial).  "The segments . . . look and feel like fabric material," and may be folded or crumpled by hand.  Def.'s SOF ¶ 4; Pl. Resp. Def.'s SOF ¶ 4 (stating "the samples speak for themselves"); *see also* Pl.'s Ex. A, Dep. of Mark A. Brown (Mar. 2, 2023) ("Brown Dep.") at 16:18–21 (agreeing that the segments may be described as fabric-like).

The radial and chordal segments are "[d]uplex [s]egments" that are "manufactured by needling web and unidirectional tow fabrics together to form a duplex fabric," which can be made to a "specific areal weight and width."  Pl.'s SOF ¶ 13; Def.'s Resp. Pl.'s SOF ¶ 13 (admitting that the duplex segments can be made to a specified areal weight and width "within a certain tolerance").  The radial and chordal segments are cut into arc shapes from the duplex assembly in such "manner that results in either a radial or chordal orientation of the unidirectional fibers," respectively.  Pl.'s SOF ¶ 15; Def.'s Resp. Pl.'s SOF ¶ 15.

Web segments are manufactured by "needling tows of oxidized PAN fiber in a manner that results in a web of fibers."  Pl.'s SOF ¶ 18; Def.'s Resp. Pl.'s SOF ¶ 18. Additionally, "[t]he number of tows and the width of the web are designed to achieve the

required areal weight and width."  Pl.'s SOF ¶ 18; Def.'s Resp. Pl.'s SOF ¶ 18.  The web

segments are "cut into arc shapes with a specific outer radius, a specific inner radius

and an arc angle," and have a web orientation.  Pl.'s SOF ¶ 18; Def.'s Resp. Pl.'s SOF

¶ 18.

Web, chordal, and radial segments are generally not interchangeable.  Pl.'s SOF

¶ 22; Def.'s Resp. Pl.'s SOF ¶ 22.  The imported segments have part numbers based on

the segment type, part names indicating, when appropriate, whether the segment is for

use in a stator or rotor disc, and a specified aircraft program use.  Pl.'s SOF ¶ 10; Def.'s

Resp. Pl.'s SOF ¶ 10.[5]

After importation, the segments are first used to produce needled preforms.  To

that end, following importation the segments are delivered to Honeywell's contractor,

Bethlehem Advanced Materials, Inc. ("BAM") in Knoxville, Tennessee.  Def.'s SOF ¶ 6;

---

[5] The Government admits that filings in this case include information as to part number, part name, and segment type.  Def.'s Resp. Pl.'s SOF ¶ 10.  Regarding aircraft program use, the Government avers that Honeywell has designated certain segments "for *both* aircraft and automotive use."  Def.'s Resp. Pl.'s SOF ¶ 19 (citing Pl.'s Ex. B, Pl.'s Ans. to Def.'s First Interrogs.) (emphasis added).  The Government thus admits the information as to aircraft use but avers that Plaintiff's factual representation is incomplete as to automotive use.  Deposition testimony indicates that, up until 2013, certain segments that are not among the entries at issue in this case were "used in specialty automotive racing applications."  Brown Dep. at 54:18–19; *see also id.* at 54:9–56:24; Pl.'s Ex. B at 5 (containing a chart including "Brembo" as an additional program use for certain parts, with "Brembo" identifying automotive use).  As part of that program, Honeywell used certain aerospace brake discs and "cut them into pieces" to be used "for those racing applications."  Def.'s Ex. 16, Dep. of Chris Matheis (Mar. 2, 2023) at 11:9–12, ECF No. 54-13.  Honeywell no longer develops brakes for automotive use.  *Id.* at 11:13–12:8.

Pl.'s Resp. Def.'s SOF ¶ 6.[6]  To create the needled preforms, BAM personnel identify

the specific preform to be manufactured and prepare the appropriate segments (radial,

chordal, or web) and the needling machines.  Def.'s SOF ¶ 11; Pl.'s Resp. Def.'s SOF

¶ 11.  Each layer of the preform contains "six segments of the same type."  Def.'s SOF

¶ 14; Pl.'s Resp. Def.'s SOF ¶ 14.  "[T]he needling machine automatically creates an

additional layer of six segments of a different type than the first, and possibly another

layer of six segments of a third type, depending on the requirements correlating with the

preform requested by the purchase order."  Def.'s SOF ¶ 15; Pl.'s Resp. Def.'s SOF

¶ 15.  The needling machine picks and lays the segments in a donut formation while it

"jab[s] the needles into and out of the segments" to connect the layers.  Def.'s SOF

¶ 16; Pl.'s Resp. Def.'s SOF ¶ 16.  The completed needled preform is assigned a serial

number.  Def.'s SOF ¶ 17; Pl.'s Resp. Def.'s SOF ¶ 17.

Thereafter, multiple needled preforms are gathered and stacked into a furnace

with spacers in between.  Def.'s SOF ¶ 19; Pl.'s Resp. Def.'s SOF ¶ 19.  A weighted

load applies pressure from the top of the stack.  *See id.*  The stacks are heated for

three-and-a-half to four days as part of the carbonization cycle, during which time gases

are released.  Def.'s SOF ¶¶ 21–22; Pl.'s Resp. Def.'s SOF ¶¶ 21–22.  Upon completion

of the carbonization cycle, the now carbonized preform has lost 50 percent of its

---

[6] BAM "is an advanced materials company that specializes in the processing and manufacturing of carbonized products through its use of high-temperature furnace systems."  Def.'s SOF ¶ 7; Pl.'s Resp. to Def.'s SOF ¶ 7.  Honeywell contracted with BAM to create needled preforms which are then processed into carbonized preforms out of the PAN fabric segments.  Def.'s SOF ¶¶ 8-25; Pl.'s Resp. Def.'s SOF ¶¶ 8-25.

needled preform weight and has shrunk in size.  Def.'s SOF ¶ 24; Pl.'s Resp. Def.'s

SOF ¶ 24.  The preform has gone through a molecular change and is considered a

carbon material instead of a PAN material, no longer exhibiting the fabric quality of the

imported segments and instead becoming rigid, solid, and inflexible.  Def.'s SOF ¶¶ 23,

25; Pl.'s Resp. Def.'s SOF ¶¶ 23, 25.

The carbonized preforms are returned to Honeywell for further processing.  Def.'s

SOF ¶ 26; Pl.'s Resp. Def.'s SOF ¶ 26.  At Honeywell's facility, the carbonized preforms

undergo "a densification process involving chemical vapor infiltration (CVI) and [a]

chemical vapor deposition (CVD) process which deposits additional carbon on and

around the carbonized preform."  Def.'s SOF ¶ 27; Pl.'s Resp. Def.'s SOF ¶ 27.  The

densification process involves months of cyclical heating in the furnace totaling

hundreds of hours, increasing the weight of the preforms.  Def.'s SOF ¶¶ 30–31; Pl.'s

Resp. Def.'s SOF ¶¶ 30–31.  The manufacturing process for a densified carbon-carbon

preform "can take up to six months, with the CVD/CVI densification process being the

longest portion of that process."  Def.'s SOF ¶ 32; Pl.'s Resp. Def.'s SOF ¶ 32.

The densified carbon-carbon preforms are manufactured into aircraft brake discs

by means of "a final machining operation."  Def.'s SOF ¶ 33; Pl.'s Resp. Def.'s SOF

¶ 33.  As part of that machining operation, "the friction surfaces are ground to specific

dimensions, the inner and outer dimensions are machined and the other parts such as

lugs, grooves and holes are machined and antioxidant [is] applied."  Def.'s SOF ¶ 33;

Pl.'s Resp. Def.'s SOF ¶ 33.  The resulting product takes on desired characteristics of

brake discs including high strength, thermal capabilities, heat transfer and absorption, and friction generation.  Def.'s SOF ¶ 34; Pl. Resp. Def.'s SOF ¶ 34.

"[A]ircraft brake discs used in aircraft landing gear are parts of aircraft braking systems."  Def.'s Resp. Pl.'s SOF ¶ 26; *see also* Pl.'s SOF ¶ 26.  "Aircraft braking systems are parts of aircraft."  Pl.'s SOF ¶ 25; Def.'s Resp. Pl.'s SOF ¶ 25.[7]

## II.    Procedural History

In 2017, Honeywell filed three protests[8] challenging CBP's classification and claiming classification under Heading 8803.  *See* Pl.'s SOF ¶ 7; Def.'s Resp. Pl.'s SOF ¶¶ 4, 7.  On May 19, 2017, Customs issued Headquarters Ruling Letter H243798 and concluded therein that radial and chordal brake segments imported by Honeywell are properly classified under subheading 6307.90.98.  *See* Pl.'s SOF ¶ 6; Def.'s Resp. Pl.'s SOF ¶ 6.[9]  Customs subsequently denied all three protests.  Pl.'s SOF ¶ 7; Def.'s Resp. Pl.'s SOF ¶ 7.

---

[7] Whether an article is classifiable pursuant to a parts provision is a legal question (when no dispute exists regarding material facts).  However, the court understands the parties to agree that aircraft brake discs and aircraft braking systems would be classifiable as parts of aircraft.  This makes sense given the reference to "and parts thereof" in the subheadings falling within heading 8803.  *See, e.g.*, HTSUS Subheading 8803.20.00 ("Undercarriages and parts thereof."); Explanatory Note ("EN") 88.03(II)(5) (describing "undercarriages" as "brakes and brake assemblies").

[8] Honeywell filed Protest No. 1704-17-101113 on February 21, 2017, Protest No. 3501-17-100099 on March 31, 2017, and Protest No. 1704-17-101346 on May 1, 2017.  *See* Summons at 1, 3–5.

[9] Honeywell's ruling request did not include web segments.  H243798 at 1.

On October 23, 2017, Honeywell commenced this case.  Summons.  Honeywell

filed its complaint on October 29, 2021.  Compl., ECF No. 13.[10]  The Government

answered the complaint.  Ans., ECF No. 18.  Honeywell filed two amended complaints.

First Am. Compl., ECF No. 31; Second Am. Compl.  The Government answered the

second amended complaint.  Ans. 2nd Am. Compl., ECF No. 39.  Following briefing on

the cross-motions for summary judgment, the court heard oral argument on December

11, 2024.  Docket Entry, ECF No. 66.

### JURISDICTION AND STANDARD OF REVIEW

The court has subject-matter jurisdiction pursuant to 28 U.S.C. § 1581(a) (2018).

The court decides classification cases *de novo*.  28 U.S.C. § 2640(a)(1).  The court has

"an independent responsibility to decide the legal issue of the proper meaning and

scope of HTSUS terms."  *Warner-Lambert Co. v. United States*, 407 F.3d 1207, 1209

(Fed. Cir. 2005).  It is "the court's duty . . . to find the *correct* result, by whatever

procedure is best suited to the case at hand."  *Jarvis Clark Co. v. United States*, 733

F.2d 873, 878 (Fed. Cir. 1984).

---

[10] Pursuant to USCIT Rule 83(a), (c), an action commenced under 28 U.S.C. § 1581(a) is placed on the Customs Case Management Calendar for an initial 24-month period with the possibility of extension upon motion by the plaintiff.  An action may not remain on the Customs Case Management Calendar for more than 48 months and may be removed from the Customs Case Management Calendar following the filing of a complaint.  USCIT Rule 83(b), (d).

DISCUSSION

## I.    Legal Framework

The court may grant summary judgment when "there is no genuine issue as to any material fact," and "the moving party is entitled to judgment as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986); USCIT Rule 56(a).

Classifying an imported good involves two steps: (1) determining the meaning of the relevant tariff provisions and (2) determining whether the product at issue falls within a particular tariff provision. *Gerson Co. v. United States*, 898 F.3d 1232, 1235 (Fed. Cir. 2018). The first step is a question of law; the second is a question of fact. *Id.* When there is no factual dispute as to the nature of the product, the two-step analysis is "entirely . . . a question of law." *Id.* (citation omitted).

The General Rules of Interpretation ("GRIs") accompanying the HTSUS govern the court's classification of goods under the HTSUS. *See RKW Klerks Inc. v. United States*, 94 F.4th 1374, 1378 (Fed. Cir. 2024). The court "appl[ies] the GRIs in numerical order." *Gerson*, 898 F.3d at 1235. GRI 1 states that "classification shall be determined according to the terms of the headings and any [relevant] section or chapter notes." The court considers chapter and section notes of the HTSUS because they are statutory law, not interpretive rules. *See Aves. in Leather, Inc. v. United States*, 423 F.3d 1326, 1333 (Fed. Cir. 2005) (citing 19 U.S.C. § 1202).[11]

---

[11] Pursuant to Section 1202, "[t]he Harmonized Tariff Schedule of the United States, which replaced the Tariff Schedules of the United States, is not published in the Code. A current version of the Harmonized Tariff Schedule is maintained and published periodically by the United States International Trade Commission."

When an "imported article is described in whole by a single classification heading or subheading, then that single classification applies, and the succeeding GRIs are inoperative." *Gerson*, 898 F.3d at 1235 (citation omitted).  When necessary to resolve classification, GRI 2(a) states that "[a]ny reference in a heading to an article shall be taken to include a reference to that article incomplete or unfinished, provided that, as entered, the incomplete or unfinished article has the essential character of the complete or finished article."  When "goods are, *prima facie*, classifiable under two or more headings," GRI 3(a) states that "[t]he heading which provides the most specific description shall be preferred to headings providing a more general description."  In that case, "we look to the provision with requirements that are more difficult to satisfy and that describe the article with the greatest degree of accuracy and certainty."  *Orlando Food Corp. v. United States*, 140 F.3d 1437, 1441 (Fed. Cir. 1998).  In addition to the headings and section or chapter notes, courts also may consult the World Customs Organization's Explanatory Notes, which are not legally binding but "are 'persuasive' and are 'generally indicative' of the proper interpretation."  *Otter Prods., LLC v. United States*, 834 F.3d 1369, 1375 (Fed. Cir. 2016).

II.    **Competing Tariff Provisions**

At liquidation, Customs classified the segments under subheading 6307.90.98. That subheading describes:

**6307** Other made up articles, including dress patterns:

   **6307.90** Other

      **6307.90.98** Other.

Subchapter 1 of Chapter 63, which includes heading 6307, "applies only to made up articles, of any textile fabric."  HTSUS Ch. 63 Note 1.  For purposes of heading 6307, "the expression 'made up' means," *inter alia*, "[c]ut otherwise than into squares or rectangle."  HTSUS Section XI Note 7(a) (underline omitted).[12]  Heading 6307 "covers made up articles of any textile material which are not included more specifically in other headings of Section XI or elsewhere in the Nomenclature."  EN 63.07.

Honeywell contends that the segments are instead described by subheading 8803.20.00.  That subheading covers:

**8803** Parts of goods of heading 8801 or 8802:

**8803.20.00** Undercarriages and parts thereof.

Heading 8802 covers "Other aircraft (for example, helicopters, airplanes); spacecraft (including satellites) and suborbital and spacecraft launch vehicles." Accordingly, heading 8803 effectively covers parts of aircraft, including parts of airplanes.[13]

Chapter 88 falls within Section XVII of the HTSUS.  Section XVII Note 2 excludes certain "[p]arts of general use. . . of base metal . . . or similar goods of plastics" as defined elsewhere in the tariff.  HTSUS Section XVII Note 2(b).  "References in chapters 86 to 88 to 'parts' or 'accessories' do not apply to parts or accessories which are not

---

[12] The section notes provide seven alternate definitions of the phrase "made up," as indicated by the disjunctive "or" separating Note 7(f) and (g).

[13] The subheadings under heading 8803 are organized by various aircraft parts, such as "[p]ropellors and rotors and parts thereof" in subheading 8803.10.00; "[u]ndercarriages and parts thereof" in subheading 8803.20.00; or "[o]her parts of airplanes or helicopters" in subheading 8803.30.00.  HTSUS heading 8803.

suitable for use solely or principally with the articles of those chapters." HTSUS Section

XVII Note 3. Similarly, Additional U.S. Rules of Interpretation ("ARI") 1(c) states that "a

provision for parts of an article covers products solely or principally used as a part of

such articles but a provision for 'parts' or 'parts and accessories' shall not prevail over a

specific provision for such part or accessory."

The Explanatory Notes accompanying heading 8803 provide examples of parts

of aircraft covered by this provision. Those examples include:

> (1) Fuselages and hulls; fuselage or hull sections; also their internal or external parts (radomes, tail cones, fairings, panels, partitions, luggage compartments, floors, instrument panels, frames, doors, escape chutes and slides, windows, port-holes, etc.).

> (2) Wings and their components (spars, ribs, cross-members).

> (3) Control surfaces, whether or not movable (ailerons, slats, spoilers, flaps, elevators, rudders, stabilisers, servo-tabs, etc.).

> (4) Nacelles, cowlings, engine pods and pylons.

> (5) Undercarriages (including brakes and brake assemblies) and their retracting equipment; wheels (with or without tyres); landing skis.

> (6) Seaplane floats.

> (7) Propellers (airscrews), rotors for helicopters and gyroplanes; blades for propellers and rotors; pitch control mechanisms for propellers and rotors.

> (8) Control levers (control columns, rudder-bars and various other operational levers).

> (9) Fuel tanks, including auxiliary fuel tanks.

EN 88.03(II).

### III.    Classification of the Segments Under Heading 8803

### A.  Overview and Parties' Contentions

"In adjudicating a tariff classification dispute, the court first considers whether 'the government's classification is correct, both independently and in comparison with the importer's alternative.'"  *Shamrock Bldg. Materials, Inc. v. United States*, 47 CIT __, __, 619 F. Supp. 3d 1337, 1342 (2023) (quoting *Jarvis Clark*, 733 F.2d at 878).  Because Customs' classification turned on its conclusion that heading 8803 does *not* cover the segments, the court begins with an examination of that classification.  There is no dispute over the plain meaning of the relevant tariff terms.  As discussed above, heading 8803 covers parts of aircraft.  At issue is whether the segments meet the requirements for classification as parts of aircraft.

This case stands apart from other classification cases involving parts of articles. The imported segments are not installed directly on an aircraft.  Instead, the segments are imported into the United States as an upstream product for the production of the aircraft brake discs, an article the parties agree constitutes a part of an aircraft.  Thus, the issue in this case involves the extent to which a part of a part is a part for tariff purposes.[14]  The parties agree that the "subpart rule" may apply to articles within the

---

[14] "In the field of [C]ustoms jurisprudence it is a well-recognized principle that a part of a part is a part for tariff purposes."  *American Schack Co. v. United States*, 1 CIT 1, 5 (1980); *cf., e.g.*, *Honda of Am. Mfg., Inc. v. United States*, 607 F.3d 771, 773 (Fed. Cir. 2010) (observing that subject oil bolts facially meet heading 8708 as parts of an automobile "because they are 'parts and accessories' of vehicle power trains" or "of vehicle 'brakes and servo-brakes'").  While this case presents an unusual circumstance with respect to the relationship between the claimed part (the segments) and the

aircraft parts supply chain—no matter how far upstream—provided those articles meet

the requirements for a part (or a part of a part, as the case may be) and are not

otherwise excluded from classification as a part by relevant section and chapter notes.

Oral Arg. at 02:00–03:50 (colloquy with Plaintiff's counsel); *id.* at 45:15–45:39 (colloquy

with Defendant's counsel).[15]

At first glance, the segments do not look like parts of aircraft.  As discussed

above, the relationship between the segments as imported and the article of which they

are claimed to be a part requires that the segments undergo substantial post-

importation processing in the manufacturing of needled preforms, carbonized preforms,

carbon-carbon preforms and, finally, aircraft brake discs.  The question that arises in

this case is whether this degree of processing removes the segments from classification

---

downstream product (the aircraft), there is some analogous precedent.  *See Gallagher & Ascher Co. v. United States*, 63 Cust. Ct. 223, 224–28, C.D. 3899 (1969) (finding that a lock cylinder plug is a part of a locking gas tank cap and, thus, part of a motor vehicle, and further finding that keys, which were "necessary parts of the cylinder plugs," were also dutiable as parts of motor vehicles).  *Gallagher & Ascher* involved the Tariff Schedule of the United States ("TSUS"), the predecessor to the HTSUS.  Cases interpreting the TSUS may be instructive but are not dispositive.  *See JVC Co. of Am., Div. of US JVC Corp. v. United States*, 234 F.3d 1348, 1355 (Fed. Cir. 2000).

[15] The Government's filings do not explicitly address the subpart rule.  At oral argument, the following exchange occurred:

> Court: "Just so I'm clear, you don't disagree with [counsel for Honeywell] that essentially [the subpart rule] goes all the way up the supply chain except as otherwise limited by ARI 1(c), Section Note 3, etc."
> Mr. Kenny: "*Yes*.  It has to be capable of being a part and not elsewhere specifically found in the HTSUS and it has to meet Section Note 17 in this case."

Oral Arg. at 45:15–45:39 (emphasis added).  The court understands the reference to Section Note 17 to mean Section XVII Note 3.

as aircraft parts notwithstanding the segments' principal, and perhaps sole, use in the production of aircraft brake discs.

Honeywell contends that the segments are classifiable under heading 8803 because they are parts of aircraft brake discs that, in turn, are parts of aircraft braking systems used in aircraft landing gear.  Pl.'s Mem. at 21–25.  Plaintiff avers that the segments "are fully finished parts" ready for use "in the manufacture of brake discs."  *Id.* at 34; *see also* Pl.'s Resp. in Opp'n to Gov't's Cross-Mot. for Summ. J. and Reply in Supp. of Pl.'s Mot. for Summ. J. ("Pl.'s Resp.") at 6, ECF No. 60.  At oral argument, Honeywell argued that the segments may also be considered parts of the needled preform, stating that whether the segments are considered parts of the preforms or parts of the brake discs is "a distinction without a difference" after application of the subpart rule.  Oral Arg. at 28:00–31:00.

The Government contends that the segments are not finished parts or subparts of an aircraft.  Def.'s Cross-Mem. at 15.  Emphasizing the post-importation processing that occurs in the manufacturing of aircraft brake discs, the Government argues that the segments are not sufficiently advanced "to be recognized as a part."  Def.'s Reply Mem. of Law in Opp'n to Pl.'s Mot. for Summ. J. and in Further Supp. of Def.'s Cross-Mot. for Summ. J. ("Def.'s Reply") at 6, ECF No. 63.  The Government contends that the segments are not "attached to an existing item," but are instead subject to "extensive post-importation manufacturing" that results in "a wholly new article, *i.e.*, the brake disc."

Def.'s Reply at 12.[16]  At oral argument, the Government acknowledged that the

segments are first manufactured into needled preforms but averred that the segments

are not parts of preforms.  Oral Arg. at 59:47–1:02:17.

### B.  The Segments are Classifiable as Parts of Aircraft

In briefing the issues relevant to this case and as summarized above, the parties

focus on the relationship between the segments and the aircraft brake discs, perhaps

because they agree that aircraft brake discs constitute parts of aircraft for purposes of

heading 8803.  Plaintiff argues the segments are parts of brake discs and are, thus,

likewise classifiable as parts of aircraft; Defendant argues the segments are mere

materials out of which the brake discs are made and are not classifiable as parts of

brake discs.  Nevertheless, the parties agree that the potential breadth of the subpart

rule obviates any basis for treating aircraft brake discs as an arbitrary cut-off point

whereby products further upstream cannot be considered aircraft parts despite their

dedicated use in aircrafts.  The subpart rule, however, is not dispositive of the

---

[16] The Government further avers that the segments are not unfinished aircraft brake
discs for purposes of GRI 2(a).  Def.'s Reply at 19–27.  According to the Government,
GRI 2(a) is relevant to discerning finished parts from unfinished parts, *id.* at 19–20, but
asserts that the segments do not "possess the essential character of the aircraft brake
system of which they claim to be a part, i.e., the densified carbon-carbon aircraft brake
disc," *id.* at 20.  Honeywell contends that GRI 2(a) is inapplicable because this case is
resolved by GRI 1.  Pl.'s Resp. at 20.  Because the court finds that the segments satisfy
the parts test, the court does not address the unfinished parts arguments or whether
GRI 2(a) applies to a subpart analysis.  *See* GRI 2(a) ("Any reference *in a heading* to an
article shall be taken to include a reference to that article incomplete or unfinished,
provided that, as entered, the incomplete or unfinished article has the essential
character of the complete or finished article.") (emphasis added).

segments' classification in light of the additional processing by both BAM and Honeywell and judicially recognized distinctions between parts and materials.  The following principles are relevant to the court's analysis.

Whether something is a part for tariff purposes is governed by relevant section and chapter notes and caselaw.  The U.S. Court of Appeals for the Federal Circuit ("Federal Circuit") has recognized two tests for determining whether merchandise may be classified as a "part" of another article.  Application of those tests depends on the facts of the particular case.  *RKW Klerks*, 94 F.4th at 1378.

First, an item may be a part for tariff purposes if the item is "dedicated solely for use with another article and is not a separate and distinct commercial entity."  *Id.* (quoting *Bauerhin Techs. Ltd. P'ship v. United States*, 110 F.3d 774, 779 (Fed. Cir. 1997)).  In *Bauerhin*, the Federal Circuit classified imported canopies as parts of child safety seats and not as made-up textiles when they "serve[d] no function or purpose that is independent of" child safety seats.  110 F.3d at 779.  Similarly, in *United States v. Pompeo*, the Federal Circuit's predecessor court, the U.S. Court of Customs and Patent Appeals, classified an imported supercharger as a part of an automobile because it was "dedicated solely for use upon automobiles."  43 C.C.P.A. 9, 14 (1955).  In both *Bauerhin* and *Pompeo*, "the items at issue were considered parts because they could not serve a function apart from being a component of the larger article."  *RKW Klerks*, 94 F.4th at 1379.

Second, an item may be considered a part if it "is an 'integral, constituent, or component part, without which the article to which it is to be joined, could not function

as such article.'"  *RKW Klerks*, 94 F.4th at 1378 (citation omitted); *see also United States v. Willoughby Camera Stores, Inc.*, 21 C.C.P.A. 322, 324 (1933) (stating the "integral, constituent, or component part" test and noting the "well-established rule that a 'part' of an article is something necessary to the completion of that article").  While the two tests consider similar factors, each addresses a different situation, and both do not have to be satisfied.  *See Bauerhin*, 110 F.3d at 779 (finding that the "integral, constituent, or component part" test was not exclusive and that the "dedicated solely for use" test applied instead); *Trans Atl. Co. v. United States*, 48 C.C.P.A. 30, 32–33, C.A.D. 758 (1960) (stating that the *Willoughby* test is not "dispositive" when the imported items "have but one commercial use").

Courts have applied varying tests, also suited to the circumstances of each case, to determine whether a subject import is classifiable as a part or as material from which finished parts are subsequently produced.  Distinctions between parts and materials may be relevant when an imported article is not dedicated for use in the downstream article because the imported article has a variety of applications, or when the imported article must be modified after importation in order to be usable as a finished part.  These considerations are reflected in HTSUS Section XVII Note 3 (something may be a part if it is both "suitable for use" with an article and "solely or principally" used with the article).

One example of these distinctions is found in *Baxter Healthcare Corp. of Puerto Rico v. United States*, in which the Federal Circuit addressed "[w]hether an imported item that is made into multiple parts after import is classifiable as 'parts' of other articles under the HTSUS."  182 F.3d 1333, 1338 (Fed. Cir. 1999).  In that case, the plaintiff

imported Oxyphan® in 10-kilometer spools and claimed classification as part of an

oxygenator.  *Id.* at 1335.  Each spool contained sufficient product for roughly four

oxygenators, though "the exact length of membrane required per oxygenator [wa]s not

fixed."  *Id.*

       Citing *Bauerhin* and *Willoughby*, the Federal Circuit first considered whether the

imported product was "dedicated solely or principally for use in" the making of

membrane oxygenators and had no other "substantial . . . commercial uses" and found

those requirements to be met.  *Id.* at 1338–39.  This first consideration reflects the

"parts" tests set forth above.  Second, the court explained that "if the item as imported

can be made into *multiple* parts of articles, the item must identify and fix with certainty

the individual parts that are to be made from it."  *Id.* at 1339.  On this point, a majority of

the panel concluded that the Oxyphan® material was not classifiable as a part,

reasoning:

> At the time of import, the individual parts cannot be discerned from the roll,
> and the roll nowhere marks or otherwise identifies the individual parts to
> be made from it.  Rather, Baxter individually cuts lengths of Oxyphan®
> from a roll and custom-fits them around a steel bellows.  The exact length
> needed per oxygenator is not known until the oxygenator is made.

*Id.* at 1339.[17]  Likewise focusing on the post-importation cutting to size, the dissenting

opinion noted that "[a]pplying the panel majority's rationale, Oxyphan® would be a 'part'

---

[17] For this consideration, the majority cited *Harding Co. v. United States*, 23 C.C.P.A.
250 (1936).  *See Baxter*, 182 F.3d at 1339 (citing *Harding*, 23 C.C.P.A. at 253).
*Harding* observed that "[t]o be a part of an automobile, that is a brake lining," the subject
import "must be more than mere material for making a brake lining."  The *Harding* court
concluded that although the imported merchandise had "but one use . . . in the

if it were simply repackaged so that each roll held one-fourth its capacity." *Id.* at 1340 (Newman, J., dissenting).

In another example that involved post-importation processing other than being cut to size, the Federal Circuit considered whether the imported item was "sufficiently processed to be dedicated for use" in the downstream article. *E.M. Chems. v. United States*, 920 F.2d 910, 914 (Fed. Cir. 1990). In that case, the appellate court affirmed this court's finding that liquid crystals' "dedicated use in [liquid crystal displays ("LCDs")] was fixed with sufficient certainty without further processing to qualify them as parts" despite post-importation mixing of the chemicals and addition of a twist agent. *Id.*

In yet another example, in a case involving Canadian lumber, the Federal Circuit explained that for the cut lumber to qualify as "recognizable unassembled pieces" (i.e., parts) of wooden trusses, the cut lumber "must be 'dedicated solely or principally for use in those articles'" and "must be more than just basic material generally suitable for use in the finished article." *Millenium Lumber Distrib. Ltd. v. United States*, 558 F.3d 1326, 1329 (Fed. Cir. 2009) (quoting *Baxter*, 182 F.3d at 1339). The Federal Circuit found that "[b]ecause the merchandise maintained its identity and usefulness as *general* sawn lumber for potentially *numerous purposes*, it was not sufficiently advanced at the time of importation to be classified under 4418" as parts of wood trusses. *Id.* at 1330 (emphases added) (citation omitted); *cf. Ludvig Svensson (U.S.) Inc. v. United States*,

---

manufacture of brake lining for automobiles," the merchandise was not classifiable as a part of an automobile because the identity of the individual article had not yet been fixed with certainty (i.e., it was not cut to size or marked for cutting as a particular brake lining). 23 C.C.P.A. at 252–53.

23 CIT 573, 580–84, 62 F. Supp. 2d 1171, 1178–81 (1999) (holding that imported

screens must be classified as parts of agricultural equipment because they were an

integral part of and dedicated for use in greenhouses, had "no other commercial uses,"

and were "in an advanced state of manufacture" despite some post-importation

processing incident to installation).[18]

The foregoing cases reflect judicial consideration of case-specific facts as to

whether an imported article 1) is dedicated for use in the downstream article; 2) must be

cut to size to be used for its particular purpose; or 3) otherwise requires substantial

additional processing before being identifiable for its intended purpose.  While the

foregoing cases are instructive, they are not dispositive in light of the unique

circumstances of this case.  Unlike those cases that relied on post-importation cutting to

size or other modification of *the imported article* to find that the article was not

classifiable as a part, here, the segments, as imported, are cut-to-size and identified for

the production of a brake disc for a particular type of aircraft.  *See* Pl.'s SOF ¶¶ 10–12;

Def.'s Resp. Pl.'s SOF ¶¶ 10–12.  The imported segments are used in their condition as

imported to produce the needled preforms that are, thereafter, used in the

---

[18] Specifically, the *Ludvig Svensson* court found:
> The screens are the product of high technology, design and planning and
> are not simple products; they are complex screens incorporating several
> different types of materials, manufactured for the specific goal of
> controlling the various aspects of a greenhouse environment.  Moreover,
> each type of screen may only be used for the purpose for which it was
> manufactured and the function and purpose of each screen is clearly
> identifiable upon importation.

23 CIT at 582, 62 F. Supp. 2d at 1179.

manufacturing of aircraft brake discs.  Def.'s SOF ¶¶ 11–33; Pl.'s Resp. Def.'s SOF

¶¶ 11–33.  In other words, notwithstanding the post-importation processing that is

required as part of the production process, the imported segments are identifiable to the

downstream article and are used for no other purpose.  Thus, taking account of the

considerations deemed relevant in the foregoing cases, the court finds that the imported

segments are classifiable as parts of aircraft.

Whether considered in light of the language of HTSUS Section XVII Note 3 or the

judicially recognized tests for parts, the segments are recognizable parts of the needled

preforms.  Upon importation, the segments are suitable for use in the needled preforms,

requiring no further processing prior to such use.  *See* Def.'s SOF ¶¶ 6, 8, 11–17; Pl.'s

Resp. Def.'s SOF ¶¶ 6, 8, 11–17.  Additionally, the segments are dedicated to that use

and had no other substantial commercial application.[19]  The segments may also be

considered integral, constituent, and component parts of the needled preforms because

---

[19] Honeywell's earlier participation in the specialty automotive business is immaterial. The segments involved in that program were used to produce certain aircraft brake discs that were subsequently modified for automotive use.  *See supra* note 5 (discussing relevant evidence).  Moreover, HTSUS Section XVII Note 3 does not require sole use with an article; principal use is sufficient.  To the extent the automotive use is relevant, it is enough that the segments were principally used in aerospace applications, and since 2013, that has been their sole use.  Additionally, the parts of general use exclusion considered dispositive in *Honda of America* is inapplicable here.  In *Honda of America*, the Federal Circuit acknowledged that the subject oil bolts facially met Honda's proposed subheadings as "parts and accessories" of vehicles or motorcycles. 607 F.3d at 773.  The court concluded that the oil bolts were correctly classified under subheading 7318.15.80, which covers "screws, bolts, nuts, . . . and similar articles, or iron and steel," *id.* 772, based on an exclusion from headings of chapter 87 for "[p]arts of general use. . . of base metal . . . or similar goods of plastics" as defined in HTSUS Section XV Note 2(a), *id.* at 773–76; HTSUS Section XVII Note 2(b).  The imported segments are not covered by that exclusion.

each of those preforms are *made from* various combinations of the segments.  Simply

put, without the segments, there would be no needled preforms.  *See Willoughby*, 21

C.C.P.A. at 324 (describing a part as "something necessary to the completion of that

article").

      That the segments are not joined to the preforms in the manner of an attachment

but are instead combined to form the preform in the needling operation does not

preclude classification of the segments as parts.  *See* Def.'s SOF ¶¶ 14–16; Pl.'s Resp.

Def.'s SOF ¶¶ 14–16.  In *E.M. Chemicals. v. United States*, 13 CIT 849, 851, 858, 728

F. Supp. 723, 725, 730 (1989), *aff'd*, 920 F.2d 910 (Fed. Cir. 1990), the court classified

liquid crystals as parts of LCDs when, after importation, the liquid crystals were

"sandwiched between two 'plates.'"  This finding undercuts the Government's argument

that the line separating parts from raw material is separability from the downstream

article.  Oral Arg. at 52:50–54:26.[20]

---

[20] During oral argument, the Government cited *Rollerblade, Inc. v. United States*, 282 F.3d 1349 (Fed. Cir. 2002), for this proposition.  In *Rollerblade*, the Federal Circuit observed that the term "part" may be defined as "an essential element or constituent; integral portion which can be separated, replaced, etc."  282 F.3d at 1353 (quoting *Part*, Webster's New World Dictionary 984 (3d College Ed. 1988)).  *Rollerblade* is, however, inapposite.  That case involved the classification of inline roller-skating protective gear to be used with inline roller skates.  *Id.* at 1350–51.  The appellate court considered the dictionary definition relevant to its conclusion that a part "must have a direct relationship to the primary article, rather than to the general activity in which the primary article is used," *id.* at 1353, and to the court's corresponding conclusion that the protective gear was not classifiable as parts of skates, *id.* at 1353–54.  The Federal Circuit did not seek to limit the definition of parts for all purposes to separable or removable articles, and the Government's reliance on *Rollerblade* for that proposition runs counter to that court's holding in *E.M. Chemicals* given the lack of indication that the liquid crystals may be separated from, or replaced in, their respective LCDs once applied to that use.

The Government's additional arguments that the segments constitute mere materials are also misplaced.  At its core, the Government's argument against classification of the segments as parts of aircraft rests on the degree of processing involved in the production of aircraft brake discs.  Def.'s Cross-Mem. at 25–26; Oral Arg. at 1:02:07–1:03:59 (in response to the court's question whether the segments are integral to the brake discs, arguing that "there's too much baking of the cake . . . there's too much manufacturing").  That argument, however, discounts the segments' dedicated use *in the production of* aircraft brake discs and relies instead on the complex nature of that production to remove the segments from classification as parts.  The Government, however, nowhere explains why the complexity of this production materially changes the outcome.  Moreover, the Government's attempt to analogize the facts of this case to those in *Baxter* are premised on the Government's mistaken reliance on a GRI 2(a) analysis.  *See* Def.'s Cross-Mem. at 27 ("The PAN segments' identity, therefore, cannot be considered fixed with certainty upon importation, as it does not have the essential character of the final carbon-carbon brake discs . . . ."); Def.'s Reply at 6 ("[T]he fabric segments are not advanced enough in manufacture to be recognized as a part, *i.e.* brake discs.").  The question is not, however, whether the segments are recognizable as aircraft brake discs, finished or unfinished.  Rather, the question is whether the segments are finished or unfinished parts at the time of importation in relation to a downstream article that constitutes a part of an aircraft, which, by operation of the subpart rule, may be a part of the brake disc.

Furthermore, the Government's assertion that the "segments' identity . . . cannot be considered fixed with certainty upon importation," Def.'s Cross-Mem. at 27, is factually incorrect.  The analysis of whether an imported good's identity is fixed with certainty is intended to ascertain whether the identity of *the individual part* is fixed at the time of importation.  *See Baxter*, 182 F.3d at 1339 (stating that when "the item as imported *can be made into multiple parts of articles*, the item must identify and fix with certainty *the individual parts* that are to be made from it") (emphases added).  As discussed above, the imported spools of Oxyphan® at issue in *Baxter* are not analogous to the imported segments, each of which is identifiable as a radial, web, or chordal segment, cut to size for the production of, and identified by part number for, the production of a brake disc for a particular type of aircraft.  Recognition of the imported merchandise as a part is not precluded simply because the article of which the import *is* a part undergoes further processing *provided* the import meets the requirements for classification as a part, is not mere material for a part, and is not excluded by operation of the section and chapter notes.  For the reasons discussed above, the segments as imported meet these requirements.  Accordingly, the court finds that the segments are *prima facie* classifiable as parts of aircraft.

## IV.  Classification of the Segments Under Heading 6307

The parties do not dispute that the segments are *prima facie* classifiable in heading 6307.  However, the Government seeks classification of the segments under heading 6307 even if the court finds the segments classifiable under heading 8803.  Def.'s Cross-Mem. at 28–29.  The Government argues that heading 6307 more

specifically describes the imported segments.  *See id.* at 29.  According to the

Government, "both headings 8801 and 8802 . . . include a basket element in addition to

named articles," for example, "heading 8802 includes 'Other Aircraft.'"  *Id.* at 30.

Honeywell disputes the Government's arguments regarding specificity.  *See* Pl.'s

Resp. at 19.  Honeywell argues that neither heading 8801 nor 8802 is a basket

provision because they each cover a specific type of aircraft by name, namely, powered

or non-powered.  *See id.*  The Government offers no arguments in response.  *See*

Def.'s Reply at 19–20 (merely stating that "because [P]laintiff's classification is

inapplicable, classification under subheading 6307.90.98, HTSUS, is appropriate").

As an initial matter, the imported segments are *prima facie* classifiable in heading

6307.  The imported segments consist of a nonwoven PAN fiber fabric, i.e., a textile.[21]

Pl.'s SOF ¶¶ 11–12; Def.'s Resp. Pl.'s SOF ¶¶ 11–12; *see also* HTSUS Ch. 63 Note 1.

The segments have the "look and feel" of "fabric material," Def.'s SOF ¶ 4; Pl. Resp.

Def.'s SOF ¶ 4; Def.'s Physical Exs. 2–4.  They are "arc-shaped," Def.'s SOF ¶ 3; Pl.

Resp. Def.'s SOF ¶ 3, and, thus, "made up" for purposes of heading 6307, *see* HTSUS

Section XI Note 7(a).  Accordingly, the segments are *prima facie* classifiable under

heading 6307.  However, heading 6307 covers only those articles "which are not

---

[21] "When the HTSUS does not define a tariff term, the term receives its 'common and popular meaning,'" for which the "court may consult 'dictionaries, scientific authorities, and other reliable information sources.'"  *Rollerblade*, 282 F.3d at 1352 (citations omitted).  The term "textile" may be defined as "any cloth or goods produced by weaving, knitting, or felting."  *Textile*, Dictionary.com, https://www.dictionary.com/browse/textile (last visited Jan. 30, 2025).

included more specifically in other headings of Section XI or elsewhere in the

Nomenclature."  EN 63.07.[22]

> To that end, the court disagrees with the Government's argument that heading

6307 more specifically describes the segments.  The court has previously recognized

that heading 6307 is a basket provision because it covers "Other made up articles,

including dress patterns."  *See Allstar Mktg. Grp., LLC v. United States*, 41 CIT __, __,

211 F. Supp. 3d 1319, 1337 n.26 (2017).[23]  Heading 8803 covers "Parts of goods of

heading 8801 or 8802."  While the court has used the shorthand, "parts of aircraft," in

reference to heading 8803 to incorporate the language of heading 8802, the latter

heading specifically covers "Other aircraft (for example, helicopters, airplanes);

spacecraft (including satellites) and suborbital and spacecraft launch vehicles."  While

heading 8802 uses the term "other," it also specifies examples of what those "other"

aircraft are, and that includes "airplanes."  When "goods are, *prima facie*, classifiable

under two or more headings," GRI 3(a) requires classification in the heading that

contains "the most specific description" of the article rather than in a heading that

contains a "more general description."  The phrase "other made up articles" is more

general than a heading that effectively provides for parts of "other aircraft," particularly

---

[22]Pursuant to ARI 1(c), a parts provision "shall not prevail over a specific provision for
such part."

[23] In *Allstar*, the court declined to consider heading 6307 as an alternative classification
after finding that GRI 3(a) would require classification under heading 6301 as the more
specific provision.  211 F. Supp. 3d at 1337 n.26.  Here, however, the court considers
heading 6307 in light of the Government's argument that heading 6307 is more specific
to the segments than heading 8803.

when those "other aircraft" are specified in the heading to include airplanes.  Moreover, the requirements of heading 8803 are more difficult to satisfy.  *See Orlando Food Corp.*, 40 F.3d at 1441 (stating the rule).  The Government's vague references to "basket elements" in headings 8801 and 8802 and the dictates of "logic" unsupported by citations to authority do not persuade the court to find otherwise.  Accordingly, the segments must be classified in heading 8803.[24]

**CONCLUSION**

The court finds that the imported segments must be classified under heading 8803.  In the absence of any dispute as to the proper subheading, the court further finds that the imported segments must be classified under subheading 8803.20.00.  The court will grant Plaintiff's motion for summary judgment and will deny the Government's cross-motion for summary judgment.  Judgment will be entered accordingly.

/s/      Mark A. Barnett____
Mark A. Barnett, Chief Judge

Dated: January 30, 2025__
          New York, New York

---

[24] The court independently considered other tariff classifications, including heading 5603 discussed in the Government's moving brief.  *See* Def.'s Cross-Mot. at 15 n.8.  The court agrees that classification in Chapter 56 is precluded by Section XI Note 8, which states that Chapter 56 does not apply to goods that are "made up within the meaning of" Section XI Note 7.  The segments are "made up" for purposes of Note 7(a).