UNITED STATES COURT OF INTERNATIONAL TRADE
BEFORE: HON. MARK A. BARNETT, CHIEF JUDGE

|  |  |  |
|---|---|---|
| HONEYWELL INTERNATIONAL INC., | : | |
| | : | |
| Plaintiff, | : | Court No. 17-00256 |
| | : | |
| v. | : | |
| | : | |
| UNITED STATES, | : | |
| | : | |
| Defendant. | : | |

## <u>ORDER</u>

Upon consideration of defendant's motion for a rehearing pursuant to USCIT Rule 59(a); and upon consideration of other papers and proceedings had herein; it is hereby

ORDERED that defendant's motion be, and hereby is, granted, and it is further

ORDERED that judgment is entered for the United States; and it is further

ORDERED that this action is dismissed in its entirety.

_____
MARK A. BARNETT, CHIEF JUDGE

Dated: New York, New York
This _____ day of _____ , 2025.

UNITED STATES COURT OF INTERNATIONAL TRADE
BEFORE: HON. MARK A. BARNETT, CHIEF JUDGE

|                                    |   |                    |
|------------------------------------|---|--------------------|
| HONEYWELL INTERNATIONAL INC.,      | : |                    |
|                                    | : |                    |
| Plaintiff,                         | : | Court No. 17-00256 |
| v.                                 | : |                    |
|                                    | : |                    |
| UNITED STATES,                     | : |                    |
|                                    | : |                    |
| Defendant.                         | : |                    |
|                                    | : |                    |

**DEFENDANT'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION
FOR REHEARING AND FOR THE COURT TO AMEND ITS FINDINGS OF
FACT AND CONCLUSIONS OF LAW AND MAKE ADDITIONAL ONES**

YAAKOV M. ROTH
Acting Assistant Attorney General

PATRICIA M. McCARTHY
Director

JUSTIN R. MILLER
Attorney-In-Charge
International Trade Field Office

AIMEE LEE
Assistant Director

EDWARD F. KENNY
Senior Trial Counsel
Civil Division, Dept. of Justice
Commercial Litigation Branch
International Trade Field Office
26 Federal Plaza, Room 346
New York, New York 10278
*Attorneys for Defendant*
Tel. No. 212-264-9240 or 9230

Of Counsel:
Yelena Slepak, Esq.
Office of Assistant Chief Counsel
International Trade Litigation
U.S. Customs and Border Protection

## TABLE OF CONTENTS

INTRODUCTION ..................................................................................................1

BACKGROUND ..................................................................................................3

STATEMENT OF FACTS ....................................................................................4

DISCUSSION ......................................................................................................6

I.    THE CIRCUMSTANCES WARRANT REHEARING AND FOR THE
      COURT TO AMEND ITS FINDINGS AND CONCLUSIONS AND MAKE
      ADDITIONAL ONES IF NECESSARY ........................................................6

      A.  The Legal Standards For a Rule 59 Motion.............................................6

      B.  The Court's Decision Not to Utilize a GRI 2(a) Analysis Of The Segments
          Comprises Clear Error .............................................................................8

          1)  The GRIs Are Hierarchical, And The Court Committed Clear Legal Error
              When It Analyzed GRIs 1 And 3 But Failed To Consider GRI 2(a)................9

          2)  The Court Committed Error When It Failed To Determine Whether The
              Segments Were A Finished Part Of An Aircraft, An Unfinished Part Of
              An Aircraft Having The Essential Character Of The Finished Part Of An
              Aircraft, Or An Unfinished Part Of An Aircraft Not Having The Essential
              Character Of The Finished Part Of An Aircraft.............................................12

          3)  Had The Court Applied GRI 2(a), It Had To Conclude That The
              Segments Are Unfinished Articles That Do Not Have The Essential
              Character Of The Finished Brake Discs ........................................................15

      C.  The Court Committed Error When It Interpreted Section XVII Note 3's
          "Suitable For Use Solely Or Principally With The Articles Of Those Chapters
          [Chapters 86-88]" To Be The Equivalent To Suitable For Use In The
          Manufacture Of Articles Of Those Chapters .......................................................17

CONCLUSION..................................................................................................19

# TABLE OF AUTHORITIES

## Cases

*Aqua-Lung Am., Inc. v. Am. Underwater Prods.,*
Court No. C 07-5346, 2010 WL 2991512 (N.D. Cal. July 28, 2010)............................8

*Bauerhin Technologies Ltd. v. United States,*
110 F.3d 774 (Fed. Cir. 1997)........................................................................................11

*Baxter Healthcare Corp. of Puerto Rico v. United States,*
182 F.3d 1333 (Fed. Cir. 1999)......................................................................................11

*Doe v. New York City Dep't of Social Servs.,*
709 F.2d 782 (2d Cir. 1983)............................................................................................8

*E.M. Chems. v. United States,*
920 F.2d 910 (Fed. Cir. 1990)........................................................................................11

*Ford Motor Co. v. United States,*
30 CIT 1587 (2006) ..........................................................................................................8

*Ford Motor Co. v. United States,*
751 F. Supp. 2d 1316 (Ct. Int'l Trade 2010) ..............................................................7, 8

*Gallagher & Ascher Co. v. United States,*
63 Cust. Ct. 223 (1969)..................................................................................................12

*Honeywell International, Inc. v. United States,*
*No. 17-00256, 2025 WL 342865 (Ct. Int'l Trade Jan. 30, 2025)* ............................ *passim*

*Harding Co. v. United States,*
23 CCPA 250 (1936) ......................................................................................................12

*In re Fosamax Prods. Liab. Litig.,*
815 F. Supp. 2d 649 (S.D.N.Y. 2011).............................................................................8

*Junge v. Hedden,*
146 U. S. 233 (1892)......................................................................................................15

*JVC Co. of America, Div. of US JVC Corp. v. United States,*
234 F.3d 1348 (Fed.Cir. 2000).......................................................................................12

*Kerr-McGee Chem. Corp. v. United States,*
14 CIT 582 (1990) ............................................................................................................7

*Kolel Beth Yechiel Mechil of Tartikov, Inc. v. YLL Irrevocable Trust,*
    729 F.3d 99 (2d Cir. 2013)..........................................................................7

*Ludvig Svensson, Inc.  v. United States,*
    23 CIT 573, 62 F.Supp. 2d 1171 (1999) ........................................................11

*Tiffany (NJ) v. Forbse,*
    11-Civ-4976, 2012 WL 3686289 (S.D.N.Y. Aug. 23, 2012) ...........................8

*Orlando Food Corp. v. United States,*
    140 F.3d 1437 (Fed.Cir. 1998)...............................................................10, 11

*Otter Products, LLC v. United States,*
    834 F.3d 1369 (Fed. Cir. 2016)...................................................................10

*Pleasure-way Industries, Inc. v. United States,*
    Court No. 10-00173, 2016 WL 6081818 (Ct. Int'l Trade, October 18, 2016) .............13

*RKW Klerks v. United States,*
    592 F.Supp.3d 1349, (Ct. Int'l Trade 2022) ...............................................11

*Royal Thai Gov't v. United States,*
    441 F. Supp. 2d 1350 (2006) .......................................................................8

*Ryburn v. Westerman,*
    No. 07-cv-0011, 2010 WL 2813354 (S.D. Ill. July 9, 2010)...........................8

*SGS Sports Inc. v. United States,*
    No. 18-00128, 2020 WL 6196122 (Ct. Int'l Trade Oct. 22, 2020).................7

*Swimways Corporation v. United States,*
    329 F.Supp.3d 1313 (Ct Int'l Trade 2018) ...................................................10

*Tran v. Macomber,*
    No. 11-cv-00877, 2015 WL 1774397 (N.D. Calif. 2015)................................8

*United States v. J.D. Richardson Co.,*
    36 C.C.P.A. 15 (1948) .................................................................................13

*United States v. Pompeo,*
    43 C.C.P.A. 9 (1955) ...................................................................................11

*United States v. Willoughby Camera Stores,*
    Inc., 21 C.C.P.A. 322 (1933) ......................................................................11

*Well Luck Co. v. United States,*
  887 F.3d 1106 (Fed. Cir. 2018).................................................................10

**Rules, United States Court of International Trade**

Rule 59.................................................................................................6, 7

USCIT Rule 52(b)...........................................................................1, 7, 19

USCIT Rule 59(a)................................................................................1, 19

USCIT Rule 59(a)(1)(B)............................................................................7

USCIT Rule 59(a)(2)........................................................................1, 7, 19

**Harmonized Tariff Schedule of the United States (HTSUS)**

General Rule of Interpretation 1 ....................................................... *passim*

General Rule of Interpretation 2 ...............................................................11

General Rule of Interpretation 2(a).................................................... *passim*

General Rule of Interpretation 3 .......................................................2, 9, 15

General Rule of Interpretation 3(a)..................................................4, 10, 11

General Rule of Interpretation 6 ...............................................................15

Section XI

    Heading 6307...................................................1, 2, 4, 9, 10, 17

        Subheading 6307.09.98 ...........................................................3

Section XIV

    Chapter 71 .................................................................... 18

        Subheading 7113.11.10 ...........................................................18

        Subheading 7113.19.10 ...........................................................18

        Subheading 7113.20.10 ...........................................................18

        Subheading 7117.19 .................................................................18

Section XV

Chapter 73 ................................................................................................. 18

Subheading 7304.51.10................................................................................18

Subheading 7304.59.10................................................................................18

Section XVII

Note 3 .....................................................................................................3, 17

Heading 8801..............................................................................................15

Heading 8802.......................................................................................4, 9, 15

Heading 8803.......................................................2, 3, 4, 9, 10, 15, 17, 18

Subheading 8803.20.00 ........................................................................3, 15, 18

**Explanatory Notes (World Customs Organization)**

Explanatory Note GRI 2(a)............................................................................14

Explanatory Note GRI 6 ................................................................................15

UNITED STATES COURT OF INTERNATIONAL TRADE
BEFORE: HON. MARK A. BARNETT, CHIEF JUDGE

|  |  |  |
|---|---|---|
| HONEYWELL INTERNATIONAL INC., | : | |
| | : | |
| Plaintiff, | : | Court No. 17-00256 |
| | : | |
| v. | : | |
| | : | |
| UNITED STATES, | : | |
| | : | |
| Defendant. | : | |
| | : | |

**DEFENDANT'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION FOR A REHEARING AND FOR THE COURT TO AMEND ITS FINDINGS OF FACT AND CONCLUSIONS OF LAW AND MAKE ADDITIONAL ONES**

Defendant, the United States ("Government"), moves for rehearing and for the Court to amend its findings of fact and conclusions of law and make additional ones pursuant to Rule 52(b) and Rule 59(a)(1) and (2) of the Rules of the United States Court of International Trade (USCIT), for *Honeywell International, Inc. v. United States*, No. 17-00256, 2025 WL 342865 (Ct. Int'l Trade Jan. 30, 2025) (hereinafter "*Honeywell*") and Final Judgment (Jan. 30, 2025). We submit this memorandum in support of our motion.

## **INTRODUCTION**

We respectfully move for rehearing and for the Court to amend its findings of fact and conclusions of law in its recent decision in this case. In concluding that the imported segments were more specifically described as "parts of other aircraft" of Heading 8802, rather than "other made up textiles" of Heading 6307 of the Harmonized Tariff Schedule of the United States ("HTSUS"), the analysis neglected to consider the application of necessary legal principles.

Under General Rule of Interpretation ("GRI") 1, the Court must determine if the good in its condition as imported is capable of being classified as a part of an aircraft, or as other made

up textiles.  Applying GRI 1, the Court found that the imported segments were *prima facie* classifiable under Heading 6307.  *Honeywell* at *11.  The Court also found that the segments were a part of an aircraft under Heading 8803, using a flawed analysis.  The Court looked at the post-importation downstream uses of the segments in manufacturing, but did not address whether the segments constituted finished or unfinished "parts" of an aircraft pursuant to GRI 2(a).[1]  As a result, the Court skipped any GRI 2(a) analysis and proceeded directly from a GRI 1 analysis to a GRI 3 analysis, contrary to the GRI's hierarchical scheme.

The Court applied a common law parts analysis to find that the segments were parts of a part of a precursor to a part of an aircraft brake disc, *i.e.*, a needled preform.  *Honeywell* at *10 (stating that "[t]he imported segments are used in their condition as imported to produce the needled preforms that are, thereafter, used in the manufacturing of aircraft brake discs.").  As this Court recognized, this case is unique from prior judicial precedent (*Id.* at *10) and the Court should have engaged in a determination of whether the segments as imported were finished or unfinished parts of parts of brake discs under GRI 2(a).

Had the Court utilized a GRI 2(a) analysis, it would have considered whether the segments were unfinished parts of the asserted end use product, *i.e.* unfinished parts of the densified carbon-carbon aircraft brake disc, and if the Court found the segments to be unfinished, the Court would have engaged in an essential character determination pursuant to GRI 2(a).  It appears from the decision that the Court agrees with the facts that segments are articles used to manufacture needled preforms (*Honeywell* at *10);  then by application of a GRI 2(a) analysis it is clear, and admitted by Honeywell through its representative witness, that the needled preforms

---

[1] GRI 2(a) states that "[a]ny reference in a heading to an article shall be taken to include a reference to that article incomplete or unfinished, provided that, as entered, the incomplete or unfinished article has the essential character of the complete or finished article."

2

do not have the essential character of the asserted end use product, *i.e.* the densified carbon-carbon aircraft brake disc. *See* Gov. Exhs. 2-4 (Segment Samples) and Gov. Ex. 19-20 Densified Carbon-Carbon Aircraft Brake Disc Samples (stator and rotor); SOF ¶ 34 supported by Pl. Ex. A, Brown Dep. at 27, 90, 91, 106.

Finally, we submit that the Court erred in interpreting the phrase "suitable for use solely or principally with the articles [of Chapters 86-88]" in Section XVII Note 3 to mean "suitable for use in the manufacture" of articles of those Chapters. Heading 8803 does not contain language concerning the manufacture of parts of an aircraft, or manufacture of a precursor to the manufacture of a part of an aircraft. Accordingly, the Court's interpretation does not comport with the plain language of the note or the heading.

These errors are significant as it would be dispositive of the case if decided in favor of the United States. We set forth a more fulsome discussion of these points below.

## BACKGROUND

Honeywell International, Inc. ("Honeywell") imported radial, web, and chordal segments (the "imported segments" or "segments") through the ports of Minneapolis, Charlotte, and Atlanta in 2015 and 2016. *See Honeywell* at *2. U.S. Customs and Border Protection ("Customs" or "CBP") liquidated the segments under subheading 6307.90.98, HTSUS, as "[o]ther made up articles, including dress patterns," dutiable at seven percent *ad valorem*. *Honeywell* at *1. Honeywell protested the classification and claimed classification pursuant to HTSUS subheading 8803.20.00 as "[p]arts of goods of heading 8801 or 8802: ... [u]ndercarriages and parts thereof," a duty-free provision applicable to parts of aircraft. *Id*. CBP denied all three protests and Honeywell commenced this case. *Id.*

3

After discovery concluded, the parties cross-moved on their respective classification positions. The Court, in its decision on the cross-motions found the segments were "*prima facie*" classifiable as parts of aircraft pursuant to Heading 8803 as well as being "*prima facie*" classifiable pursuant to Heading 6307. *Id.* at *11. After conducting a GRI 3(a) relative specificity analysis between the two applicable headings, the Court determined that Heading 8803 was the more specific heading and therefore controlled the classification of the segments. *Id.* at *12. The Court in its decision on the parties' cross-motions for summary judgment, granted Honeywell's summary judgment motion. *Id.*

## STATEMENT OF FACTS

We briefly set forth relevant facts below. The segments are made from nonwoven polyacrylonitrile ("PAN") fiber fabric material that is cut to a specific arc shape and size as described in one of three Engineering Material Specifications: EMS-182, EMS-183, or EMS-270. *Id.* at *2. The Court's inspection of the segments indicates that each segment is approximately ten and a half inches across at its widest portion, approximately five inches along its radius, and approximately one eighth of an inch thick. *Id.* "The segments . . . look and feel like fabric material," and may be folded or crumpled by hand. *Id.*

The radial and chordal segments are "[d]uplex [s]egments" that are "manufactured by needling web and unidirectional tow fabrics together to form a duplex fabric," which can be made to a "specific areal weight and width." *Id.* The radial and chordal segments are cut into arc shapes from the duplex assembly in such "manner that results in either a radial or chordal orientation of the unidirectional fibers," respectively. *Id.* Web segments are manufactured by "needling tows of oxidized PAN fiber in a manner that results in a web of fibers." *Id.* The web

segments are "cut into arc shapes with a specific outer radius, a specific inner radius and an arc angle," and have a web orientation. *Id.*

After importation, the segments are used to produce needled preforms. *Id.* at *3. To that end, following importation, the segments are delivered to Honeywell's contractor, Bethlehem Advanced Materials, Inc. ("BAM") in Knoxville, Tennessee.[2] *Id.* To create the needled preforms, BAM personnel identify the specific preform to be manufactured and prepare the appropriate segments (radial, chordal, or web) and the needling machines. *Id.* at *3. Each layer of the preform contains "six segments of the same type." *Id.* The needling machine picks and lays the segments in a donut formation while it "jab[s] the needles into and out of the segments" to connect the layers. *Id.* Thereafter, multiple needled preforms are gathered and stacked into a furnace with spacers in between. *Id.* A weighted load applies pressure from the top of the stack. *Id.* The stacks are heated for three-and-a-half to four days as part of the carbonization cycle, during which time gases are released. *Id.* Upon completion of the carbonization cycle, the now carbonized preform has lost 50 percent of its needled preform weight and has shrunk in size. *Id.* The preform has gone through a transformative molecular change and is considered a carbon

---

[2] The Government provided the Court with the Honeywell/BAM, Inc. contract which characterized the PAN fabric segments alternatively as "raw material" for use by BAM, Inc. in the creation of needled preforms for Honeywell. *See* Gov. Ex. 13, Third Addendum to Amended and Restated Toll Manufacturing Agreement for Carbonization Services at ¶4A(7) and 4B(6). *See* BAM000046, BAM000050, BAM000076 and BAM000080. It was telling that both Honeywell and the specialized company charged with manufacturing the preforms characterized the function the segments played in the preform manufacturing process as being the "raw material." This characterization of the segments by Honeywell and the preform manufacturer also underscores the understanding that the segments are an unfinished good in the aircraft disc brake manufacturing process. Without explanation, the Court while crediting facts utilized in Honeywell's production documents, such as the "EMS" documents referenced in the decision (*Honeywell* at *2), declined to use this fact from the Honeywell/BAM, Inc. contract that formed the basis for the relationship between Honeywell and the manufacturer of the needled preform.

material instead of a PAN material, no longer exhibiting the fabric quality of the imported segments and instead becoming rigid, solid, and inflexible. *Id.*

The carbonized preforms are returned to Honeywell for further processing. *Id.* At Honeywell's facility, the carbonized preforms undergo "a densification process involving chemical vapor infiltration (CVI) and [a] chemical vapor deposition (CVD) process which deposits additional carbon on and around the carbonized preform." *Id.* The densification process involves months of cyclical heating in the furnace totaling hundreds of hours, increasing the weight of the preforms. *Id.* The manufacturing process for a densified carbon-carbon preform "can take up to six months, with the CVD/CVI densification process being the longest portion of that process." *Id.* The densified carbon-carbon preform takes on desired characteristics of brake discs including high strength, thermal capabilities, heat transfer and absorption, and friction generation.[3] *Id. See also* Pl, Ex. A, Brown Dep. at 27, 90, 91, 106.

The densified carbon-carbon preforms are manufactured into aircraft brake discs by means of "a final machining operation." *Id.* As part of that machining operation, "the friction surfaces are ground to specific dimensions, the inner and outer dimensions are machined and the other parts such as lugs, grooves and holes are machined and antioxidant [is] applied." *Id.*

## **DISCUSSION**

**I. THE CIRCUMSTANCES WARRANT REHEARING AND FOR THE COURT TO AMEND ITS FINDINGS AND CONCLUSIONS AND MAKE ADDITIONAL ONES IF NECESSARY**

### **A.      The Legal Standards For a Rule 59 Motion**

---

[3] Honeywell's engineer/30(b)(6) witness, Mr. Brown, testified that it is only after the preform has reached the stage in processing that it has completed densification and carbonization, *i.e,* it has become a densified carbon-carbon preform, does the preform take on the characteristics of a carbon-carbon aircraft brake disc. Pl. Ex. A, Brown Dep. at 27, 90, 91, 106. It is unclear from the factual statements in the opinion that the court understood this point. *See Honeywell* at *3.

The Court may "grant a new trial or rehearing on all or some of the issues – and to any party . . . for any reason . . ." USCIT Rule 59(a)(1)(B).  Similarly, the Rule provides that ". . . the court may, on a motion for a new trial, open the judgment if one has been entered, take additional testimony, *amend findings of fact and conclusions of law or make new ones*, and direct entry of a new judgment."  USCIT Rule 59(a)(2) (emphasis added).  The provisions of a Rule 59, *i.e.,* as a procedure for "seeking the grant of a new trial or rehearing" are equally applicable with regard to decisions rendered by the Court on summary judgment.  *See e.g.*, *SGS Sports Inc. v. United States*, No. 18-00128, 2020 WL 6196122 (Ct. Int'l Trade Oct. 22, 2020).

These provisions of Rule 59 dovetail with Rule 52(b).  Pursuant to USCIT Rule 52(b), "[o]n a party's motion, or on its own, filed no later than 30 days after the entry of judgment, the court may amend its findings – or make additional findings – and may amend the judgment accordingly."  USCIT Rule 52(b).  A motion made under Rule 52(b) "may accompany a motion for a new trial under Rule 59."  *Id.*

Whether to grant a motion under Rule 59 is within the sound discretion of the court.  *See Ford Motor Co. v. United States*, 751 F. Supp. 2d 1316, 1317 (Ct. Int'l Trade 2010); *Kerr-McGee Chem. Corp. v. United States*, 14 CIT 582, 583 (1990).  It should be granted only when the party "identifies an intervening change of controlling law, the availability of new evidence, or the need to correct a clear error or prevent manifest injustice."  *Kolel Beth Yechiel Mechil of Tartikov, Inc. v. YLL Irrevocable Trust*, 729 F.3d 99, 104 (2d Cir. 2013) (citation omitted); *see Ford Motor Co. v. United States*, 751 F. Supp. 2d at 1317 (holding that the primary grounds for supporting the grant of a motion for rehearing or reconsideration are "an intervening change in the controlling law, the availability of new evidence, the need to correct a clear factual or legal error, or the need to prevent a manifest injustice." (internal citations omitted)); *Ford Motor Co.*

*v. United States*, 30 CIT 1587, 1588 (2006) (same); *see also Royal Thai Gov't v. United States*, 441 F. Supp. 2d 1350, 1354 (2006) (quoting *Doe v. New York City Dep't of Social Servs.*, 709 F.2d 782, 789 (2d Cir. 1983)).

Although a motion under Rule 59 is not a chance for a party to relitigate the same issues previously before the Court, it is a method "to correct a significant flaw in the original judgment." *Ford Motor Co.*, 751 F. Supp. 2d at 1317. *See, e.g., In re Fosamax Prods. Liab. Litig.*, 815 F. Supp. 2d 649, 651 (S.D.N.Y. 2011) (a motion for reconsideration may be granted "where the [C]ourt has erred by overlooking a factual or legal argument presented, not where a party failed to present relevant factual or legal arguments."); *Aqua-Lung Am., Inc. v. Am. Underwater Prods.*, Court No. C 07-5346, 2010 WL 2991512, *2 (N.D. Cal. July 28, 2010) (noting that plaintiff's contention that the order "failed to consider an argument that had been presented," if that argument were dispositive, "arguably satisfies the prerequisite for reconsideration."); *Ryburn v. Westerman*, No. 07-cv-0011, 2010 WL 2813354, *4 (S.D. Ill. July 9, 2010) (noting that a court's failure to consider plaintiff's Eighth and Fourteenth Amendment arguments, if true, "would be a very good reason for rehearing."); *Tran v. Macomber*, No. 11-cv-00877, 2015 WL 1774397, *1 (N.D. Calif. 2015) (noting that "a motion for reconsideration may be granted on the ground that the court failed to consider facts or argument previously presented to it.").[4]

---

[4] While many cases were decided under local rules, the applicable standard appears the same. *See, e.g.,Tiffany (NJ) v. Forbse,* 11-Civ-4976, 2012 WL 3686289, **4-6 (S.D.N.Y. Aug. 23, 2012).

**B.    The Court's Decision Not to Utilize a GRI 2(a) Analysis Of The Segments Comprises Clear Error**

By this motion, we respectfully request that the Court revisit its decision not to utilize a GRI 2(a) analysis which we assert is clear error.  To start, Honeywell agrees that the imported segments are textile fabric and *prima facie* covered by Heading 6307 as other made-up articles. *Honeywell* at *11.  The question the Court then considered was whether the imported segments also fell within Heading 8803 as parts of Heading 8802, which covers "other aircraft."

The Court's analysis of whether the segments in their imported condition meet the parts test to the exclusion of any analysis of whether they are incomplete or unfinished articles pursuant to GRI 2(a) is error.  Paradoxically, the Court recognized that the status of an article being finished or unfinished is relevant to the classification decision here, as it stated the following:

> The question is not, however, whether the segments are recognizable as aircraft brake discs, finished or unfinished.  Rather, the question is whether the segments are finished or unfinished parts at the time of importation in relation to a downstream article that constitutes a part of an aircraft, which, by operation of the subpart rule, may be a part of the brake disc.

*Honeywell* at *11.

The failure to undertake a GRI 2(a) analysis is significant, because if the segments are not finished parts of an aircraft or unfinished parts with the essential character of a finished aircraft part, then they cannot be classified as a part of an aircraft and therefore they are classifiable as made-up articles of textile pursuant to Heading 6307, HTSUS.  We discuss these errors below.

**1)    The GRIs Are Hierarchical, And The Court Committed Clear Legal Error When It Analyzed GRIs 1 And 3 But Failed To Consider GRI 2(a)**

Tariff classification under the HTSUS is governed by the GRIs and the Additional U.S. Rules of Interpretation, both of which are part of the legal text of the HTSUS. The GRIs are applied in numerical order. *Otter Products, LLC v. United States*, 834 F.3d 1369, 1375 (Fed. Cir. 2016). We begin with GRI 1, which provides that "classification shall be determined according to the terms of the headings and any relative section or chapter notes." GRI 1, HTSUS. GRIs 2 through 5 apply "provided such headings or notes do not otherwise require." *See Swimways Corporation v. United States,* 329 F.Supp.3d 1313 (Ct Int'l Trade 2018). "When, [] 'merchandise is *prima facie* classifiable under two or more headings or subheadings of the HTSUS' *and GRI 2 does not apply*, 'we apply GRI 3 to resolve the classification.'" *Well Luck Co. v. United States*, 887 F.3d 1106, 1111 (Fed. Cir. 2018) (emphasis added).

Here, the Court applied a GRI 1 analysis and determined that the goods were *prima facie* classifiable in Heading 8803 and Heading 6307. *Honeywell* at *11. Given the Court's conclusion that the segments were *prima facie* classifiable in both headings, and given the Government's alternative argument that Heading 6307 was, in fact, the more specific heading of the two, the Court performed a GRI 3(a) relative specificity analysis. *Id.* at *12. The Court cited to *Orlando Food Corp. v. United States*, 140 F.3d 1437, 1441 (Fed. Cir. 1998) in applying the GRI 3(a) test ("[w]hen ... goods are, *prima facie*, classifiable under two or more headings, classification shall be effected as follows: The heading which provides the most specific description shall be preferred to headings providing a more general description.") *See Honeywell* at *12. The Court determined that Heading 6307 which contained "[t]he phrase "other made up articles" is more general than a heading [Heading 8803] that effectively provides for parts of "other aircraft," particularly when those "other aircraft" are specified in the heading to include airplanes." *Id.* The Court continued by stating that "[m]oreover, the requirements of heading

10

8803 are more difficult to satisfy."  Based on this analysis the Court concluded that "[a]ccordingly, the segments must be classified in heading 8803".  *Id.*

However, moving from a GRI 1 analysis to a GRI 3(a) analysis, without completing the parts analysis and disregarding GRI 2(a), is error.  The Court failed to apply the GRIs in a hierarchical manner, even though it understood the segments to be arguably unfinished because "[a]t first glance, the segments do not look like parts of aircraft," (*Honeywell* at * 7), they "are not installed directly on an aircraft," (*Id*. at * 6)  and the segments "are used in their condition as imported to produce the needled preforms that are, thereafter, used in the manufacturing of aircraft brake discs."  *Id.* at *10.  Notwithstanding GRI 2(a), the Court took into account ". . . the considerations deemed relevant in the foregoing cases [*RKW Klerks v. United States*, 592 F.Supp.3d 1349, (Ct. Int'l Trade 2022) *aff'd,* 94 F.4th 1374 (Fed. Cir. 2024), *Bauerhin Technologies Ltd. v. United States*, 110 F.3d 774, 779 (Fed. Cir. 1997), *United States v. Willoughby Camera Stores, Inc*., 21 C.C.P.A. 322, 324 (1933), *United States v. Pompeo*, 43 C.C.P.A. 9, 14 (1955), *Baxter Healthcare Corp. of Puerto Rico v. United States*, 182 F.3d 1333 (Fed. Cir. 1999), *Ludvig Svensson, Inc.  v. United States*, 23 CIT 573, 62 F. Supp. 2d 1171, 1179 (1999), and *E.M. Chems. v. United States*, 920 F.2d 910, 914 (Fed. Cir. 1990)], [and] the court [found] that the imported segments are classifiable as parts of aircraft."  *Honeywell* at *10.  In determining that the imported segments were parts of a needed preform, which is a precursor to becoming a part of a brake disc, the Court declined "to address the unfinished parts arguments or whether GRI 2(a) applies to a subpart analysis."  *Id.* at FN 16.  We submit that it is error to proceed to a GRI 3(a) analysis without applying GRI 2(a) and engaging in an unfinished parts analysis.  Frequently, the Court bypasses a GRI 2(a) analysis because there is no unfinished part

11

or article in dispute.  Here, however, it is a recognized fact and issue and therefore GRI 2(a) must be addressed.

Moreover, it is error to elevate a common law parts analysis to the exclusion of GRI 2(a), when the application of this statutory rule would directly affect the outcome of this case.  *See generally, JVC Co. of America, Div. of US JVC Corp. v. United States*, 234 F.3d 1348, 1354-55 (Fed. Cir. 2000).  Classification analysis is dictated by the relevant, applicable GRIs as aided by common law where that common law is analyzing HTSUS based tariff rules and not carrying forward superseded TSUS interpretations.[5]

> **2)  The Court Committed Error When It Failed To Determine Whether The Segments Were A Finished Part Of An Aircraft, An Unfinished Part Of An Aircraft Having The Essential Character Of The Finished Part Of An Aircraft, Or An Unfinished Part Of An Aircraft Not Having The Essential Character Of The Finished Part Of An Aircraft**

While the Court determined the segments were "parts" of aircraft, it never explicitly stated whether the segments were finished aircraft parts, unfinished aircraft parts having the essential character of the finished aircraft part or unfinished parts not having the essential character of the finished aircraft part.  *Honeywell* at *11.  We note that the Court highlighted the

---

[5] Certain cases cited by the Court as influencing its parts analysis are grounded on the prior statutory tariff scheme, *i.e.*, the Tariff Schedules of the United States (TSUS).  *See e.g., Honeywell* FN 17 (citing the *Harding Co. v. United States*, 23 CCPA 250 (1936)) and FN 14 (citing *Gallagher & Ascher Co. v. United States*, 63 Cust. Ct. 223 (1969).  When the Harmonized Tariff Schedule of the United States was enacted on January 1, 1989, entries of goods became subject to the wording of the HTSUS, and the TSUS was no longer in effect. Reliance on cases controlled by the TSUS is particularly problematic when the tariff language relevant to the analysis has changed. *See JVC Co. of America, Div. of US JVC Corp. v. United States,* 234 F.3d 1348, 1354-55 (Fed. Cir. 2000) (Under the TSUS, judicially created classification principles were expressly sanctioned by General Interpretative Rule 10(a) a provision not carried forward in the HTSUS).  Accordingly, the TSUS left up to the court and Customs to set the rules for deciding if an article had been sufficiently processed to be classified as a finished article.  Now GRI 2(a), HTSUS contains the proviso that for an incomplete or unfinished article, the unfinished or incomplete article must have the "essential character" of the complete or finished article to be classified as that finished good.

significance of the issue when it stated: "*the question is whether the segments are finished or unfinished parts at the time of importation* in relation to a downstream article that constitutes a part of an aircraft, which, by operation of the subpart rule, may be a part of the brake disc." *Id.* at *11 (emphasis added). According to GRI 2(a), only finished parts and unfinished parts having the essential character of the finished part are classifiable as the finished part pursuant to the tariff. *See* GRI 2(a).

Here, the imported segments would need to be a finished brake disc (the finished part), or an unfinished brake disc with the essential character of a finished brake disc. However, this analysis was not performed. The Court stated that "[b]ecause the court finds the segments satisfy the parts test, the court does not address the unfinished parts arguments or whether GRI 2(a) applies to a subpart analysis." *Honeywell* at FN 16. It is error to conclude that that the segments are classifiable as aircraft parts before determining whether the goods are finished aircraft parts, unfinished aircraft parts having the essential character of the finished aircraft part or unfinished aircraft parts not having the essential character of the finished part in accordance with GRI 2(a).

Further, the Courts have interpreted the term "finished" as used in the tariff to cover articles suitable for their ultimate "intended use." *See Pleasure-way Industries, Inc. v. United States*, Court No. 10-00173, 2016 WL 6081818 (Ct. Int'l Trade, Oct. 18, 2016), citing *United States v. J.D. Richardson Co*., 36 C.C.P.A. 15, 18 (1948) (A "finished" good is one that is suitable for its ultimate "intended use" finding that exported articles that are not yet suitable for their intended use are unfinished). Here, the segments in their imported state are not suitable for their intended use – to be parts of aircraft and more specifically aircraft disc brakes; they require extensive post-importation manufacturing to become finished aircraft parts. While not stating the segments are unfinished, the Court has recognized that the segments have the characteristics

13

of unfinished articles in that they "are not installed directly on an aircraft" (*Honeywell* at *6) and instead "are used in their condition as imported to produce the needled preforms. . ." (*Id.* at *10), which are an intermediate processing step in the manufacture of brake discs. *See Honeywell* at *3*.

Moreover, the article into which the segments are first manufactured is the "needled preform," which is itself an unfinished article.[6]  See ENs to GRI 2(a).  The *Honeywell* decision lacks any analysis of whether any of the intermediate articles, *i.e.*, the needled preform, the carbonized preform or the densified carbon-carbon preform, can be considered parts of aircraft or whether any of them are unfinished goods having the essential character a finished good pursuant to GRI 2(a).  We know from the testimony and the accepted material facts that it is only when the preform article reaches the densified carbon-carbon preform stage that the characteristics of a carbon-carbon aircraft brake disc appear, *i.e.*, the characteristics of high strength, thermal capabilities, heat transfer and absorption, and friction generation.  *See Honeywell* *3, citing Def.'s SOF ¶ 34 supported by Pl. Ex. A, Brown Dep. at 27, 90, 91, 106.  To hold that a segment is a part of a needled preform[7] without analyzing whether the needled preform can be considered a part pursuant to GRI 2(a) is error.

The Court infers at FN 16 that GRI 2(a) may not apply to "parts" or "subparts."  The terms of GRI 2(a) state that "[a]ny reference in a heading to an article shall be taken to include a

---

[6] The definition of a "preform" is "any of various objects of manufacture or handicraft after *preliminary* shaping" *See* Gov. Ex. 15 (emphasis added).  A preform *per se* is not a finished good and requires analysis pursuant to GRI 2(a) to determine if it would be classified as a finished good, *i.e.*, whether the preform has the essential character of the finished good.

[7] The ENs for GRI 2(a) at "II" discuss "blanks" "having the approximate shape of the finished article **or part**" as coming under the provisions of GRI 2(a) (emphasis added).  The ENs at GRI 2(a) II give an example of a "blank" as being a "bottle preform."  The ENs therefore contemplate "parts" as being subject to GRI 2(a). *See* ENs.

reference to that article incomplete or unfinished . . ."  Nothing in the text of the HTSUS precludes a "part" from being an "article" especially if the heading explicitly includes "parts."[8] Accordingly, GRI 2(a) applies to parts if the terms of the applicable heading or subheading involve "parts."[9]  Here, the terms of the heading and subheading being analyzed, 8803, HTSUS, (Parts of goods of heading 8801 or 8802) and subheading 8803.20.00, HTSUS, (Undercarriages and parts thereof), refer to the articles at issue in those headings as being "parts."  According to the plain meaning of GRI 2(a) and the tariff provisions being analyzed, GRI 2(a) applies to parts or subparts.  It is clear error for the Court not to apply the GRI 2(a) analysis to both the imported segment and the preform into which the segments are manufactured, *i.e.*, the needled preform.

### 3.  Had The Court Applied GRI 2(a), It Had To Conclude That The Segments Are Unfinished Articles That Do Not Have The Essential Character Of The Finished Brake Discs

If the Court applied GRI 2(a), that analysis would have required consideration of whether the imported segment has the essential character of the finished part *i.e.*, the aircraft brake disc. As noted, the segments as imported are molecularly different from the densified carbon-carbon aircraft brake discs into which they are processed.  Pl. Ex. A, Brown Dep. at 64.  In terms of physical characteristics, the stark contrast of the texture and feel of the imported fabric segments as compared with the hard, solid, dense feel of the densified carbon-carbon aircraft brake disc is indicative of the difference in the characteristics.  *See* Gov. Exhs. 2-4: segments and Gov. Exhs.

---

[8] In common usage, 'article' is applied to almost every separate substance or material, whether as a member of a class, or as a particular substance or commodity. *See Junge v. Hedden*, 146 U. S. 233 (1892).

[9] The terms of GRI 6 make GRIs 1-5 applicable to the subheading level.  *See* GRI 6. The ENs for GRI 6 Note that "Rules 1 to 5 above govern, *mutatis mutandis*, classification at subheading levels within the same heading.  *See* EN.  GRI 2(a) therefore can be utilized to analyze both the heading 8803, HTSUS, "Parts of goods of heading 8801 or 8802:" and subheading 8803.20.00, HTSUS, "Undercarriages and parts thereof."

19-20: Physical Samples of densified carbon-carbon aircraft brake discs (stator and rotor). The segments in their condition as imported cannot be substituted for the finished densified carbon-carbon aircraft brake discs. The imported segments do not have the strength to withstand hundreds of thousands of pounds of pressure involved in stopping a jet aircraft. Nor do the segments have the extensive friction capabilities and thermal absorption characteristics allowing them to repeatedly stop the force of large jets landing. Nor are the segments as imported capable of being drilled and shaped into a form capable of being assembled into the finished aircraft brake system. In other words, the essential character of the final product, *i.e.*, the densified carbon-carbon aircraft brake disc, its strength, and its ability to absorb the heat created by the friction inherent in stopping jet aircraft, is nothing like the character of the pliable, soft, delicate, feltlike fabric segments that in their imported form are incapable of being used in a braking system to stop any aircraft. *See* Gov. Exhs. 2-4 (Segment Samples) and Gov. Ex. 19-20 Densified Carbon-Carbon Aircraft Brake Disc Samples (stator and rotor); Pl. Ex. A, Brown Dep. at 90, 91.

While the imported segments might, at best, be considered an unfinished part, the segments do not have the stopping strength and friction characteristics, which provide the essential character of the finished densified carbon-carbon aircraft brake disc that is a part of an aircraft brake system. The Court devalued these salient facts as well as the relevant testimony of Mr. Brown, one of Honeywell's Rule 30(b)(6) witnesses and lead production engineer for wheel and brake development, when asked about the desirability or prevalence of the carbon-carbon rotors and stators (carbon-carbon brake discs) stated as follows:

> The carbon-carbon material offers a significant advantage over most steel or historical steel offerings. Specifically, they generally weigh a lot less than steel, and in the aircraft industry, weight is usually king in terms of a design feature. They also offer generally longer brake life, meaning you can get more landings

> out of a carbon heat sync generally than an equivalent steel heat sync. Additionally, they provide excellent friction capability for -- specific for[] aircraft braking  parameters and needs. They also have many of the other desirable characteristics that are necessary for that application such as strength and energy absorption capability, the thermal properties.

Pl. Ex. A, Brown Dep. at 27.

As noted above, it is the strength, excellent friction capability, energy absorption capability and thermal properties of the carbon-carbon brake discs that make these brake discs so prevalent and desirable in the aircraft brake industry.  These qualities are not found in the segments as imported, which are foldable arc shaped pieces of material incapable of aiding in the stopping of a jet aircraft.  As Mr. Brown noted, it is not until the imported segments advance in manufacture beyond the needled preform stage, beyond the carbonized preform stage, and complete the densification stage wherein a carbon matrix affixes to the carbon preform to become a densified carbon-carbon preform – do the aforementioned characteristics of an aircraft brake disc inure to the material.  *See* Pl. Ex. A: Brown Dep. at 90-91.

As a GRI 2(a) analysis shows, the segments cannot be classified as the finished good, *i.e.*, an aircraft brake part of Heading 8803.  It follows that the Court must classify the segments pursuant to Heading 6307 which it found to be *prima facie* applicable.

C.    **The Court Committed Error When It Interpreted Section XVII Note 3's "Suitable For Use Solely Or Principally With The Articles Of Those Chapters [Chapters 86-88]" To Be The Equivalent To Suitable For Use In The Manufacture Of Articles Of Those Chapters**

In its GRI 1 analysis of whether the segments could *prima facie* be a part of an aircraft of Heading 8803, the Court identified Note 3 to Section XVII, HTSUS, as being applicable.  Note 3 states: "References in chapters 86 to 88 to 'parts' or 'accessories' do not apply to parts or accessories which are not suitable for use solely or principally with the articles of those chapters." Note 3 to Section XVII, HTSUS.  *Honeywell* at *5.  The Court also understood that

the segments could not be used directly on an aircraft as imported. The Court instead found support for classifying the segments as suitable for use as parts of aircraft because the segments "are used in their condition as imported to produce the needled preforms that are, thereafter, used in the manufacturing of aircraft brake discs." *Honeywell* *10. The Chapter 88 heading and subheading under consideration by the Court have the following terms:

> 8803 Parts of goods of heading 8801 or 8802:
> 8803.20.00 Undercarriages and parts thereof.

*See* Heading 8803, HTSUS.

As noted, the terms of this heading and subheading do not include the wording "suitable for use in the manufacture of articles provided for in this heading." Certain subheadings in the tariff include this "suitable for use in the manufacture. . ." terminology. *See e.g.,* Subheadings 7113.11.10 HTSUS, 7113.19.10 HTSUS, 7113.20.10 HTSUS, 7117.19 HTSUS, 7304.51.10 HTSUS and 7304.59.10 HTSUS. By interpreting Note 3's language of "suitable for use solely or principally *with* the articles of those chapters" to include "suitable for use in the *manufacture* of articles of those chapters," the Court goes against the plain meaning of the note and how the phrase is used in the tariff. Had the drafters of the tariff wanted to broaden the scope of the relevant tariff provisions to include articles "suitable for use in the *manufacture* of aircraft parts," they would have included that language as they did in subheadings of Chapter 71 and Chapter 73 HTSUS.

## CONCLUSION

For these reasons, we respectfully request that the Court grant our motion for a new trial or rehearing pursuant to USCIT Rule 59(a), and for the Court to amend its findings of fact and conclusions of law and make additional ones under USCIT Rule 52(b) and USCIT Rule 59(a)(2).

Respectfully submitted,

YAAKOV M. ROTH
Acting Assistant Attorney General

PATRICIA M. McCARTHY
Director

JUSTIN R. MILLER
Attorney in Charge
International Trade Field Office

By:    /s/ Aimee Lee
AIMEE LEE
Assistant Director

/s/ Edward F. Kenny
EDWARD F. KENNY
Senior Trial Counsel
Of Counsel:                          Civil Division, Dept. of Justice
Yelena Slepak, Esq.                  Commercial Litigation Branch
Office of Chief Counsel              International Trade Field Office
U.S. Customs and Border Protection   26 Federal Plaza, Room 346
                                     New York, New York 10278
                                     *Attorneys for Defendant*
Dated: February 28, 2025             Tel. No. 212-264-0480 or 9230

19

UNITED STATES COURT OF INTERNATIONAL TRADE
BEFORE: HON. MARK A. BARNETT, CHIEF JUDGE

|  |  |  |
|---|---|---|
| HONEYWELL INTERNATIONAL INC., | : | |
| | : | |
| Plaintiff, | : | Court No. 17-00256 |
| | : | |
| v. | : | |
| | : | |
| UNITED STATES, | : | |
| | : | |
| Defendant. | : | |
| | : | |

CERTIFICATE OF COMPLIANCE PURSUANT TO USCIT
STANDARD CHAMBER PROCEDURE 2(B)

I, Edward F. Kenny, senior trial counsel in the Office of the Assistant Attorney General,

Civil Division, Commercial Litigation Branch, International Trade Field Office, who is

responsible for the foregoing brief, relying upon the Microsoft Word word count feature of the

word processing program used to prepare the brief, certify that this brief complies with the type-

volume limitation under USCIT Standard Chamber Procedure 2(B) and contains 6,077 words.


/s/ Edward F. Kenny