Slip Op. 25-146

## UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| HONEYWELL INTERNATIONAL, INC., | |
| Plaintiff, | |
| v. | Before: Mark A. Barnett, Chief Judge |
| | Court No. 17-00256 |
| UNITED STATES, | |
| Defendant. | |

## <u>OPINION AND ORDER</u>

[Granting Defendant's motion for rehearing and classifying subject imports under subheading 6307.90.98 of the Harmonized Tariff Schedule of the United States.]

Dated: November 25, 2025

<u>Wm. Randolph Rucker</u>, Faegre Drinker Biddle & Reath, LLP, of Chicago, IL, for Plaintiff Honeywell International, Inc.

<u>Edward F. Kenny</u>, Senior Trial Counsel, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of New York, NY, for Defendant United States. On the brief were <u>Yaakov M. Roth</u>, Acting Assistant Attorney General, <u>Patricia M. McCarthy</u>, Director, <u>Aimee Lee</u>, Assistant Director, and <u>Justin R. Miller</u>, Attorney in Charge, International Trade Field Office. Of counsel on the brief was <u>Yelena Slepak</u>, Office of the Assistant Chief Counsel, International Trade Litigation, U.S. Customs and Border Protection.

Barnett, Chief Judge: At issue in this case is the correct classification of certain radial, web, and chordal segments ("the segments") imported by Plaintiff Honeywell International, Inc. ("Honeywell"). Honeywell argues for classification pursuant to subheading 8803.20.00 of the Harmonized Tariff Schedule of the United States ("HTSUS") as "[p]arts of goods of heading 8801 or 8802: . . . [u]ndercarriages and parts thereof," a duty-free provision applicable to parts of aircraft. Defendant United States

("the Government") argues for classification of the segments pursuant to subheading 6307.90.98 of the HTSUS as "[o]ther made up articles, including dress patterns," dutiable at seven percent *ad valorem*.[1]  The court previously concluded that the segments are properly classified pursuant to subheading 8803.20.00.  *See Honeywell Int'l, Inc. v. United States* (*Honeywell I*), 49 CIT __, 756 F. Supp. 3d 1346 (2025).  The Government seeks reconsideration of that decision.  Def.'s Mem. of Law in Supp. of its Mot. for Rehearing and for the Ct. to Amend its Findings of Fact and Conclusions of Law and Make Add'l Ones ("Def.'s Mem."), ECF No. 69.[2]  Plaintiff opposes the motion. Pl.'s Resp. in Opp'n to Gov't's Mot. for [Rehearing] ("Pl.'s Resp."), ECF No. 70.  The Government filed a reply.  Def.'s Reply Mem. of Law in Supp. of its Mot. for Rehearing ("Def.'s Reply"), ECF No. 71.  The parties also filed supplemental briefs in response to the court's questions.  *See* Pl.'s Suppl. Br. in Opp'n to Gov't's Mot. for [Rehearing] ("Pl.'s Suppl. Br."), ECF No. 73; Def.'s Resp. to Pl.'s Suppl. Br. Regarding the Gov't's Mot. for Rehearing ("Def.'s Suppl. Br."), ECF No. 76.

---

[1] All citations to the HTSUS are to the 2015 version, as determined by the date of importation of the merchandise.  *See LeMans Corp. v. United States*, 660 F.3d 1311, 1314 n.2 (Fed. Cir. 2011).

[2] While the Government states that it "moves for rehearing," Def.'s Mem. at 1, the Government filed only a memorandum in support of its motion, and no document titled "motion."  USCIT Rule 7(b)(1)(B) requires "[a] request for a court order" to "be made by motion" that "state[s] with particularity in a single document the grounds for seeking the order and the legal argument necessary to support it."  The rule further states that "[a] separate brief supporting . . . a motion must not be filed unless specifically required by the [c]ourt."  The court construes the Government's memorandum as a motion with the required statement of grounds and legal argument, consistent with Rule 7(b)(1)(B).

The court has subject matter jurisdiction pursuant to 28 U.S.C. § 1581(a) (2018). For the reasons discussed herein, the court will grant the Government's motion, revise its decision as detailed herein, and enter a new judgment accordingly.

### LEGAL STANDARD

The Government seeks rehearing pursuant to Rule 59. "The court may, on motion, grant a new trial or rehearing on all or some of the issues -- and to any party . . . after a nonjury trial, for any reason for which a rehearing has heretofore been granted in a suit in equity in federal court." USCIT Rule 59(a)(1)(B). "Although the Rule references nonjury trial[s], subsection (B) has been expansively read by this Court to encompass rehearing[s] of any matter[s] decided by the court without a jury." *AD HOC Utilities Grp. v. United States*, 33 CIT 1284, 1285 n.1, 650 F. Supp. 2d 1318, 1321 n.1 (2009) (internal quotation marks and citation omitted) (alterations in original). The court may also "open the judgment if one has been entered, take additional testimony, amend findings of fact and conclusions of law or make new ones, and direct the entry of a new judgment." USCIT Rule 59(a)(2); *see also* USCIT Rule 52(b) (similar).

Reconsideration is appropriate to correct "a significant flaw in the conduct of the original proceeding" but is not intended "to allow the losing party to reargue its case." *Acquisition 362, LLC v. United States*, 45 CIT __, __, 539 F. Supp. 3d 1251, 1255–56 (2021), *aff'd*, 59 F.4th 1247 (Fed. Cir. 2023), *cert. denied*, 144 S. Ct. 81 (2023). "The decision whether to grant reconsideration lies largely within the discretion of the [lower] court." *Yuba Nat. Res., Inc. v. United States*, 904 F.2d 1577, 1583 (Fed. Cir. 1990).

## BACKGROUND

The Government's motion for rehearing relies on General Rule of Interpretation ("GRI") 2(a), Def.'s Mem. at 9–17; Def.'s Reply at 3–10, and HTSUS Section XVII Note 3, Def.'s Mem. at 17–18; Def.'s Reply at 10–11.  Familiarity with *Honeywell I* is presumed.  Below the court recounts the background necessary to resolve the pending motion.

### I.    The Segments

"The segments are made from nonwoven polyacrylonitrile ('PAN') fiber fabric material that is cut to a specific shape and size."  *Honeywell I*, 756 F. Supp. 3d at 1351.  "[T]he segments are arc shaped," *id.* at 1352, "'look and feel like fabric material,' and may be folded or crumpled by hand," *id.* (citations omitted).  "The imported segments have part numbers based on the segment type, part names indicating, when appropriate, whether the segment is for use in a stator or rotor disc, and a specified aircraft program use."  *Id.* at 1352–53.

"After importation, the segments are first used to produce needled preforms" by "Honeywell's contractor, Bethlehem Advanced Materials, Inc. ('BAM')."  *Id.* at 1353.  The needled preforms consist of several layers of the segments, with each layer "contain[ing] 'six segments of the same type.'"  *Id.*  A "needling machine picks and lays the segments in a donut formation" while needling the layers together.  *Id.*  "The completed needled preform is assigned a serial number."  *Id.*  BAM then gathers and stacks "multiple needled preforms . . . into a furnace with spacers in between" and applies heat and pressure "for three-and-a-half to four days as part of the carbonization

cycle." *Id.* The carbonization cycle results in "a molecular change" such that the preform "is considered a carbon material instead of a PAN material" that is "rigid, solid, and inflexible." *Id.*

The carbonized preforms are further processed by Honeywell. That processing comprises "a densification process involving chemical vapor infiltration (CVI) and [a] chemical vapor deposition (CVD) process which deposits additional carbon on and around the carbonized preform." *Id.* at 1353–54 (citations omitted). "The densification process involves months of cyclical heating in the furnace totaling hundreds of hours, increasing the weight of the preforms. The manufacturing process for a densified carbon-carbon preform 'can take up to six months, with the CVD/CVI densification process being the longest portion of that process.'" *Id.* at 1354 (citations omitted).

Lastly, the densified carbon-carbon preforms are machined into aircraft brake discs. *Id.* The parties agree that an aircraft brake disc is a part of an aircraft braking system, which, in turn, is a part of an aircraft. *Id.* at 1354 & n.7.

## II.    The General Rules of Interpretation

The GRIs accompanying the HTSUS govern the court's classification of goods pursuant to the HTSUS. *See RKW Klerks Inc. v. United States*, 94 F.4th 1374, 1378 (Fed. Cir. 2024). The court "appl[ies] the GRIs in numerical order." *Gerson Co. v. United States*, 898 F.3d 1232, 1235 (Fed Cir. 2018). GRI 1 states that "classification shall be determined according to the terms of the headings and any [relevant] section or chapter notes." When an "imported article is described in whole by a single

classification heading or subheading, then that single classification applies, and the succeeding GRIs are inoperative."  *Gerson*, 898 F.3d at 1235 (citation omitted).

When necessary to resolve classification, the court may consider GRI 2(a), which provides that "[a]ny reference in a heading to an article shall be taken to include a reference to that article incomplete or unfinished, provided that, as entered, the incomplete or unfinished article has the essential character of the complete or finished article."  Explanatory Note ("EN") (II) accompanying GRI 2(a) states that GRI 2 "appl[ies] to blanks unless these are specified in a particular heading."  EN (II), GRI 2(a) (2015). The EN defines a "blank" as "an article, not ready for direct use, having the approximate shape or outline of the finished article or part, and which can only be used, other than in exceptional cases, for completion into the finished article or part."[3]  *Id.*  By way of example, the EN references "bottle preforms of plastics being intermediate products having tubular shape, with one closed end and one open end threaded to secure a screw type closure, the portion below the threaded end being intended to be expanded to a desired size and shape."  *Id.*  However, "[s]emi[-]manufactures not yet having the essential shape of the finished articles (such as is generally the case with bars, discs, tubes, etc.) are not regarded as 'blanks.'"  *Id.*

---

[3] Explanatory Notes are not legally binding but "are 'persuasive' and are 'generally indicative' of the proper interpretation."  *Otter Prods., LLC v. United States*, 834 F.3d 1369, 1375 (Fed. Cir. 2016).

When "goods are, *prima facie*, classifiable under two or more headings," GRI 3(a) states that "[t]he heading which provides the most specific description shall be preferred to headings providing a more general description."

### III.   Case and Procedural History

At liquidation, Customs classified the segments under subheading 6307.90.98. That subheading describes:

**6307** Other made up articles, including dress patterns:

> **6307.90** Other:

>> **6307.90.98** Other.

Subchapter 1 of Chapter 63, which includes heading 6307, "applies only to made up articles, of any textile fabric."  HTSUS Ch. 63 Note 1.  For purposes of heading 6307, "the expression 'made up' means," *inter alia*, "[c]ut otherwise than into squares or rectangles."  HTSUS Section XI Note 7(a) (underline omitted).

"The parties do not dispute that the segments are *prima facie* classifiable in heading 6307," and the court agrees.  *Honeywell I*, 756 F. Supp. 3d at 1363–64. Heading 6307, however, covers articles "which are not included more specifically in other headings of Section XI or elsewhere in the Nomenclature."  EN 63.07.  Honeywell contends that the segments are more specifically described by subheading 8803.20.00. That subheading covers:

**8803** Parts of goods of heading 8801 or 8802:

> **8803.20.00** Undercarriages and parts thereof.

Heading 8802 covers "Other aircraft (for example, helicopters, airplanes); spacecraft (including satellites) and suborbital and spacecraft launch vehicles." Accordingly, heading 8803 effectively covers parts of aircraft, including parts of airplanes, and establishes a duty-free rate for such parts.  *See Honeywell I*, 756 F. Supp. 3d at 1350, 1356.  Chapter 88 falls within Section XVII of the HTSUS. References in Chapter 88 to "'parts' or 'accessories' do not apply to parts or accessories which are not suitable for use solely or principally with the articles of those chapters."  HTSUS Section XVII Note 3.[4]

The Government's motion raises the question whether the segments are finished parts of an aircraft, or unfinished parts classifiable as a finished part pursuant to GRI 2(a), or neither.[5]  In *Honeywell I*, the court concluded that the segments are finished parts of the needled preforms.  756 F. Supp. 3d at 1359–63.[6]  The court observed that

---

[4] Additional U.S. Rules of Interpretation 1(c) states similarly that "a provision for parts of an article covers products solely or principally used as a part of such articles but a provision for 'parts' or 'parts and accessories' shall not prevail over a specific provision for such part or accessory."

[5] To some extent, this case implicates "the subpart rule," the rule "that a part of a part is a part for tariff purposes."  *Am. Schack Co. v. United States*, 1 CIT 1, 5 (1980).  In *Honeywell I*, the court noted that

> [t]he parties agree that the "subpart rule" may apply to articles within the aircraft parts supply chain—no matter how far upstream—provided those articles meet the requirements for a part (or a part of a part, as the case may be) and are not otherwise excluded from classification as a part by relevant section and chapter notes.  Oral Arg. at 02:00–03:50 (colloquy with Plaintiff's counsel); *id*. at 45:15–45:39 (colloquy with Defendant's counsel).

756 F. Supp. 3d at 1357–58.

[6] The court used the phrasing "recognizable parts of the needled preforms."  *Id*. at 1361. By this phrasing the court meant to convey the finished status of the segments in relation to the needled preforms.

"[t]his case stands apart from other classification cases involving parts of articles."  *Id.* at

1357.  That observation was grounded in the recognition that the segments are

principally, if not solely, "use[d] in the production of aircraft brake discs" yet "undergo

substantial post-importation processing in the manufacturing of needled preforms,

carbonized preforms, carbon-carbon preforms and, finally, aircraft brake discs."  *Id.* at

1358.  The court nevertheless concluded that the need for the additional processing did

not remove the segments from classification as a part.  *Id.* at 1363.

        The court further found that the segments are not mere materials for parts.  *Id.*

The court based these findings on the following undisputed facts: (1) "the segments, as

imported, are cut-to-size and identified for the production of a brake disc for a particular

type of aircraft," *id.* at 1361; (2) "[t]he imported segments are used in their condition as

imported to produce the needled preforms that are, thereafter, used in the

manufacturing of aircraft brake discs," *id.*; and (3) "[u]pon importation, the segments are

suitable for use in the needled preforms, requiring no further processing prior to such

use," *id.*  The court concluded that "the segments are dedicated to that use [in needled

preforms] and had no other substantial commercial application."  *Id.* at 1362 & n.19.

Moreover, the court found, "[t]he segments may also be considered integral, constituent,

and component parts of the needled preforms because each of those preforms are

*made from* various combinations of the segments.  Simply put, without the segments,

there would be no needled preforms."  *Id.* at 1362.

        The court rejected the Government's argument that "the line separating parts

from raw material is separability from the downstream article."  *Id.*  The court explained

that, "[i]n *E.M. Chemicals. v. United States*, 13 CIT 849, 851, 858, 728 F. Supp. 723, 725, 730 (1989), *aff'd*, 920 F.2d 910 (Fed. Cir. 1990), the court classified liquid crystals as parts of LCDs when, after importation, the liquid crystals were 'sandwiched between two "plates."'" *Id.* at 1362.

The court also rejected the Government's argument "that the segments constitute mere materials." *Id.* at 1362. The court explained that the segments are distinct from the judicially recognized examples of raw materials that typically constitute imported articles with other commercial uses or do not fix with certainty the identity of the part to be made from the imported article. *Id.* at 1363.

The court further stated: "notwithstanding the post-importation processing that is required as part of the production process, the imported segments are identifiable to the downstream article and are used for no other purpose." *Id.* at 1361. Put differently, the segments are used in their condition as imported (not modified, not cut to size) to produce the needled preforms, and will only ever end up in an aircraft.

The court's conclusion that the segments are classifiable as parts of aircraft prompted the Government's motion for rehearing.

DISCUSSION

For the reasons discussed herein, the court reconsiders its classification analysis and applies GRI 2(a). The court declines to reconsider its analysis pursuant to Section XVII Note 3.[7]

---

[7] For a brief discussion on Note 3, see *infra* note 18.

**I.   Parties' Contentions**

The Government contends that the court addressed GRI 1 and GRI 3(a) but skipped the necessary consideration of GRI 2(a). Def.'s Mem. at 11. The Government argues that the court failed to make an explicit finding with respect to whether the segments are finished parts or unfinished parts, and if they are unfinished, whether the segments have the essential character of a finished aircraft part. *See id.* at 11–13.

The Government also contends that the needled preform "is itself an unfinished article," and the court failed to analyze "whether any of the intermediate articles, *i.e.*, the needled preform, the carbonized preform or the densified carbon-carbon preform, can be considered parts of aircraft or whether any of them are unfinished goods having the essential character [of] a finished good pursuant to GRI 2(a)." *Id.* at 14; *see also* Def.'s Reply at 5. The Government agrees that a carbon-carbon brake disc is classifiable as a finished aircraft part. Def.'s Reply at 2. The Government also acknowledges that "the densified carbon-carbon preform, which has the essential characteristics of the carbon-carbon brake disc," would likewise be classifiable as an aircraft part pursuant to GRI 2(a). *Id.* The problem, according to the Government, is that neither the segments nor the needled preforms have the essential character of the brake disc. *Id.* at 6.

Plaintiff responds that the court properly declined to analyze the segments under GRI 2(a) because the court correctly concluded that the segments are finished parts. Pl.'s Resp. at 4. Plaintiff did not, however, address the Government's arguments regarding application of a parts analysis to the "intermediate articles." *See* Pl.'s Resp. at 3–9.

The court understands the Government to argue that, for the segments, there are two avenues to classification as a part of an aircraft. One avenue is through GRI 2(a) *provided* the segments have the essential character of the finished part, i.e., the aircraft brake disc. *See* Def.'s Mem. at 9–12, 16–17. The other avenue is through application of the subpart rule, but for that to apply, Defendant contends, the court must find each part in the production chain to constitute either 1) a finished part, or 2) an unfinished part having the essential character of a finished part (of a part, as the case may be). For this latter path, the Government contends that additional findings are necessary to apply that rule, *see id.* at 14–15, and it further contends that the segments do not meet the requirements for either path.

Because Plaintiff did not respond to the Government's arguments regarding analysis of the intermediate articles, the court ordered supplemental briefing on that point. Order (June 23, 2025), ECF No. 72. The court noted that, at oral argument, "Plaintiff argued that whether the segments are considered parts of the needled preforms or parts of the aircraft brake discs is 'a distinction without a difference' after application of the subpart rule" and directed Plaintiff to "present further argument on this issue and identify undisputed material facts and legal support for its assertion or explain any change in Plaintiff's position." *Id.* at 2 (citation omitted).

In its supplemental brief, Honeywell first argues that the court "must" disregard the Government's arguments regarding application of a parts analysis to the intermediate articles because those arguments are untimely. Pl.'s Suppl. Br. at 3. On the merits, Plaintiff argues that "*the intermediate articles are themselves*

*indistinguishable from the Brake Discs*, which both parties agree is a part of an aircraft." *Id.* at 4.  Thus, according to Plaintiff, no further analysis is required because "the preforms are just different stages of the brake disc production, rather than distinct entities requiring a separate 'parts' analysis."  *Id.* at 2; *see also id.* at 3.

Honeywell further avers that, if the court applies a GRI 2(a) analysis to the needled preform, of which the segments are a part, the court should find that the needled preforms may be considered "blanks" as discussed in the Explanatory Notes "and properly considered to be unfinished brake discs" because they "have the approximate size and shape of the finished brake disc."  *Id.* at 5–6; *see also id.* at 7 ("Since the preforms resemble the finished brake discs (same shape/size) and are used solely in the manufacture of brake discs, they are unfinished brake discs classified in heading 8803 as parts of airplanes.").

The Government responds that the court should not find forfeiture of its arguments based on the court's "mandate to 'reach a correct result."  Def.'s Suppl. Br. at 2 n.1 (quoting *Jarvis Clark Co. v. United States,* 733 F.2d 873, 878 (Fed. Cir. 1984)). The Government also relies on 28 U.S.C. § 2643(b), *id.*, which permits "rehearing for all purposes."[8]  The Government argues that the segments "require extensive manufacturing and sequential transformation into three unique intermediate articles

---

[8] Section 2643(b) states: "If the Court of International Trade is unable to determine the correct decision on the basis of the evidence presented in any civil action, the court may order a retrial or rehearing for all purposes, or may order such further administrative or adjudicative procedures as the court considers necessary to enable it to reach the correct decision."

before being finished into a carbon-carbon brake disc," and that "the essential characteristics of the finished carbon-carbon brake disc are acquired only upon the completion of the densified carbon-carbon preform stage of manufacturing." Def.'s Suppl. Br. at 3. Defendant contends that the intermediate articles are indeed distinguishable from the brake discs and Plaintiff's reliance on "size and shape" to argue that the needled preform has the essential character of the brake disc is misplaced. *Id.* at 4–5. Size and shape are not enough, the Government argues, because the essential characteristics of the brake discs include "high strength, thermal capabilities, heat transfer and absorption, and friction generation." *Id.* at 5 (quoting *Honeywell I*, 756 F. Supp. 3d at 1354).

Defendant further avers that Plaintiff's reliance on "blanks" overlooks that the EN does not replace the "essential character" requirement with something less. *Id.* at 6. The Government contends that "even if as entered, the segments are a part of the needled preform or the carbonized preform, neither the segments nor the intermediate articles have the 'essential character of the complete or finished' densified carbon-carbon aircraft brake disc as required by the plain terms of GRI 2(a)." *Id.* at 7.

## II.    The Court Reconsiders Its Classification Analysis

As an initial matter, the court will consider Defendant's arguments for reconsideration based on an analysis of the intermediate articles. From the outset, this case has differed "from other classification cases involving parts of articles." *Honeywell I*, 756 F. Supp. 3d at 1357. That is because, as a factual matter, the segments appear to share characteristics of both parts and raw materials. The segments are like parts

because they are dedicated for use in, and are integral to, the manufacturing of needled preforms and, ultimately, aircraft brake discs, and are imported in a condition suited for that use. *See id.* at 1359. The segments are also like raw materials. Although they are unlike the factual scenarios in which courts have found articles to constitute raw materials, they are imported upstream in the production process before undergoing substantial post-importation processing, including a change at the molecular level, resulting in several identifiable (intermediate) articles before the final product. *See id.* at 1360–63 (discussing case law distinguishing parts from raw materials and applying that precedent to the segments). Neither the tariff schedule nor the relevant caselaw provided clear guidance in this scenario.

Additionally, the purpose of the doctrine of forfeiture is to ensure that courts have the benefit of parties' positions on all salient issues. *See, e.g.*, *Carducci v. Regan*, 714 F.2d 171, 177 (D.C. Cir. 1983) (discussing the adversarial system); *Royal Brush Mfg., Inc. v. United States*, 44 CIT __, __, 483 F. Supp. 3d 1294, 1305 n.19 (2020) (declining to find an argument forfeited when the plaintiff "could have been more explicit" with its arguments but "the parties' briefing [was] sufficient for the court to address the competing arguments"). After receiving the parties' briefs (and supplemental briefs) on the issues raised by Defendant's motion for rehearing, the court has the benefit of the parties' complete views on the application of the subpart rule to the intermediate articles. Thus, the court declines to find forfeiture of any salient arguments.

Turning to the merits, the court previously placed the segments within the category of a finished part of the needled preform and not within the category of raw

materials.  *See Honeywell I*, 756 F. Supp. 3d at 1361–63.  For the reasons discussed in *Honeywell I*,[9] the court sees no reason to reconsider *that* decision.[10]

But as the Government articulates well in its motion for rehearing, that is not the end of the inquiry.  The needled preforms are not a finished "part" of an aircraft.  "A 'finished' good is one that is suitable for its ultimate 'intended use.'"  *Pleasure-Way Indus., Inc. v. United States*, Slip Op. 16-100, 2016 WL 6081818, at *3 (CIT Oct. 18, 2016), *aff'd*, 878 F.3d 1348 (Fed. Cir. 2018) (quoting *United States v. J.D. Richardson Co.*, 36 C.C.P.A. 15, 18 (1948)).[11]  That is why, as the parties agree, an aircraft brake disc may be classified as a part of an aircraft braking system and, in turn, a part of an aircraft.  The needled preforms, however, are not finished because, unlike the segments that are needled together to produce the preform, the preforms (both needled and carbonized) are not suitable for their intended use and, instead, must undergo

---

[9] Those reasons include the court's reliance on *E.M. Chemicals* to reject the Government's attempt to impose a separability requirement on a finished part. *Honeywell I*, 756 F. Supp. 3d at 1362.  In briefing its grounds for rehearing, the Government does not address *E.M. Chemicals* or the court's reliance on that decision.

[10] The Government criticized the court's failure to consider the fact that the contract between BAM and Honeywell in some instances refers to the segments as raw materials.  *See* Def.'s Mot. at 5 n.2.  But as Plaintiff has pointed out, use of that terminology is inconsistent insofar as the contract documents also use the terms "part" and "segment."  *See* Pl.'s Resp. to Def.'s Statement of Undisputed Material Facts ¶ 8, ECF No. 60.  The court relied instead on judicial precedent discussing and distinguishing parts and raw materials and applied that precedent to the undisputed material facts.  *See Honeywell I*, 756 F. Supp. 3d at 1359–63.

[11] The segments are suitable for their ultimate intended use, namely, the production of the needled preforms.  *Honeywell I*, 756 F. Supp. 3d at 1353.  That the needled preforms are not the final downstream product does not mean that the segments are not a finished good suitable for their intended use because the subpart rule can be applied to upstream components.

substantial additional processing.  *Honeywell I*, 756 F. Supp. 3d at 1353–54.  The court

thus reconsiders the implications of the additional processing on the requisite analysis.

It is true, as the court previously found, that the "segments are identifiable to the

downstream article," namely, the brake discs, "and are used for no other purpose."  *Id.*

at 1361.  It is also true that "[r]ecognition of the imported merchandise as a part is not

precluded simply because the article of which the import *is* a part undergoes further

processing *provided* the import meets the requirements for classification as a part, is not

mere material for a part, and is not excluded by operation of the section and chapter

notes."  *Id.* at 1363.  Meeting the requirements for a part, however, requires an article to

be a finished part or to meet the requirements for an unfinished part pursuant to GRI

2(a) when the terms of the relevant heading expressly include parts.[12]  While the court

continues to find that the segments are finished parts in relation to the needled preform,

the same must also be true for the needled preform (and interim articles upstream from

the brake disc) in relationship to the brake disc.  Thus, the court erred in failing to

conduct an analysis of the interim articles, beginning with the needled preform.

---

[12] The court previously questioned the application of GRI 2(a) to subparts because
although the rule references an "article" named in a heading (relevant here, in heading
8803, the "part" of an aircraft), it does not reference "subparts."  *Honeywell I*, 756 F.
Supp. 3d at 1358 n.16.  Therein, the court did not intend to convey doubt as to whether
GRI 2(a) applies generally to a part.  *See* Def.'s Mem. at 15 (arguing that when a
heading refers to a part, "GRI 2(a) applies" to that part).  Moreover, upon further
consideration, the court sees no reason to disregard GRI 2(a) in the analysis of
upstream parts and subparts thereof to determine whether the imported article is
classifiable under heading 8803.

To that end, Plaintiff makes no argument that the needled preform is a finished part.  *See* Pl.'s Suppl. Br. at 1 (stating that preforms are "not a separate 'part' with a distinct commercial identity that is separately classifiable in the HTSUS"); *id.* at 2 (similar).  Plaintiff argues instead that a needled preform may be considered a "blank" classifiable as an unfinished aircraft brake disc pursuant to GRI 2(a).  *Id.* at 6.  Plaintiff also appears to argue that the needled preforms have the essential character of the aircraft brake disc in terms of the preform's size and shape.  *Id.* at 6–7.[13]  The Government argues that size and shape are not enough and that blanks must also have the essential characteristics of the finished article.  Def.'s Suppl. Br. at 5–6.

As previously discussed, the essential "characteristics of brake discs includ[e] high strength, thermal capabilities, heat transfer and absorption, and friction generation."  *Honeywell I*, 756 F. Supp. 3d at 1354.  Accordingly, the terms of GRI 2(a) alone do not suffice to classify the needled preforms as a finished aircraft part.  Similarity in size and shape are not enough, and Plaintiff does not argue that the needled preforms have the essential characteristics of an aircraft brake disc.[14]  The

---

[13] Plaintiff does not argue that the needled preforms have the essential character of the carbonized preform.  Moreover, facts regarding the essential characteristics of any interim article upstream from the brake disc are not before the court.  Similarly, Plaintiff does not argue that each such interim article is an identifiable part as to which the subpart rule applies.  Pl.'s Suppl. Br. at 2–3.

[14] Such an argument would likely fail in light of the undisputed facts that are before the court.  As discussed above and in *Honeywell I*, the needled preforms undergo a molecular change after several days of applied heat and pressure.  756 F. Supp. 3d at 1353.  The preforms shrink in size, lose roughly half their weight, and, instead of exhibiting a fabric-like quality, they become rigid, solid, and inflexible.  *Id.*  Those carbonized preforms then undergo a months-long densification process to become densified carbon-carbon preforms.  *Id.* at 1353–54.

remaining question, however, is whether the needled preforms are "blanks" pursuant to

EN (II), GRI 2(a).

> As stated above:
>
> The provisions of [GRI 2(a)] also apply to blanks unless these are specified in a particular heading.  The term "blank" means an article, not ready for direct use, having the approximate shape or outline of the finished article or part, and which can only be used, other than in exceptional cases, for completion into the finished article or part.

EN (II), GRI 2(a).[15]  The case law provides little guidance on this EN.  Two related

cases cited by Plaintiff appear to constitute the universe of cases discussing blanks.

*See* Pl.'s Suppl. Br. at 4–5.

In the cited cases, certain crankshaft blanks were classifiable as finished

crankshafts when further processing was performed but "nothing [was] added" to the

blanks "to make them finished crankshafts," *Cummins Engine Co. v. United States*

(*Cummins I*), 23 CIT 1019, 1030–31, 83 F. Supp. 2d 1366, 1376 (1999) (citation

omitted); *see also Cummins Inc. v. United States* (*Cummins II*), 29 CIT 525, 542–43,

377 F. Supp. 2d 1365, 1380–81 (2005), *aff'd*, 454 F.3d 1361 (Fed. Cir. 2006)

(addressing similar facts).[16]  The court concluded that the unfinished crankshafts were

---

[15] The phrase "unless these are specified in a particular heading" requires little consideration for this case.  Neither party addresses the meaning of this phrase.  However, the phrase suggests that an article classified elsewhere in the HTSUS may not be classified as a "blank."  The court need not further address this language because unlike the segments that are described by heading 6307, neither party proffers an alternative classification for the needled preforms.

[16] *Cummins I* and *Cummins II* address whether crankshafts imported into Mexico from Brazil were entitled to NAFTA preferential treatment upon importation into the United States as a product of Mexico based on a "tariff shift" in Mexico that was "required [for

classifiable as finished crankshafts even though fourteen different machining operations were performed on the products after importation.  *See Cummins I*, 23 CIT at 1021, 83 F. Supp. 2d at 1368; *Cummins II*, 29 CIT at 526 n.2, 377 F. Supp. 2d at 1367 n.2.  The court did not, however, address whether the essential character requirement of GRI 2(a) applied to a product that otherwise constituted a blank pursuant to the EN.  *See, e.g.*, *Cummins I*, 23 CIT at 1030, 83 F. Supp. 2d at 1376 (summarizing the parties' arguments regarding the essential characteristics of a finished crankshaft and then finding the unfinished crankshafts to constitute blanks pursuant to the EN).

The Government's position that the language regarding blanks in the EN does not obviate the requirement for an unfinished article or part to have the essential characteristics of the finished article, Def.'s Suppl. Br. at 6, appears to be correct.  While the *Cummins I* court did not resolve the competing arguments about the crankshaft's essential characteristics, the opinion is consistent with Defendant's position insofar as the processing involved machining operations, i.e., alterations to the size and shape, rather than more significant changes to the product's characteristics.  *See* 23 CIT at 1021, 83 F. Supp. 2d at 1368.  The concept of a blank applies to a type of intermediate product that is imported, perhaps *en masse*, for final finishing operations particular to the desired end product.  The example of a bottle preform made of plastic where "the portion below the threaded end being intended to be expanded to a desired size and

---

the crankshafts] to be deemed goods originating from a NAFTA country."  *See, e.g.*, *Cummins I*, 23 CIT at 1020, 83 F. Supp. 2d at 1367.   Determining whether a tariff shift occurred required application of the GRIs and other relevant rules of the HTSUS.  *See id.* at 1022–23, 83 F. Supp. 2d at 1370.

shape" is indicative of a product composed of the final constituent material (plastic) with the "approximate shape or outline of the finished article or part" that requires some "completion into the finished article." EN (II), GRI 2(a). The completion required in the provided example is minimal, or at least well short of what occurs to transform a needled preform into an aircraft brake disc—otherwise the product would not be a "blank," it would be something else.[17] Thus, the inclusion of blanks in the ENs does not limit the essential character requirements to similarities in size and shape to the exclusion of other material considerations. Rather, the language regarding blanks explains the application of GRI 2(a) to one type of imported article with an approximate size and shape of the finished article that is subsequently processed to the "desired size and shape." *See id.*

This understanding of a blank as a product that undergoes finishing operations is consistent with at least one dictionary definition. *Merriam Webster*, for example, defines a blank, *inter alia*, as "a piece of material prepared to be made into something (as a key) by a further operation." *Blank*, *Merriam-Webster's Collegiate Dictionary* (11th ed. 2004). A "blank" key is a key, but one that requires some machining to become a finished key shaped for a specific lock. Likewise, a bottle preform is functionally a bottle that is

---

[17] For example, "[s]emi[-]manufactures not yet having the essential shape of the finished articles (such as is generally the case with bars, discs, tubes, etc.) are not regarded as 'blanks.'" EN (II), GRI 2(a). For such semi-manufactures, the more significant additional work necessary to shape the bar, disc, or tube, removes the article from the provision for a blank. This distinction articulated in the ENs between a semi-manufacture and a blank supports the notion that a blank is *not* something that undergoes substantial processing.

further processed to the desired shape.  Neither example suggests that the needled

preforms are properly considered "blanks" in relation to the aircraft brake disc.  Simply

put, a needled preform is not a "blank" aircraft brake disc ready to be processed into the

"desired size and shape" of an aircraft brake disc.  Instead, it must first undergo a days-

long molecular change while being processed into a carbonized preform, after which a

months-long densification process converts the carbonized preform into a densified

carbon-carbon preform.  *See Honeywell I*, 756 F. Supp. 3d at 1353–54.  Such extensive

processes are not akin to the machining processes discussed above.

Insofar as the needled preforms are not classifiable as a part of an aircraft brake

disc, neither are the segments, regardless of the fact they may be considered parts of

the needled preform.  Accordingly, the court reconsiders its decision to classify the

segments under heading 8803.  In the absence of any other suitable provision, the

segments are properly classified under heading 6307, and, thereafter, under

subheading 6307.90.98 of the HTSUS.[18]

---

[18] While not necessary to the court's decision herein, for the sake of completeness, the
court disagrees that Section XVII Note 3 is a separate or additional basis for
reconsidering *Honeywell I*.  Contrary to the Government's arguments, Note 3 operates
to exclude certain goods from classification as "parts" or "accessories."  Note 3 does not
supply a particular definition for "parts," but rather excludes from classification those
parts that are "not suitable for use solely or principally with the articles of those
chapters."  The principal use considerations reflected in Note 3 are further evidenced by
the Explanatory Notes.  Section XVII Explanatory Note (III)(B) (2015), governing the
"[c]riterion of sole or principal use" for parts and accessories, provides guidance on the
proper classification of articles that are parts or accessories of articles falling within
Section XVII and another Section, or falling within two or more headings of Section XVII.
Note 3 does not govern the court's consideration of the underlying question about
whether an article is a part; for that, the court looks to the judicially established tests

Court No. 17-00256                                                                           Page 23

### CONCLUSION AND ORDER

Plaintiff has not carried its burden of proving that Customs' classification of the

segments was incorrect, either independently or in comparison to Plaintiff's proffered

alternative.  *See Jarvis Clark*, 733 F.2d at 876–78.  Additionally, the court finds that the

imported segments must be classified under heading 6307.  The court **GRANTS** the

Government's motion for rehearing and, not, its motion for summary judgment.  A new

Judgment will be entered accordingly.


                                                            /s/      Mark A. Barnett
                                                            Mark A. Barnett, Chief Judge


Dated: <u>November 25, 2025</u>
           New York, New York

---

(and, as set forth above, GRI 2(a)).  *See Honeywell I*, 756 F. Supp. 3d at 1359–60.
Thus, Note 3, taken in isolation, does not preclude classification of the segments as
parts of aircrafts.  *See id.* at 1362 & n.19 (discussing sole or principal use of the
segments).